Attachment 4 to Decl of Mark
F Anderson (Opp to Summ Jmt)
*Yourke v Experian*

Exhibit Q to Anderson Declaration,
Yourke v Experian

*STEVEN R. YOURKE v.*
*EXPERIAN INFORMATION SOLUTIONS, INC.*

---

*CARRIE HIGGINBOTHAM*
*February 13, 2007*

---

*STEVEN GENTRY & ASSOCIATES, INC. (214) 321-5333*
*Web: www.gentrycr.com  E-mail: gentrycr@swbell.net*

Original File HIGGINBOTHAM,Carrie2-13-07.txt, Pages 1-63



STEVEN R. YOURKE v.
EXPERIAN INFORMATION SOLUTIONS, INC.

CARRIE HIGGINBOTHAM
February 13, 2007

---

**Page 1**

[1]                    UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF CALIFORNIA
[2]
        STEVEN R. YOURKE,              )
[3]                                    )
                 Plaintiff,            )
[4]                                    )
        vs.                            )
[5]                                    ) CASE NO. C-06-2370 CW
                                       )
[6]     EXPERIAN INFORMATION           )
        SOLUTIONS, INC.                )
[7]                                    )
                 Defendant.            )
[8]
[9]
[10]                       ORAL DEPOSITION
[11]                    CARRIE HIGGINBOTHAM
[12]                     FEBRUARY 13, 2007
[13]
[14]
[15]
[16]         ORAL DEPOSITION OF CARRIE HIGGINBOTHAM, produced as
[17]    a witness at the instance of the Defendant and duly
[18]    sworn, was taken in the above-styled and numbered cause
[19]    on the 13th day of February, 2007, from 12:23 p.m. to
[20]    2:27 p.m., before Susie Miller, Certified Shorthand
[21]    Reporter No. 5033 in and for the State of Texas,
[22]    reported by machine shorthand at the offices of Jones
[23]    Day, 2727 North Harwood Street, Dallas, Texas 75201,
[24]    pursuant to the Federal Rules of Civil Procedure and the
[25]    provisions stated on the record or attached hereto.

---

**Page 2**

[1]
[2]                         APPEARANCES
[3]     FOR PLAINTIFF:
[4]         MR. MARK F. ANDERSON
            KEMNITZER, ANDERSON, BARRON & OGILVIE, L.L.P.
[5]         445 BUSH STREET
            SIXTH FLOOR
[6]         SAN FRANCISCO, CALIFORNIA  94108
            Telephone: (415)623-3784 X101
[7]         Fax:  (415)861-3151
            E-mail: MARKFKABOLAN.CO
[8]
[9]     FOR DEFENDANT:
[10]        MR. JONATHON D. NICOL
            JONES DAY
[11]        3 PARK PLAZA
            SUITE 1100
[12]        IRVINE, CALIFORNIA  92614-8505
            Telephone: (949)851-3939
[13]        Fax:  (949)553-7539
            E-mail: JDNICOL@JONESDAY.COM
[14]
            MS. CINDY W. ANDREW
[15]        JONES DAY
            2727 NORTH HARWOOD STREET
[16]        DALLAS, TEXAS  75201-1515
            Telephone: (214)220-3939
[17]        Fax:  (214)969-5100
            E-mail: CANDREW@JONESDAY.COM
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

---

**Page 3**

[1]                            INDEX
[2]
[3]     CARRIE HIGGINBOTHAM                        PAGE
[4]     Examination by Mr. Anderson ...................   5
[5]     Examination by Mr. Nicol ......................   57
[6]     Signature Page  ...............................   60
[7]     Court Reporter's Certificate .................   62
[8]
[9]                           EXHIBITS
[10]
[11]    EXHIBIT            DESCRIPTION               PAGE
[12]    39         Letter to Experian Legal          18
                  Department from Steven R.
[13]              Yourke, dated January 10, 2006,
                  with attachments from
[14]              California Franchise Tax Board
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

---

**Page 4**

[1]                        STIPULATIONS
[2]
[3]         It is agreed by and between the parties hereto,
[4]    through their attorneys appearing herein, that the
[5]    deposition of CARRIE HIGGINBOTHAM is being taken at this
[6]    time pursuant to notice and agreement and in accordance
[7]    with the Federal Rules of Civil Procedure.
[8]         It is further agreed that Rule 30(b)(4) is waived by
[9]    agreement of the parties.
[10]
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

---

**Page 5**

[1]         CARRIE HIGGINBOTHAM,
[2]  having been first duly sworn, testified as follows:
[3]         **EXAMINATION**
[4]  **BY MR. ANDERSON:**
[5]     Q.  Please state your name.
[6]     A.  Carrie Higginbotham.
[7]     Q.  And what's your business address?
[8]     A.  701 Experian Parkway, Allen, Texas 75013.
[9]     Q.  And what's your present position with Experian?
[10]    A.  I am a specialist in consumer affairs special
[11] services.
[12]    Q.  Is that sometimes referred to as the CASS
[13] department?
[14]    A.  Yes, it is.
[15]    Q.  How long have you been in that position?
[16]    A.  I have been in that position for almost
[17] 12 years.
[18]    Q.  And what was your position -- did you have a
[19] position at Experian before that?
[20]    A.  Yes, I did.
[21]    Q.  And what was that?
[22]    A.  I was in customer service.
[23]    Q.  Okay.  What was your title?
[24]    A.  Just customer service representative.
[25]    Q.  And how many years were you a customer service

**Page 6**

[1]  representative?
[2]     A.  Five years.
[3]     Q.  To whom do you report?
[4]     A.  Cristen Ransom.
[5]     Q.  From time to time do you have any direct
[6]  contact with the legal department concerning consumer
[7]  disputes?
[8]     A.  Yes, I do.
[9]     Q.  Now, in your -- in 2006 in your day-to-day job,
[10] do you take telephone calls from consumers who have
[11] disputes with -- concerning their credit reports?
[12]    A.  Yes, I do.
[13]    Q.  Do you also handle disputes that come in by
[14] letter?
[15]    A.  Yes, I do.
[16]    Q.  Let me ask you, have you ever had your
[17] deposition taken before?
[18]    A.  No, I haven't.
[19]    Q.  If you don't understand one of my questions,
[20] just tell me, all right?
[21]    A.  Yes, sir.
[22]    Q.  And I'll rephrase it.
[23]        Okay.  What's your badge number?
[24]    A.  CH016299, and occasionally it's also CX016299.
[25]    Q.  What's the difference?

**Page 7**

[1]     A.  Depending on which type of work that I'm doing.
[2]     Q.  If you've got your CH hat on, what are you
[3]  doing?
[4]     A.  Well, I'm doing just normal customer service
[5]  through our NCAC.
[6]         It's very rare that I use that badge.
[7]     Q.  When you say NCAC, what are you referring to?
[8]     A.  Our national consumer assistance center.
[9]     Q.  Which is where you work, right?
[10]    A.  In a division of.
[11]    Q.  By the way, you have to answer audibly rather
[12] than shaking your head or she can't get it down.
[13]    A.  Okay.  Sorry.
[14]    Q.  And you're doing fine so far.
[15]        So what's the basic function of CASS?
[16]    A.  Do you want my basic function?
[17]    Q.  Yeah.
[18]    A.  Okay.  My basic function in that department is
[19] to take disputes from typically attorneys representing
[20] their clients or from escalated issues.
[21]    Q.  Okay.  What do you mean by escalated issues?
[22]    A.  Those who have gone to our senior management
[23] staff asking for assistance with their credit report.
[24]    Q.  So what percent of your day is dealing with
[25] escalated issues as opposed to disputes that come from

**Page 8**

[1]  third parties like attorneys?
[2]     A.  It would be hard for me to say exactly.
[3]     Q.  Well, I know you can't.  Just an estimate.
[4]     A.  If I had to guess, I would actually say maybe
[5]  one percent.
[6]     Q.  One percent of what?
[7]     A.  One percent of consumers are escalated issues
[8]  that have gone through our senior management.
[9]     Q.  Okay.  Ninety-nine percent of the time it's
[10] from third parties?
[11]    A.  Correct.
[12]    Q.  Do you handle disputes generated by or sent
[13] forward by so-called credit repair organizations?
[14]    A.  I have handled disputes that were sent through
[15] credit repair organizations.
[16]    Q.  Okay.  Are you familiar with Experian's dispute
[17] resolution log?
[18]    A.  Yes, I am.
[19]    Q.  You consult that from time to time in your work
[20] on a day-to-day basis?
[21]    A.  Yes, I do.
[22]    Q.  How about the disclosure log, from time to time
[23] do you look at that?
[24]    A.  Yes, I do.
[25]    Q.  How about the admin log, do you ever look at

---

Page 9

[1] that?

[2]    A.  Yes, I do.

[3]    Q.  For what purpose do you look at the admin log?

[4]    A.  To review the consumer's credit report.

[5]    Q.  Okay.  Well, let me show you Mr. Yourke's admin

[6] log that was produced in this case.  This is Bates

[7] stamped 418 to 433.

[8]       Does that appear to be an admin log?

[9]    A.  Yes, it does.

[10]    Q.  And what -- is that the same information that

[11] would appear in a consumer disclosure that you may have

[12] sent to Mr. Yourke, the same type of material, the same

[13] type of information?

[14]    A.  I'm not sure I understand what you mean.

[15]    Q.  Well, on a given day if you pull an admin log

[16] and you pull a consumer disclosure, is it the exact same

[17] information?

[18]    A.  I can't say that it's the exact same

[19] information.

[20]    Q.  Well, how close is it in terms of the type of

[21] information that's presented?

[22]    A.  It would be very similar to the contents of

[23] what would be sent to the consumer.

[24]    Q.  Well, why would you look at an admin log rather

[25] than just look at a consumer disclosure report?

---

Page 10

[1]    A.  Well, an admin log could -- an admin log could

[2] give me a better insight into when accounts may have

[3] been reported or things like that.

[4]    Q.  There is more detail?

[5]    A.  There is more detail.

[6]    Q.  Well, what documents did you look at in

[7] preparation for today's deposition?

[8]    A.  What documents did I look at?

[9]    Q.  Did you look at.

[10]    A.  We looked at the disclosure request log, the

[11] dispute resolution log, and the correspondence that was

[12] sent in to the consumer, and the letters that we sent to

[13] the consumer.

[14]    Q.  Now, we've got a stack of documents that have

[15] been marked as exhibits.  Let me take these back --

[16] these logs back for the moment.  Let me leave the D/R

[17] log with you.  You might want to look at that at some

[18] point.

[19]       Let's look at what's been marked as

[20] Exhibit 3.  It's a handwritten note from Steven Yourke

[21] and was produced by Experian.  Now, this is dated '03.

[22]       Did you have any involvement with

[23] Mr. Yourke's claim or his dispute back in '03?

[24]    A.  No.

[25]    Q.  Let me just turn that one over then.

---

Page 11

[1]       Exhibit 4 is -- for identification is

[2] Experian consumer disclosure May 8th, 2003.

[3]       Again, you had no involvement at that

[4] time, right?

[5]    A.  Right.

[6]    Q.  Okay.  And moving on, Exhibit 5 appears to

[7] be -- it says your personal credit report prepared for

[8] Mr. Yourke, October 18th, '05.

[9]       Did you have any involvement with

[10] Mr. Yourke's claim or dispute at that point in time?

[11]    A.  No.

[12]    Q.  Now, in the course of your -- strike that.

[13]       Well, the disclosure log references agent

[14] ML4000071.

[15]       Do you recognize that badge number?

[16]    A.  No, I don't.

[17]    Q.  Okay.  Exhibit 6 is another personal credit

[18] report of Mr. Yourke, again October '05.

[19]       You had no involvement in that one either,

[20] right?

[21]    A.  Right.

[22]    Q.  Okay.  Exhibit 7 is a letter to Experian

[23] October '05.

[24]       Again, that predates your involvement,

[25] right?

---

Page 12

[1]    A.  Correct.

[2]    Q.  Exhibit 8.  What's Exhibit 8 look like to you?

[3] What is this document?

[4]    A.  This is a consumer dispute verification form.

[5]    Q.  Let's go on to -- Exhibit 9 is a November 2,

[6] '05 credit report.

[7]       Again, you weren't involved, right?

[8]    A.  Correct.

[9]    Q.  Ten is a November 12th, '05 credit report.

[10]       No involvement on your part, right?

[11]    A.  Correct.

[12]    Q.  Exhibit 11 is a IRS document, so we'll go on.

[13]       Twelve is a December 12th, '05 report.

[14]       Did you have any involvement at that point

[15] in time?

[16]    A.  No.

[17]    Q.  Okay.  How about 13, January 26, 2006, did you

[18] have any involvement with Mr. Yourke's claim or dispute

[19] at that point in time?

[20]    A.  I don't believe I did.

[21]    Q.  Do you know from looking at documents in

[22] preparation for this what date you would have first

[23] become involved with Mr. Yourke's claim or dispute?

[24]    A.  It was in February of 2006.

[25]    Q.  Okay.  Find the entry on the D/R log to

---

**Page 13**

[1] February 8th, 2006. There's a referred to CASS
[2] department.
[3]   A.   What page?
[4]   Q.   Well, let's find it.  Page 11, third whole
[5] entry at the top here.
[6]   A.   Okay.
[7]   Q.   Now, we're looking at where it says internal
[8] remark, "handled by supervisor" -- or even above that --
[9] well, there are two entries for February 8, '06, both
[10] start out "handled by supervisor."
[11]         Starting from that point, can you tell
[12] where -- exactly what date you became involved in this
[13] matter?
[14]   A.   Looks like my first remark is on February 9th,
[15] 2006.
[16]   Q.   Okay.  Where do you see that?  What page?
[17]   A.   Page 6.
[18]   Q.   February 9th or March -- February 9th?
[19]   A.   Yes, sir.
[20]   Q.   And what's it say?
[21]         Which one are you looking at?
[22]   A.   The very top.
[23]   Q.   Okay.  It says agent ID CH016299.
[24]         That you?
[25]   A.   Correct.

**Page 14**

[1]   Q.   Okay.  That's you acting as sort of the
[2] ordinary agent and the CASS kind of person?
[3]   A.   Well, no, I was acting as a -- as a CASS
[4] representative taking a phone call, and I think when I
[5] logged this I may have just happened to be in my office
[6] one badge.
[7]   Q.   Okay.  So when you enter the computer system
[8] you have to put in your badge number?
[9]   A.   Yes.
[10]   Q.   Now, you were reacting to what, a letter, a
[11] phone call, or what type of inquiry from Mr. Yourke?
[12]   A.   I believe that it was a phone call.
[13]   Q.   Was it an in-person phone call or voice mail?
[14]   A.   I -- I don't know.  Based on this, I don't -- I
[15] don't really know.
[16]   Q.   And now, the second -- you call each entry a
[17] remark?
[18]   A.   Yes.
[19]   Q.   Okay.  The second remark, it says -- it's got
[20] your badge number, right?
[21]   A.   Right.
[22]   Q.   It says withdrawn, but until he does they will
[23] remain on his report for seven years from the date of
[24] release, and it's got your name and extension.
[25]         What's that entry mean?

**Page 15**

[1]   A.   That's a continuation from the first remark.
[2] It's still referring to the tax liens.
[3]   Q.   I see.
[4]         Why does the computer break it up that
[5] way?  Do you have any idea?
[6]   A.   There wasn't enough room for me to put
[7] everything in one -- one comment.
[8]   Q.   Okay.  Now, is this something you told
[9] Mr. Yourke on the telephone when you called him back?
[10]   A.   It says here that I left him a voice mail -- a
[11] voice message.
[12]   Q.   Okay.  What's the next remark that you entered
[13] that concerned Mr. Yourke?
[14]         Why don't we just go through this log and
[15] see what we can figure out here.
[16]   A.   Looks like on February the 15th I entered a
[17] remark.
[18]   Q.   Okay.  Which is what?
[19]   A.   On page 5 --
[20]   Q.   Yeah.
[21]   A.   -- at the bottom.
[22]   Q.   Handled by CASS, extension 4016.  It's got your
[23] name -- it's truncated, but your name, concern,
[24] consumer -- what's the rest of that?  Can you tell?  It
[25] just looks like it's cut off.

**Page 16**

[1]   A.   No, that would be the end.
[2]   Q.   What's that mean?
[3]   A.   Well, that means that any future calls or
[4] correspondence from this consumer would be directed to
[5] my attention.
[6]   Q.   Thank you.  All right.
[7]         And then the next remark -- there's one
[8] 3/14/06.  Looks like an agent JR705047 transferred to
[9] CASS cue.
[10]         What's that mean?
[11]   A.   That means an agent transferred Mr. Yourke to
[12] our CASS line.
[13]   Q.   What's cue, C-U-E?
[14]   A.   It's like a holding pattern.
[15]   Q.   Oh, it's Q-U-E.  Oh, okay.
[16]         So that was a phone call, and then above
[17] that there's another one.
[18]         Same thing?  There was another phone call
[19] the same day?
[20]   A.   Yes.
[21]   Q.   And another phone call the same day?
[22]   A.   Right.
[23]   Q.   Can you tell if you ever talked to Mr. Yourke
[24] on that date, March 14th, '06?
[25]   A.   I did not talk to him on that date.

STEVEN R. YOURKE v.
EXPERIAN INFORMATION SOLUTIONS, INC.

CARRIE HIGGINBOTHAM
February 13, 2007

Page 17

[1]  **Q.**  And that could be what, you weren't there or --
[2]  **A.**  I was out of the office that day.
[3]  **Q.**  Okay.  Good reason.
[4]      Let's go up to 3/25/06.  Internal remark
[5]  per Marina Valardi, Abril Turner, change amounts to
[6]  match what he owed after he paid his taxes per documents
[7]  from Franchise Tax Board.
[8]      Was that as a result of a discussion you
[9]  had with someone in the legal department?
[10]  **MR. NICOL:**  Objection.  Don't answer.
[11]  **Q.**  (By Mr. Anderson)  Sometime in March '06 --
[12]  don't tell me what you said or they said, but did you
[13]  have some discussions with the legal department about
[14]  Mr. Yourke's claim?
[15]  **A.**  Yes, I did.
[16]  **Q.**  Now, backing up to top of page 6 where it says
[17]  you left a voice mail with Yourke explaining that the
[18]  liens were filed against him, and although he may not
[19]  have paid them they're not released and so on.
[20]      Did you explain that to him after doing
[21]  some research, reading some documents?
[22]  **A.**  I would have reviewed his -- I would have
[23]  listened to his message or taken the information that he
[24]  had provided me and I would have reviewed his credit
[25]  report to make that determination.

Page 18

[1]  **Q.**  And I know it's been over a year, but at this
[2]  point can you tell what documents you looked at as of
[3]  that date to make that determination?
[4]  **A.**  It would have been based on his credit report.
[5]  **Q.**  Yeah.  But did you look at any documents that
[6]  Yourke sent you?
[7]  **A.**  He had not sent me any documents at that point.
[8]  **Q.**  How about letters?  Had you read any letters
[9]  that Yourke had written up to that point?
[10]  **A.**  No, I had not.
[11]  **Q.**  Now, we just -- in our stack of documents there
[12]  are -- there are -- there's at least one and I think --
[13]  strike that.
[14]      Let me have you look at the last exhibit.
[15]  It's Exhibit 39.
[16]      (Exhibit 39 marked)
[17]  **Q.**  (By Mr. Anderson)  Why don't you take a moment
[18]  and look at the -- it consists of a two-page letter with
[19]  attachments.  The Bates stamps are 4 through 14.
[20]      Have you ever seen this document before?
[21]  **A.**  I have seen it.
[22]  **Q.**  Okay.  Now, I'm not asking about -- let me ask
[23]  this.  Except for preparing for this deposition, have
[24]  you ever seen it before?
[25]  **A.**  Not prior to preparing for this deposition I

Page 19

[1]  don't recall ever seeing it.
[2]  **Q.**  Well, back on February 9th, '06 you get this
[3]  voice mail from Yourke and then you left him one.
[4]      Is there any reason you didn't search the
[5]  Experian files to see if he had written any letters on
[6]  this subject?
[7]  **A.**  I just did not.
[8]  **Q.**  Okay.  Let me ask this.  In ordinary course of
[9]  business if someone has written some letters to Experian
[10]  prior to you talking to the person, do you have the
[11]  ability to find those letters by, like, looking up on
[12]  the computer system for scanned-in letters, that kind of
[13]  thing?
[14]  **A.**  I have the ability to look for correspondence
[15]  that's been sent to us, but at this point we don't scan
[16]  in correspondence.
[17]  **Q.**  So what would it take to find the
[18]  correspondence?
[19]  **A.**  I would have to submit a request for the
[20]  previous document to our mailroom and they would
[21]  retrieve the correspondence for me.
[22]  **Q.**  That's a manual retrieval out of a box
[23]  somewhere, that kind of thing, or a file?
[24]  **A.**  A manual retrieval, yes.
[25]  **Q.**  How about today, does Experian scan in the

Page 20

[1]  letters that come in?
[2]  **A.**  No, we don't.
[3]  **Q.**  Now, this Exhibit 39 in front of you -- strike
[4]  that.  Never mind.
[5]      Okay.  Why don't you put that at the
[6]  bottom there.  Thank you.
[7]      Let's go back to the D/R log and see what
[8]  happened next after -- top of page 5, we talked about
[9]  that.
[10]      Let's go to page 4, March 24th.  There's
[11]  some entries and it's got your badge number.
[12]      Can you tell looking at that what
[13]  transpired?
[14]  **A.**  Yes, I can.  We were changing the amount to
[15]  match what he actually owed the IRS when he did file his
[16]  tax returns.
[17]  **Q.**  Some of these remarks there's a notation N and
[18]  then dash and a number.
[19]      What's the N stand for?
[20]  **A.**  That identifies what name is associated with
[21]  that on his credit report.
[22]  **Q.**  His own name?
[23]  **A.**  Right.
[24]  **Q.**  Okay.  And what's the A?  Is that address?
[25]  **A.**  Correct.

Page 21

[1]   **Q.** What's VIDDABFI mean?
[2]   **A.** I don't know exactly.
[3]   **Q.** Well, what's it mean when it says monitor,
[4] hyphen, CAPS?
[5]   **A.** I don't know what the exact translation would
[6] be.
[7]   **Q.** Am I correct that when someone disputes more
[8] than one item on their credit report you give it a
[9] report number and then a dash 001, 002, 003, on however
[10] many different items they're disputing?
[11]   **A.** Right.
[12]   **Q.** Let's go to page 3 of the D/R log.
[13]       Okay. What happened on March 28th?
[14] There's the bottom remark there.
[15]   **A.** There was a duplicate listing of a lien on his
[16] credit report that he would have asked me -- he would
[17] have pointed out to me, he being Mr. Yourke, and would
[18] have removed that from his credit report at that time.
[19]   **Q.** That's what soft delete means?
[20]   **A.** Correct.
[21]   **Q.** Soft delete means it won't appear on any
[22] report, right?
[23]   **A.** Correct.
[24]   **Q.** It's still out there in the system somewhere,
[25] but it won't pop up when you print it, right?

Page 22

[1]   **A.** It won't pop up on his credit report, I do know
[2] that.
[3]   **Q.** All right. Then let's go to April 3rd, '04.
[4]       What happened with respect to Mr. Yourke's
[5] reports?
[6]   **A.** We changed the amount that was appearing on the
[7] credit report to read as zero.
[8]   **Q.** This is on one of the tax liens?
[9]   **A.** Correct.
[10]   **Q.** Okay. April 28th, what happened then?
[11]   **A.** Mr. Yourke called and asked that I add a
[12] statement of continued dispute to each of the tax liens.
[13]   **Q.** Did you do that?
[14]   **A.** Yes, I did.
[15]   **Q.** And that's what's reflected on the top of
[16] page 3, page 2, page 1, correct?
[17]   **A.** Correct.
[18]   **Q.** At the top of page 1 it indicates he was
[19] complaining -- Yourke is complaining about something
[20] relating to an Asset Acceptance trade line and a
[21] Providian Financial trade line.
[22]       Can you tell what that -- what he was
[23] saying?
[24]   **A.** I can tell what responses that I sent him.
[25]   **Q.** Well, that's a better question.

Page 23

[1]       What responses did you give?
[2]   **A.** I sent him an explanation of paid collection
[3] accounts, and that a trade item and collection account
[4] are not duplicates, and an explanation of what
[5] transferred accounts are.
[6]   **Q.** All right. Let's look at Exhibit 15.
[7]       Is this a credit report or consumer
[8] disclosure that you caused to be sent to Mr. Yourke?
[9]   **A.** I do not know.
[10]   **Q.** You'd have to look at what document to figure
[11] that out?
[12]   **A.** A disclosure request log.
[13]   **Q.** I'm handing you what's been produced in this
[14] case as a disclosure log.
[15]       Page 3 I see a date of 2/14/06.
[16]   **A.** It doesn't say -- it doesn't say whether or not
[17] I sent this out, though.
[18]   **Q.** Well, no, this remark on page 3 has your badge
[19] number, right?
[20]   **A.** Oh, thank you. Yes, I do see that.
[21]   **Q.** Okay. And it says CDI sent date 2/14/06?
[22]   **A.** Correct.
[23]   **Q.** So that indicates you caused this report,
[24] Exhibit 15, to go out, right?
[25]   **A.** Yes, I did.

Page 24

[1]   **Q.** And let's look at Exhibit 16.
[2]       And what is this?
[3]   **A.** This is a letter that I sent to Mr. Yourke.
[4]       **MR. ANDERSON:** Okay. You know what, I've
[5] got a copy of a letter attached. That shouldn't be
[6] there, should it? It doesn't make sense.
[7]       **MR. NICOL:** No.
[8]       **MR. ANDERSON:** Let's take that off.
[9]       **MR. NICOL:** The attachment should be that
[10] February 14th credit report that you looked at.
[11]       **MR. ANDERSON:** Okay. Let me fix that.
[12]       **MR. NICOL:** Should we get copies of that?
[13]       **MR. ANDERSON:** Well, we could -- I don't
[14] care. It's nowhere in the record, but I guess that
[15] would make sense.
[16]       **MR. NICOL:** At the end we'll get that if
[17] you want.
[18]       **MR. ANDERSON:** Okay. We'll fix it at the
[19] end.
[20]   **Q.** (By Mr. Anderson) Okay. Have you had a chance
[21] to refresh your memory on that letter, Exhibit 16?
[22]   **A.** Yes.
[23]   **Q.** Now, did you -- when you wrote this, did you do
[24] it in consultation with anyone in Experian or did you do
[25] it yourself?

Page 25

[1] A. I would have asked my supervisor to approve the
[2] letter.
[3] Q. And that was Cristen Ransom?
[4] A. Correct.
[5] Q. Anybody else?
[6] A. No.
[7] Q. The last -- second to last paragraph it says:
[8] "Please note Black's Law Dictionary defines release as
[9] to discharge a claim one has against another. It does
[10] not state that the debt has been released by payment."
[11]        What was it you were telling Yourke at
[12] that point? What were you explaining to him?
[13] A. Well, I was explaining to him that the tax
[14] liens had been released. It did not mean that they were
[15] released because he paid the tax liens, but that the
[16] liens themselves had been released. He had been
[17] released of the debt.
[18] Q. Well, did you understand that Yourke at the
[19] time was saying that there was never a debt in the first
[20] place, that he never owed any taxes or interest or
[21] penalties in the first place?
[22] A. If I remember correctly, he had stated that to
[23] me.
[24] Q. Well, did you believe that?
[25] A. I don't know that I could say whether I

Page 26

[1] believed him or didn't believe him.
[2] Q. All right. Well, let's ask a different
[3] question.
[4]        At some point did you call someone at the
[5] Franchise Tax Board about Yourke's tax lien?
[6] A. Yes, I did.
[7] Q. Who did you talk to?
[8] A. I believe her name was Christie Norwood.
[9] Q. Did you talk to her once or more than once?
[10] A. I believe I only spoke with her one time.
[11] Q. Did you talk to anybody else at the Franchise
[12] Tax Board at any -- other than the person who answered
[13] the phone?
[14] A. Other than the person who answered the phone,
[15] no.
[16] Q. Do you know the date you talked to Ms. Norwood?
[17] A. I believe that was March 23rd.
[18] Q. Okay. You initiated the call?
[19] A. Yes, I did.
[20] Q. And you used a phone number that had been
[21] provided to you by Mr. Yourke; is that right?
[22] A. Correct.
[23] Q. Did you have any trouble getting through to
[24] Ms. Norwood?
[25] A. Yes, I did.

Page 27

[1] Q. Did you have to call multiple times?
[2] A. Yes, I did.
[3] Q. How many would you say?
[4] A. I wouldn't even be able to guesstimate.
[5] Q. Was it over a period of days before you finally
[6] got ahold of her?
[7] A. Yes, it was.
[8] Q. Okay. And in the conversation when you finally
[9] talked to her what did you say to her and what did she
[10] say to you?
[11] A. We went over each of the tax liens item by item
[12] and she had explained to me exactly what had transpired.
[13] For example, she went over why they filed the tax liens
[14] and for the amount -- she explained the amount that they
[15] were filed for, and when he repaid -- or excuse me --
[16] when he filed his tax returns she explained to me what
[17] the amount was that actually was owed, if there was any.
[18] Q. Did she say why he owed something after he
[19] filed the tax return?
[20] A. She wouldn't have explained to me why he owed.
[21] She just explained to me everything on the documents
[22] that pertained to him, any penalties or interests,
[23] things like that that he actually paid, which would have
[24] been on the documents.
[25] Q. Okay. Did she explain that what he owed were

Page 28

[1] some what are called collection fees, in other words,
[2] the fees they charge for the agency having to go to the
[3] trouble of filing a lien and then releasing it?
[4] A. I don't recall that those were her words.
[5] Q. Well, what was your understanding of what those
[6] amounts -- like the $114, $120, $11, what was your
[7] understanding at the time what that represented?
[8] A. That represented the amount that he paid once
[9] he did file his returns.
[10] Q. Okay. Correct. But did you have an
[11] understanding what that was for?
[12] A. I can't say that I had an understanding of
[13] exactly what each item -- which each payment was paid
[14] for.
[15] Q. Well, wasn't Yourke telling you look, those are
[16] just these like sort of administrative collection fees
[17] that Franchise Tax Board assesses and it wasn't taxes,
[18] it wasn't interests, it wasn't penalties? Did he tell
[19] you that?
[20] MR. NICOL: Objection, form, somewhat
[21] leading.
[22]        Can you rephrase it?
[23] Q. (By Mr. Anderson) Go ahead and answer.
[24] A. He may have. I don't recall every conversation
[25] exactly.

**Page 29**

[1]    Q. Well, I understand that, but did you -- through
[2] the letters, talking to Yourke, did you gain the
[3] understanding what -- whether it's true or not, he was
[4] telling you look, I don't -- I didn't owe, I never owed
[5] any taxes, I never owed any interests, I never owed any
[6] penalties, all I paid were these relatively small
[7] collection fees?
[8]    A. It's my understanding that he didn't believe
[9] that he owed any taxes, that he just paid some small
[10] fees.
[11]    Q. All right. Did you understand his -- that
[12] Yourke was complaining that the way Experian was
[13] reporting the tax liens on his credit report, anybody
[14] looking at that would have been misled into thinking he
[15] owed -- at some point owed taxes?
[16]    A. I don't believe we ever discussed -- I can't
[17] recall ever discussing with him as to whether or not he
[18] thought it was misleading that someone might think he
[19] owed taxes.
[20]    Q. Okay. Going back to your letter, Exhibit 16,
[21] you're quoting Black's Law Dictionary.
[22]        And nothing wrong with that, but you're
[23] not a lawyer, right?
[24]    A. No, I'm not.
[25]    Q. Okay. So did you consult with the legal

**Page 30**

[1] department before you wrote this?
[2]    A. No, I consulted with my manager.
[3]    Q. Okay. Let's go to Exhibit 18. That's a credit
[4] report dated February 22nd, 2006.
[5]        Is this a report that you caused to be
[6] sent out on or about that date?
[7]    A. No, it's not.
[8]    Q. Can you tell from the disclosure log why that
[9] was sent out?
[10]    A. No, I can't.
[11]    Q. Okay. Let's go to Exhibit 19. Oh, wait. That
[12] one in your hand, let me look at that one.
[13]    A. (Tenders document.)
[14]    Q. Let's go to Exhibit 20 first. Yeah. Okay.
[15] That's on the Franchise Tax Board's stationery, two
[16] pages.
[17]        Have you ever seen this before?
[18]    A. Yes, I believe I have.
[19]    Q. Did you see it on or about February '06,
[20] February or March?
[21]    A. February or March, yes, I did.
[22]    Q. And at the time how did you interpret this
[23] document in terms of what Yourke owed Franchise Tax
[24] Board?
[25]    A. I'm not sure I understand what you're asking

**Page 31**

[1] me.
[2]    Q. Well, it says -- what was your understanding of
[3] Yourke's tax record or liability based on this document
[4] at the time you read it?
[5]    A. Well, when he provided it to me he stated that
[6] he owed -- that it was proof that he did not owe
[7] anything to the Franchise Tax Board.
[8]    Q. Okay. And how did you interpret it?
[9]    A. Well, I wasn't sure exactly what everything on
[10] here meant, so I would have -- I would have done an
[11] investigation.
[12]    Q. Is that when you called Ms. Norwood?
[13]    A. I called her on March 23rd.
[14]    Q. Had you already looked at Exhibit 20 when you
[15] called her?
[16]    A. If I'm not mistaken, I would have had
[17] Exhibit 20 in my hand when I called her to explain -- to
[18] explain everything to me.
[19]    Q. Okay. And Exhibit 19, backing up, I think --
[20] do you remember getting this letter on or about March
[21] 6th, '06?
[22]    A. I can't say that I remember it, but I recognize
[23] the letter.
[24]    Q. All right.
[25]        MR. ANDERSON: And, Jonathon, I think 20

**Page 32**

[1] should be attached to 19, shouldn't it, or should it?
[2]        MR. NICOL: Could I see 20? I think 21
[3] should be attached.
[4]        MR. ANDERSON: Okay. Yeah.
[5]        MR. NICOL: Oh, no. Wait. No.
[6]        MR. ANDERSON: If it were on a Bates stamp
[7] that would make sense --
[8]        MR. NICOL: Well --
[9]        MR. ANDERSON: -- maybe.
[10]        MR. NICOL: -- looking for -- 29 is the
[11] next. That one is 28. Yeah, that's wrong.
[12]        THE WITNESS: It's 28 and 34.
[13]        MR. NICOL: Yeah, that's out of order.
[14]        MR. ANDERSON: Well, how should 19 go?
[15]        MR. NICOL: 19 should go 28 to 33.
[16]        MR. ANDERSON: So we're missing --
[17]        MR. NICOL: 29 to 33.
[18]        MR. ANDERSON: Well, can I trouble you to
[19] copy that one? I want to get this right.
[20]        MR. NICOL: I can take it.
[21]        MS. ANDREW: I'll take it.
[22]        MR. ANDERSON: Let's take five minutes.
[23] Go off the record.
[24]        (Recess taken from 1:11 to 1:14)
[25]        MR. ANDERSON: I'll ask the court reporter

STEVEN R. YOURKE v.
EXPERIAN INFORMATION SOLUTIONS, INC.

CARRIE HIGGINBOTHAM
February 13, 2007

Page 33

[1] to mark this document 19, and that's substituting for
[2] other previous 19s, Bates stamped 28 through 33.
[3]         (Exhibit 19 re-marked)
[4]    Q. (By Mr. Anderson) I'll hand you Exhibit 19.
[5]         Did you have this letter and the
[6] attachments at the time you talked to Ms. Norwood at
[7] Franchise Tax Board?
[8]    A. Yes, I did.
[9]         MR. ANDERSON: And I'm going to withdraw
[10] Exhibit 20 and also 21 because they're included as
[11] attachments to 19. So can you hand me 20 and 21, and
[12] I'll give them to the court reporter.
[13]    Q. (By Mr. Anderson) If you would, let's look at
[14] 22, which is in front of you.
[15]         Now, is that another letter that you
[16] received from Mr. Yourke sometime in March '06?
[17]    A. I believe so.
[18]    Q. Wait. That's the same letter. No, it's not.
[19] Yeah, okay. It starts out the same. It's a different
[20] letter.
[21]         Now, did you have this letter and the
[22] attachments at the time you talked to Ms. Norwood?
[23]    A. I would have, yes.
[24]    Q. Okay. Let's look at the next, Exhibit 23.
[25] This is a letter from Yourke March 21, '06. Says

Page 34

[1] received by consumer affairs special services March 27,
[2] '06. I think that's a seven. It could be a one. I
[3] don't know. It must be seven. It's got some
[4] attachments.
[5]         Do you know if you received this letter in
[6] March '06 or shortly thereafter?
[7]    A. It was shown to me, but it was not received by
[8] me.
[9]    Q. Okay. So you -- it was transmitted to you
[10] because you were the agent handling this dispute, right?
[11]    A. Correct.
[12]    Q. Did you take any action in response to this
[13] letter dated March 21?
[14]    A. No, I didn't.
[15]    Q. Let's go to what's been marked 23-A. It's a
[16] letter addressed to Cristen Ransom dated April 17th to
[17] Mr. Yourke. This one is about Asset Acceptance and
[18] Providian about the tax liens.
[19]         Was this assigned to you, sent to you?
[20]    A. For processing of the dispute?
[21]    Q. Right.
[22]    A. I'm not sure without looking through the log.
[23]    Q. Okay. Well, take a look.
[24]    A. It doesn't appear as though I entered a
[25] response into the system in response to this

Page 35

[1] correspondence.
[2]    Q. Did someone else?
[3]    A. I did not see a response in the --
[4]    Q. Okay.
[5]    A. -- dispute log.
[6]    Q. Now, did you ever generate a consumer dispute
[7] verification in response to Yourke's claims?
[8]    A. Yes, I did.
[9]    Q. Okay. Let's look at 24.
[10]         Did you do more than one consumer dispute
[11] verification with respect to Mr. Yourke?
[12]    A. I don't recall exactly. I don't believe that I
[13] did, but I'd like to double-check.
[14]    Q. Okay.
[15]    A. No, no more than just the one.
[16]    Q. Okay. And the one is represented by
[17] Exhibit 24?
[18]    A. I don't believe we have all the pages here.
[19]    Q. Well, that doesn't surprise me.
[20]         MR. ANDERSON: I got Bates stamp 95, 98
[21] and 101.
[22]         Am I missing something?
[23]         MR. NICOL: Should be 89 to 103.
[24]         THE WITNESS: This one just says 92 and
[25] 89.

Page 36

[1]         MR. ANDERSON: I get a D minus for
[2] exhibit work here.
[3]         Once again, can I trouble you --
[4]         MS. ANDREW: Do you not have the
[5] documents? Maybe you have them and we can just put them
[6] in order.
[7]         MR. ANDERSON: Well, let me look. I don't
[8] see them. I didn't bring every document. I thought I
[9] had them straight, but I don't. I hate to keep making
[10] you run back and forth, but -- get your exercise.
[11]         MS. ANDREW: I know. Are we at a point
[12] where we need a break anyway?
[13]         MR. ANDERSON: Yeah, let's take
[14] 10 minutes.
[15]         (Recess taken from 1:22 to 1:38)
[16]         MR. ANDERSON: We're going to substitute
[17] what -- there are two pages we added to Exhibit 24 for
[18] the complete document, which is Bates stamped 89 through
[19] 103 the way it looks.
[20]         Okay. Back on the record.
[21]    Q. (By Mr. Anderson) Now, is Exhibit 24 -- what
[22] is this document?
[23]    A. These are -- this is a CDV that I would have
[24] sent out, and these are -- it would have been returned
[25] to me with the attached documents, because I had

Case4:06-cv-02370-CW   Document48-4   Filed04/25/07   Page13 of 41

CARRIE HIGGINBOTHAM                                          STEVEN R. YOURKE v.
February 13, 2007                           EXPERIAN INFORMATION SOLUTIONS, INC.

Page 37

[1] requested all documentation in regards to the liens.
[2]   Q.  I see.  Now, when you use the acronym CDV --
[3] and that means consumer dispute verification, correct?
[4]   A.  Yes, it does.  Thank you.
[5]   Q.  All right.  And this control number that starts
[6] 388, does that correspond to a report number that was
[7] eventually sent out?
[8]   A.  It would correspond with a report number.
[9]   Q.  Okay.  Now, whose handwriting is on this
[10] document, page 1 of Exhibit 24?
[11]   A.  That would have been our vendor's handwriting,
[12] I don't know specifically who.
[13]   Q.  Was it LexusNexis?
[14]   A.  Yes, someone at LexusNexis.
[15]   Q.  Well, when you send this out, do you -- and
[16] obviously this relates to some records in San Francisco.
[17] Where do you send your CDV?  Do you send it to
[18] San Francisco or some central office of LexusNexis?
[19]   A.  I sent it to LexusNexis, and the exact location
[20] I do not know.
[21]   Q.  Is this something you put in the mail or fax to
[22] them, or how do you get it there?
[23]   A.  Well, we can put it in the mail or we can fax
[24] it to them.
[25]   Q.  Now, this handwriting here, it says CASS FRCI.

Page 38

[1] What's that mean?
[2]   A.  I have no idea.
[3]   Q.  And these numbers, do you know what they mean?
[4]   A.  No, I don't.
[5]   Q.  Now, this -- page 1 of this document no one
[6] signed it.
[7]       Why would that -- in normal course of
[8] business wouldn't somebody at LexusNexis sign the
[9] document and say here's your information?
[10]       MR. NICOL:  Objection.  The witness
[11] probably doesn't know what the normal course of business
[12] at LexusNexis is.
[13]   Q.  (By Mr. Anderson)  Okay.  Do you know why this
[14] isn't signed?
[15]   A.  No, I don't know why.
[16]   Q.  Is it because you just asked for the
[17] documentation do you think and they just said here it
[18] is?
[19]   A.  I have no way of knowing why.
[20]   Q.  Okay.  When it came back to you -- when this
[21] document -- strike that.
[22]       So at some point the document was returned
[23] to you, right, this form with its attachments?
[24]   A.  Correct.
[25]   Q.  And the date it was returned, is that this date

Page 39

[1] up here, March 23, '06, in the upper right?
[2]   A.  I don't know the exact date it was returned to
[3] me.
[4]   Q.  Well, I know you don't know exact date, but who
[5] put in the -- what are the two dates up here?  What do
[6] they signify?
[7]   A.  I don't know exactly.
[8]   Q.  Do you give them a deadline?  Do you give your
[9] vendors a deadline to get back to you?
[10]   A.  We do -- they do have a guideline to which they
[11] must follow.
[12]   Q.  What use did you make of this information in
[13] this report?
[14]   A.  Well, it did tell me that they were valid liens
[15] that were filed against him, and it did tell me that
[16] they filed the tax liens for these amounts that are on
[17] the following pages or the attached pages.  It did not
[18] tell me whether or not he paid them or didn't pay them.
[19]   Q.  And you said you called Ms. Norwood on
[20] March 23rd, '06.
[21]       Did you have this document, Exhibit 24, in
[22] front of you when you called her?
[23]   A.  I don't recall if I had it in front of me or
[24] not.
[25]   Q.  Well, did you have it in your file, in your

Page 40

[1] possession?
[2]   A.  I -- I don't recall exactly when this response
[3] came in.
[4]   Q.  Is there any way to tell?
[5]   A.  I can look through the log.
[6]   Q.  Okay.
[7]   A.  (Witness reviews document.)  It was
[8] March 23rd when it was responded to.
[9]   Q.  So you received what's been marked as
[10] Exhibit 24 on March 23rd, '06?
[11]   A.  Correct.
[12]   Q.  Did you keep any notes on your telephone call
[13] with Ms. Norwood?
[14]   A.  I believe the only notes that I had have
[15] already been submitted to you.
[16]       MR. ANDERSON:  I don't recall seeing any.
[17]       MR. NICOL:  That was something we gave to
[18] you this morning --
[19]       MR. ANDERSON:  Oh.
[20]       MR. NICOL:  -- the single sheet with the
[21] photocopied note on it.
[22]       MR. ANDERSON:  Oh, gotcha.  It's here
[23] somewhere.  It's in there.
[24]       MR. NICOL:  Is it in the stack?
[25]       MR. ANDERSON:  It's in that stack,

Page 41

[1] somewhere in there. It would have been toward the end.
[2] Let's look toward the end.
[3]     Q. (By Mr. Anderson) Let's look at Exhibit 30 --
[4] is there one before this? Excuse me. Excuse my reach.
[5]     MR. NICOL: Yeah.
[6]     Q. (By Mr. Anderson) Okay. There we go.
[7]         Exhibit 36 is one page that's in front of
[8] you.
[9]         Is this a note you wrote?
[10]     A. Yes.
[11]     Q. Can I look at it?
[12]     A. (Tenders document.)
[13]     Q. Okay. It says -- it's got the date.
[14]         Is that word "Norwood"?
[15]     A. Yes.
[16]     Q. And it says -- am I reading it right? Lien was
[17] filed; not filed in error; once he filed taxes much less
[18] or no liability; phone verified docs with Christie
[19] Norwood.
[20]         What did you mean by that, phone verified
[21] docs with Christie Norwood?
[22]     A. I contacted her to verify the documents and go
[23] over all of the documents with her and what they meant.
[24]     Q. Did Ms. Norwood explain what the amounts were,
[25] for example -- strike that.

Page 42

[1]         Did you generate a -- or change Yourke's
[2] credit reports to Ms. Norwood in any way?
[3]     A. After speaking with her, yes, we did.
[4]     Q. Okay. I've got Exhibit 26.
[5]         Is that the result of talking to her?
[6]     A. I'm not sure.
[7]     Q. Just so you're looking at the picture of point,
[8] Exhibits 26, 27 and 28 are all credit reports on Yourke
[9] and there are only -- one is March 25th and two are
[10] March 29th. Each have different report numbers, and I
[11] don't know why.
[12]         And my initial question is, which report
[13] was generated as a result of your conversation with
[14] Ms. Norwood -- which is the first report that was
[15] generated as a result of your conversation with
[16] Ms. Norwood?
[17]     A. After talking with Ms. Norwood and changing the
[18] amounts on the tax liens, Exhibit Number 26 would have
[19] been generated to Mr. Yourke.
[20]     Q. Can you tell from one of those logs why the
[21] next two were generated so close in time, 27 and 28?
[22]     A. Number 27 was in response to Mr. Yourke
[23] notifying me of the duplicate tax lien appearing on his
[24] credit report and my removing it from his credit report.
[25] And Exhibit 28, I sent him a copy of his credit report

Page 43

[1] on March 29th.
[2]     Q. Did he make a request for it?
[3]     A. I don't know exactly. I don't remember the
[4] conversation.
[5]     Q. Okay. Now, on Exhibit 26 or -- yeah -- it's
[6] still showing 51,655 owed to -- on the federal -- on the
[7] federal tax lien paid.
[8]         Do you recall Mr. Yourke saying hey, I
[9] never had to pay a federal tax of 51,000, so why is it
[10] being reported? Do you remember him saying that?
[11]     A. I don't remember that exact conversation.
[12]     Q. Well, do you remember he was complaining about
[13] the federal tax lien as well as the state lien?
[14]     A. Yes, he was.
[15]     Q. Up to this point, have you made any
[16] investigation with respect to whether he really had --
[17] ever had to pay 51,655 in federal tax?
[18]     A. That item had also been investigated, yes.
[19]     Q. Did you personally determine that that was
[20] accurate?
[21]     A. That it was a valid tax lien?
[22]     Q. Yes.
[23]     A. Based on the response I received from the
[24] investigation, it did appear as though it was a valid
[25] tax lien filed against him.

Page 44

[1]     Q. So you're referring to Exhibit 24, page 2 and
[2] 3?
[3]     A. Correct.
[4]     Q. That shows the lien was released, correct?
[5]     A. Correct.
[6]     Q. Why did you report it as paid when it says on
[7] the document released?
[8]     A. I don't know why the system reports it as paid.
[9]     Q. When you say "the system," what do you mean by
[10] that?
[11]     A. Well, I don't personally enter it as paid.
[12]     Q. Okay. Did you have the capability to enter it
[13] as paid?
[14]     A. No, I don't.
[15]     Q. Were there only two choices with a tax lien,
[16] released or not released?
[17]     A. Right. I can update it to reflect it's
[18] released, or I can leave it on there as unreleased.
[19]     Q. There's no way you can change it to say paid?
[20]     A. I cannot, no.
[21]     Q. Who can?
[22]     A. I do not know.
[23]     Q. Wait a minute. Maybe I've confused things.
[24]         Exhibit 26, the report says federal tax
[25] lien paid.

---

**Page 45**

[1]       Now, someone at Experian said it was paid,
[2] right? Obviously.
[3]     A.  I can't say that someone at Experian is saying
[4] that it's paid.  The system reflects the item as being
[5] paid on the consumer's credit report.
[6]     Q.  Right.  Did you have the capability to change
[7] it to released?
[8]     A.  No, I don't have the capability of changing it
[9] to anything other than what's appearing here.
[10]     Q.  Did someone else within Experian have the
[11] capability to change it?
[12]     A.  I'm not aware of that.
[13]     Q.  I'm confused.  I mean, obviously someone --
[14] when you say "the system"...
[15]       Do you personally know who entered this
[16] information, tax lien paid, tax lien paid, tax lien
[17] paid, on Yourke's credit report?
[18]     A.  No.
[19]     Q.  Did you have the ability to completely delete
[20] this information concerning his federal tax lien had you
[21] become convinced that nothing was ever owed --
[22]       MR. NICOL:  Object --
[23]     Q.  (By Mr. Anderson)  -- it never existed?
[24]       MR. NICOL:  Objection as compound.
[25] Clarify, please.

---

**Page 46**

[1]       MR. ANDERSON:  Yeah.
[2]     Q.  (By Mr. Anderson)  Let's say you had proof that
[3] it was just a mistake, in other words, the federal
[4] authorities placed a lien against Yourke and it's proved
[5] to you that they had the wrong person, they put the lien
[6] on and it was to Mrs. Smith or something.
[7]       Did you have the capability to go into the
[8] system and just delete it?
[9]       MR. NICOL:  Objection, form, hypothetical.
[10]     Q.  (By Mr. Anderson)  Go ahead.
[11]     A.  Well, if it had been proven not to belong to
[12] him, I do have that capability.
[13]     Q.  And if it was proven to you that -- well,
[14] strike that.
[15]       I mean, when you got Exhibit 24, page 3
[16] says the lien -- says certificate of release of federal
[17] tax lien.
[18]       My question is, why didn't you change the
[19] report from paid to released?
[20]     A.  I don't have the capability to change the
[21] wording from paid to released.
[22]     Q.  Do you know why not?
[23]     A.  It's not within my capabilities.
[24]     Q.  How about your supervisor, could she change it?
[25]     A.  No.

---

**Page 47**

[1]     Q.  Is there someone within the Experian
[2] organization that could change it?
[3]     A.  I'm not aware of that.
[4]     Q.  When this information comes up on your computer
[5] screen and it says...
[6]       Does it look just like this report,
[7] Exhibit 26, page 2 when you're looking at the tax liens?
[8] I mean, is this exactly what you see?
[9]     A.  No, it's not.
[10]     Q.  Okay.  What information do you see on your
[11] computer screen?
[12]     A.  I see it in a different format.
[13]     Q.  Okay.  Well, it's got some identifying
[14] information, I suppose, and then what's -- under like --
[15] does it show a claim amount slash liability amount?
[16]     A.  It doesn't show it in the exact same format.
[17] Without looking at it, I wouldn't be able to --
[18]     Q.  Does it show a dollar -- excuse me.
[19]       Does it show a dollar figure if there is
[20] an amount associated with the lien?
[21]     A.  It would -- it would reflect if the amount's on
[22] the system amount.
[23]     Q.  Would it show something under status details or
[24] details on the -- comments on the tax lien?
[25]     A.  It would.

---

**Page 48**

[1]     Q.  Would it be the same as what appears on the
[2] consumer's report, page 2 of Exhibit 26?
[3]     A.  It's not worded exactly the same, no.
[4]     Q.  Well, on tax liens what does it say typically?
[5]     A.  Well, again, without looking at it, I can't
[6] quote something to you.
[7]     Q.  All right.  This says federal tax lien paid,
[8] same document.
[9]       Would that show on your screen as paid?
[10]       If you got the tax liens, does it say
[11] paid?
[12]       MR. NICOL:  Objection.
[13]       Do you mean at -- I mean, at what time
[14] would that show?
[15]     Q.  (By Mr. Anderson)  Yeah.  At the time,
[16] March 20th, '06, I mean, if you pulled that up, would
[17] it -- you know, the same as this -- the same date that
[18] this report was generated, does it say paid?
[19]     A.  I don't recall if it says paid or released on
[20] the system.
[21]     Q.  So sometimes tax liens are reported as
[22] released, correct?
[23]     A.  I'm not sure I understand what you're asking
[24] me.
[25]     Q.  Okay.  Well, sometimes if you pull up

---

STEVEN R. YOURKE v.
EXPERIAN INFORMATION SOLUTIONS, INC.

CARRIE HIGGINBOTHAM
February 13, 2007

Page 49

[1] information on tax liens it'll say released rather than
[2] paid.
[3]          Is that what you're saying?
[4]     A.  It can reflect as released on some -- in some
[5] situations; yes.
[6]     Q.  Okay.  All right.  Do I understand your
[7] testimony correct that if it says released you cannot --
[8] you could not change it to paid?
[9]     A.  I cannot reflect what appears -- I cannot
[10] change what reflects on the consumer's credit report to
[11] read released versus paid.  I cannot change the wording.
[12]     Q.  Well, surely somebody within Experian could
[13] change it, right?
[14]     A.  Again, I -- I can't answer that.  I don't know.
[15]     Q.  Okay.  You don't know.
[16]          Do you know why you can't change it?
[17]     A.  Why I cannot personally change it?
[18]     Q.  Right.
[19]     A.  The system is not set up for me to change that.
[20]     Q.  Is it only the legal department can change
[21] that?
[22]     A.  I can't answer that.
[23]     Q.  As of, say, March 25th, '06, you had the
[24] capability to change the claim amount, right?
[25]     A.  Yes.

Page 50

[1]     Q.  Okay.  Okay.  We talked about Exhibit 26.
[2]          We also talked about 27 and 28, didn't we?
[3]     A.  Yes.
[4]     Q.  Okay.  Look at Exhibit 29.  Now, that's --
[5] okay.  Now, that's a report that looks like Yourke
[6] pulled off the website, right?
[7]     A.  That's what it appears like, yes.
[8]     Q.  Okay.  Okay.  March 30, '06, here's a credit
[9] report, Exhibit 30.
[10]          Can you tell why this was generated from
[11] the log?
[12]     A.  That appears to be a report that someone else
[13] sent out to him.
[14]     Q.  Some other agent?
[15]     A.  Yes.
[16]     Q.  Okay.  Let's look at Exhibit 32, about a month
[17] later -- no, two weeks later more or less.
[18]          Can you tell from the log why this report
[19] went out?
[20]     MR. ANDERSON:  No.  I think we have a
[21] little problem with this exhibit, too.  I think I got
[22] two -- let's fix this.
[23]          See, it starts out April 28th, '06 and
[24] it's got a report number.  Then if you go further into
[25] what I prepared as Exhibit 32 there's another report

Page 51

[1] with the same report number, same date, consisting of 14
[2] pages.
[3]          So let's just remove the first bit and
[4] start it where it says page 1 of 14.  Does that make
[5] sense?
[6]     THE WITNESS:  Okay.  You want to --
[7]     MR. ANDERSON:  Yeah, let's correct it.
[8]          So we're going to change Exhibit 32 by
[9] removing the first -- looks like one through 12 and
[10] start where it says page 1 through 14, Bates stamped
[11] 356.
[12]     Q.  (By Mr. Anderson)  Okay.  Let's look at
[13] reconstituted Exhibit 32.
[14]          Now this one a consumer statement has been
[15] added, correct?
[16]     A.  Yes.
[17]     Q.  And you got a request -- or how did that
[18] happen?
[19]     A.  The request came from Mr. Yourke himself over
[20] the telephone.
[21]     Q.  And so you went ahead and put that in, right?
[22]     A.  Yes.
[23]     Q.  This is chronologically out of order, but look
[24] at Exhibit 33.  It says report date March 23rd, '06.
[25]          Do you know what caused Experian to send

Page 52

[1] that one out?
[2]     A.  It would have been the end result of my
[3] investigation that began on February 24th.
[4]     Q.  Okay.  Okay.  Exhibit 34, again a bit out of
[5] order, but this one -- why was this one sent out,
[6] according to your log?
[7]     A.  This one would have been a result of my
[8] changing the amount on the federal tax lien.
[9]     Q.  What prompted you to do that?
[10]     A.  After getting clarification on the documents
[11] that he had submitted to me.
[12]     Q.  Where did you get the clarification?
[13]     A.  I consulted with our legal department.
[14]     Q.  Did you ever call Internal Revenue Service
[15] about the federal tax lien?
[16]     A.  I don't believe that I did.
[17]     Q.  Did you ever try to call them?
[18]     A.  I don't believe that I did.
[19]     Q.  Any reason you know you didn't try to call or
[20] you didn't think it was necessary, or why not call them?
[21]     A.  Well, history has proven that they don't
[22] usually speak to us about other consumers' personal tax
[23] records.
[24]     Q.  I can imagine.  It's hard to get them to talk
[25] about your own records.

Page 53

[1]     Okay.  So you thought it would be futile.
[2] You didn't think you'd get anywhere calling them, is
[3] that it?
[4]     A.  Right.
[5]     Q.  Okay.  So let's look at a letter, Exhibit 35.
[6]     Are you the one who actually drafted this
[7] letter for Ms. Ransom's signature?
[8]     A.  I started the letter for her and she edited it.
[9]     Q.  On the third paragraph you make reference -- or
[10] the letter makes reference to a section of the Fair
[11] Credit Reporting Act, 60585.
[12]     Is that something you looked up, you
[13] personally?
[14]     A.  I don't believe that I looked it up personally
[15] at that time.
[16]     Q.  Is that from the legal department?
[17]     A.  No, this information would not have been
[18] received directly from our legal department.
[19]     Q.  Where did you get that information?
[20]     A.  From previous research.
[21]     Q.  And by this last sentence in the letter, were
[22] you asking -- suggesting to Mr. Yourke he stop calling
[23] Experian about the tax lien?
[24]     A.  No, I would never suggest to anyone not to call
[25] Experian about anything on their credit report.

Page 54

[1]     Q.  All right.  Let's go to Exhibit 38.  This is
[2] going back -- well, it's a letter dated March 23rd,
[3] 2006.  It says received by consumer affairs special
[4] services March 27.
[5]     Did you personally review this letter when
[6] it came in?
[7]     A.  I do recall I did read it.
[8]     Q.  Let me direct your attention to Exhibit 39, the
[9] last one.  This is a letter dated January 10, 2006
[10] addressed to Experian legal department from Mr. Yourke.
[11]     Is this -- did you review this letter and
[12] its attachments at some point in time?
[13]     A.  No, I did not.
[14]     Q.  Approximately how many times did you talk to
[15] Mr. Yourke on the telephone personally -- not voice
[16] mail, but personally?
[17]     A.  I honestly do not remember.
[18]     Q.  Can you give me an estimate -- just your best
[19] guesstimate of how many times you talked with him?
[20]     A.  No, I wouldn't be able to really.
[21]     Q.  Was it more than 10?
[22]     A.  I don't know.
[23]     Q.  You did talk to him on the phone for more than
[24] once, didn't you?
[25]     A.  Yes, I did.

Page 55

[1]     Q.  In those telephone conversations, did he ever
[2] become abusive?
[3]     A.  What do you mean by abusive?
[4]     Q.  Well, did he ever -- okay.  Did he ever swear
[5] at you?
[6]     A.  I can't say that I recall.
[7]     Q.  Okay.  Did he ever accuse you of -- well, the
[8] word "abusive" covers a lot of territory.  I understand
[9] that.
[10]     But how would you describe his sort of
[11] tone in talking to you?
[12]     A.  Well, he was very concerned about his credit
[13] report and the tax liens.
[14]     Q.  Well, was he polite in those conversations?
[15]     A.  I don't recall the exact conversations.  I
[16] wouldn't want to characterize his actual tone.
[17]     Q.  Well, was he angry at times, if you can recall?
[18]     A.  I don't recall exactly.
[19]     Q.  Did he raise his voice?
[20]     A.  Again, I don't recall exactly every
[21] conversation, so I don't remember.
[22]     Q.  From time to time, did you pick up voice mails
[23] from him?
[24]     A.  Yes, I did.
[25]     Q.  Can you give me an estimate of how many?

Page 56

[1]     A.  No, I couldn't.
[2]     Q.  In those conversations, did Mr. Yourke ever
[3] tell you he'd been denied credit because of Experian's
[4] report on him, and specifically the tax lien?
[5]     A.  I don't recall.
[6]     Q.  Did he ever give any reason he was so concerned
[7] about his credit reports generated by Experian?
[8]     A.  Honestly, I don't recall.
[9]     Q.  Did you ever call him?  Did you ever initiate a
[10] call to Yourke?
[11]     A.  Yes, I did.
[12]     Q.  Do you know how many?
[13]     A.  No, I don't.
[14]     Q.  In these logs, is there record of telephone
[15] calls back and forth?
[16]     A.  What do you mean exactly?
[17]     Q.  I mean, there's some references to phone calls,
[18] right?
[19]     A.  Yes.
[20]     Q.  Do you think that's complete?
[21]     A.  A complete list of the phone calls?
[22]     Q.  Right.
[23]     A.  No.
[24]     Q.  Okay.  So it's correct that some phone calls
[25] aren't noted in the record?

Page 57

[1] **A.** Yes.

[2] **Q.** Can you give me an estimate of how much time

[3] you spent on Yourke's dispute?

[4] **A.** Unfortunately, I wouldn't be able to give you

[5] an estimate. It was over a year ago.

[6] **Q.** I understand.

[7] On a typical workday, approximately how

[8] many consumer disputes might you look at on average?

[9] **A.** On average on a typical workday I might handle

[10] 10 consumers.

[11] **Q.** Okay. And you might -- and that would be in

[12] addition to what, also letters coming from attorneys?

[13] **A.** It would be including letters coming from

[14] attorneys.

[15] **Q.** Okay.

[16] **MR. ANDERSON:** I think that's all I have.

[17] **MR. NICOL:** Okay.

[18] **MS. ANDREW:** Before we go off the record,

[19] can we take a little short break just to make sure...

[20] **MR. ANDERSON:** Sure.

[21] (Recess taken from 2:18 to 2:26)

[22] **MR. NICOL:** I just have a few questions

[23] for Ms. Higginbotham.

[24] **EXAMINATION**

[25] **BY MR. NICOL:**

Page 58

[1] **Q.** Do you remember when Mr. Anderson was asking

[2] you questions about the paid field on the consumer

[3] credit report?

[4] **A.** Yes.

[5] **Q.** And do you remember him asking about if you had

[6] the ability to change it from paid to released?

[7] **A.** Yes.

[8] **Q.** And do you have the ability to change it from

[9] paid to released on the -- in the system?

[10] **A.** I don't have the ability to change how it

[11] reflects on the consumer's credit report. But when

[12] entering into the system, the selections that I have are

[13] lien filed or lien released.

[14] **Q.** Okay. And there are reports different from

[15] consumer reports? What I mean is there are also credit

[16] reports that go to subscribers, right?

[17] **A.** Correct.

[18] **Q.** And are these somewhat different from consumer

[19] reports?

[20] **A.** Yes, they are.

[21] **Q.** And on a subscriber report, how does a tax lien

[22] that's been released report?

[23] **A.** To a subscriber it does appear as released.

[24] **Q.** So even though it says paid on the consumer

[25] report, the subscriber sees released?

Page 59

[1] **A.** Correct.

[2] **Q.** And does the subscriber ever see paid for a tax

[3] lien report?

[4] **A.** No.

[5] **MR. NICOL:** Okay. Thank you.

[6] **MR. ANDERSON:** That's it. Thank you very

[7] much.

[8] (Proceedings concluded at 2:27 p.m.)

[9]

[10]

[11]

[12]

[13]

[14]

[15]

[16]

[17]

[18]

[19]

[20]

[21]

[22]

[23]

[24]

[25]

Page 60

[1] CHANGES AND SIGNATURE

[2] WITNESS NAME: CARRIE HIGGINBOTHAM

[3] DATE OF DEPOSITION: FEBRUARY 13, 2007

[4] PAGE      LINE      CHANGE                    REASON

[5] _____

[6] _____

[7] _____

[8] _____

[9] _____

[10] _____

[11] _____

[12] _____

[13] _____

[14] _____

[15] _____

[16] _____

[17] _____

[18] _____

[19] _____

[20] _____

[21] _____

[22] _____

[23] _____

[24] _____

[25] _____

CARRIE HIGGINBOTHAM
February 13, 2007

STEVEN R. YOURKE v.
EXPERIAN INFORMATION SOLUTIONS, INC.

---

Page 61

[1]         I, CARRIE HIGGINBOTHAM, have read the foregoing

[2]   deposition and hereby affix my signature that same is

[3]   true and correct, except as noted above.

[4]

[5]                    _____

[6]                    CARRIE HIGGINBOTHAM

[7]

[8]   THE STATE OF _____)

[9]   COUNTY OF _____)

[10]

[11]        Before me, _____, on

[12]   this day personally appeared CARRIE HIGGINBOTHAM, known

[13]   to me or proved to me on the oath of _____

[14]   or through _____ (description of

[15]   identity card or other document) to be the person whose

[16]   name is subscribed to the foregoing instrument and

[17]   acknowledged to me that he/she executed the same for the

[18]   purpose and consideration therein expressed.

[19]        Given under my hand and seal of office on this

[20]   _____ day of _____, 20_____.

[21]

[22]                    _____

[23]                    NOTARY PUBLIC IN AND FOR

[24]                    THE STATE OF _____

[25]   My Commission Expires: _____

---

Page 62

[1]   STATE OF TEXAS   )

[2]   COUNTY OF DALLAS )

[3]

[4]        I, Susie Miller, Certified Court Reporter, duly

[5]   qualified in and for the State of Texas, do hereby

[6]   certify that, pursuant to the stipulations hereinbefore

[7]   set forth, there came before me, CARRIE HIGGINBOTHAM,

[8]   who was by me duly sworn to testify the truth, the whole

[9]   truth and nothing but the truth of their knowledge

[10]   concerning the matters in controversy in this case; and

[11]   that they were thereupon carefully examined upon their

[12]   oath and their examination reduced to typewriting by me

[13]   or under my supervision; that the deposition is a true

[14]   record of the testimony given by the witness, same to be

[15]   sworn to and subscribed by said witness before any

[16]   Notary Public, pursuant to the stipulations of the

[17]   parties.

[18]

[19]        I further certify that I am neither attorney

[20]   nor counsel for, nor related to or employed by any of

[21]   the parties to the action in which this deposition is

[22]   taken, and further that I am not a relative or employee

[23]   or any attorney or counsel employed by the parties

[24]   hereto or financially interested in the action.

[25]

---

Page 63

[1]        In witness whereof, I have hereunto set my hand

[2]   and affixed my seal this _____ 2nd____ day of

[3]

[4]   March_____, 20 07.

[5]

[6]

[7]        Susie Miller

[8]   Susie Miller, Texas CSR No. 5033

       Expiration date:  12/31/07

       Firm Registration No. 195

[9]   Steve Gentry & Associates, Inc.

       2379 Gus Thomasson Road, Suite 100

[10]   Mesquite, Texas  75150

       Telephone Number:  (214) 321-5333

[11]

[12]

[13]

[14]

[15]

[16]

[17]

[18]

[19]

[20]

[21]

[22]

[23]

[24]

[25]

---

Exhibit R to Anderson Declaration,
Yourke v Experian

*STEVEN R. YOURKE v.*
*EXPERIAN INFORMATION SOLUTIONS, INC.*

---

*KATHY CENTANNI*
*February 14, 2007*

---

*STEVEN GENTRY & ASSOCIATES, INC. (214) 321-5333*
*Web: www.gentrycr.com   E-mail: gentrycr@swbell.net*

Original File CENTANNI,Kathy2-14-07.txt, Pages 1-21



STEVEN R. YOURKE v.
EXPERIAN INFORMATION SOLUTIONS, INC.

KATHY CENTANNI
February 14, 2007

---

**Page 1**

[1]                 UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF CALIFORNIA
[2]
        STEVEN R. YOURKE,           )
[3]                                 )
                 Plaintiff,         )
[4]                                 )
        vs.                         )
[5]                                 ) CASE NO. C-06-2370 CW
                                    )
[6]     EXPERIAN INFORMATION        )
        SOLUTIONS, INC.             )
[7]                                 )
                 Defendant.         )
[8]
[9]
[10]                   ORAL DEPOSITION
[11]                   KATHY CENTANNI
[12]                 FEBRUARY 14, 2007
[13]
[14]
[15]
[16]        ORAL DEPOSITION OF KATHY CENTANNI, produced as a
[17]    witness at the instance of the Defendant and duly sworn,
[18]    was taken in the above-styled and numbered cause on the
[19]    14th day of February, 2007, from 10:33 a.m. to
[20]    10:59 a.m., before Susie Miller, Certified Shorthand
[21]    Reporter No. 5033 in and for the State of Texas,
[22]    reported by machine shorthand at the offices of Jones
[23]    Day, 2727 North Harwood Street, Dallas, Texas 75201,
[24]    pursuant to the Federal Rules of Civil Procedure and the
[25]    provisions stated on the record or attached hereto.

---

**Page 2**

[1]                    APPEARANCES
[2]
[3]   FOR PLAINTIFF:
[4]       MR. MARK F. ANDERSON
          KEMNITZER, ANDERSON, BARRON & OGILVIE, L.L.P.
[5]       445 BUSH STREET
          SIXTH FLOOR
[6]       SAN FRANCISCO, CALIFORNIA  94108
          Telephone: (415) 623-3784 X101
[7]       Fax:  (415) 861-3151
          E-mail: MARK@KABOLAW.CO
[8]
[9]   FOR DEFENDANT:
[10]      MR. JONATHON D. NICOL
          JONES DAY
[11]      3 PARK PLAZA
          SUITE 1100
[12]      IRVINE, CALIFORNIA  92614-8505
          Telephone: (949) 851-3939
[13]      Fax:  (949) 553-7539
          E-mail: JDNICOL@JONESDAY.COM
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

---

**Page 3**

[1]                       INDEX
[2]                                              PAGE
[3]   KATHY CENTANNI
[4]   Examination by Mr. Anderson ...................  5
[5]
      Signature Page  .............................  18
[6]
      Court Reporter's Certificate ..................  20
[7]
[8]
[9]
[10]
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

---

**Page 4**

[1]                    STIPULATIONS
[2]
[3]        It is agreed by and between the parties hereto,
[4]   through their attorneys appearing herein, that the
[5]   deposition of KATHY CENTANNI is being taken at this time
[6]   pursuant to notice and agreement and in accordance with
[7]   the Federal Rules of Civil Procedure.
[8]        It is further agreed that Rule 30(b)(4) is waived by
[9]   agreement of the parties.
[10]
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

---

Page 5

[1]           KATHY CENTANNI,
[2]   having been first duly sworn, testified as follows:
[3]            EXAMINATION
[4] BY MR. ANDERSON:
[5]   Q.   Please state your name and work address.
[6]   A.   My name is Kathleen Centanni, C-E-N-T-A-N-N-I.
[7] My work address -- my permanent address is 475 Anton
[8] Boulevard, Costa Mesa, California 92626.
[9]   Q.   And do you also work part of the time for
[10] Experian in Allen, Texas?
[11]   A.   Yes, I do.
[12]   Q.   What's your present position?
[13]   A.   My current position at Experian is senior
[14] compliance manager.
[15]   Q.   How long have you held that position?
[16]   A.   Going on four years.
[17]   Q.   What did you do before that?
[18]   A.   The prior three years before that I worked in
[19] our internal audit department as an internal auditor
[20] slash internal auditor senior.
[21]   Q.   Well, how many years have you been with
[22] Experian?
[23]   A.   Well, I've been with Experian since they became
[24] Experian in 1996.
[25]   Q.   And you were with TRW?

Page 6

[1]   A.   Prior to that, yes. I started with TRW in
[2] 1990.
[3]   Q.   What's your educational background?
[4]   A.   I have a high school degree, associate's
[5] degree, and a bachelor's degree.
[6]   Q.   What are your duties and responsibilities as
[7] senior compliance manager?
[8]   A.   The basic responsibility I have is to work
[9] within the company to ensure compliance to the laws and
[10] to the policies and procedures developed by Experian.
[11]   Q.   To whom do you report?
[12]   A.   I report to a director who reports to a VP.
[13]   Q.   Who's the director?
[14]   A.   Cathy Jones.
[15]   Q.   When you say "director," you don't mean a
[16] member of the board of directors?
[17]   A.   No. Her title is director, but not the board.
[18]   Q.   Cathy Jones manages a group of some sort?
[19]       What group is that?
[20]   A.   Regulatory compliance for Experian is made up
[21] of several different subsections. Cathy Jones is
[22] responsible for not only myself and my teams but other
[23] people in the compliance area.
[24]   Q.   Do you have employees that report to you?
[25]   A.   Yes, sir, I do.

Page 7

[1]   Q.   How many?
[2]   A.   Ten.
[3]   Q.   And what's the name of your group or team or
[4] whatever -- unit, whatever you call?
[5]   A.   I have two different teams, so they each have
[6] their own name.
[7]   Q.   And what are they?
[8]   A.   I manage the reseller compliance team and the
[9] risk management team.
[10]   Q.   And what's the reseller compliance team do?
[11]   A.   They're a section -- or a subsection of
[12] customers of Experian that are called resellers, and a
[13] reseller would be one that would be authorized and
[14] approved to resell our product. We manage the
[15] relationship with those specific clients in determining
[16] policies and procedures for them.
[17]   Q.   Is consumerinfo.com one of your resellers?
[18]   A.   No.
[19]   Q.   That's a -- that's a URL owned by Experian?
[20]   A.   Correct.
[21]   Q.   Give me an example of a reseller.
[22]   A.   Oh, a good example would be First American,
[23] Credco.
[24]   Q.   Okay. And what's your risk management team do?
[25]   A.   My risk management team is actually located

Page 8

[1] here in Texas, and they are responsible for monitoring
[2] agent activity within NCAC to mitigate issues of
[3] identity theft, fraud.
[4]   Q.   Are you here speaking on behalf of Experian
[5] today in this deposition?
[6]   A.   Yes, sir.
[7]   Q.   And who authorized you to do that?
[8]   A.   Our legal department.
[9]   Q.   Okay. This risk management team, do they get
[10] involved in monitoring or auditing agent activities in
[11] terms of sort of garden variety consumer disputes?
[12]   A.   No, we do not.
[13]   Q.   This reseller compliance team, are they in
[14] California or Texas, or where are they?
[15]   A.   No. I have -- two of the members -- three of
[16] the members are actually in Texas and one is in
[17] Schaumburg. I don't have any direct reports in
[18] California. I'm sorry. Schaumburg, Illinois.
[19]   Q.   Does Experian have an office there in
[20] Schaumburg?
[21]   A.   Yes, sir, we do.
[22]   Q.   And what's the function of that office?
[23]   A.   It's a multifunctional office. It houses
[24] several parts of divisions, automotive, marketing
[25] services, credit services.

Page 9

[1] **Q.** Did you review any documents in preparation for
[2] today's deposition?
[3] **A.** I reviewed the public record documents, and
[4] I -- I read the expert report submitted by David Brown.
[5] **Q.** I'll get to that later.
[6] One of the things the notice of deposition
[7] asked the person most knowledgeable to cover was
[8] Experian's reporting of tax liens and released tax
[9] liens.
[10] Are you prepared to testify on that
[11] subject?
[12] **A.** Yes, sir.
[13] **Q.** What is Experian's policy and also their
[14] procedures in terms of reporting of tax liens?
[15] **A.** Well, our basic policy is to report accurate
[16] information on our credit reports, and public record is
[17] considered to be a critical piece of that information
[18] that's been reported. So we make every effort to
[19] collect accurate public record information for our
[20] consumers.
[21] **Q.** Under the Fair Credit Reporting Act information
[22] reported is also supposed to be complete; isn't that
[23] true?
[24] **A.** Yes, it is.
[25] **Q.** Do you believe that Experian has an obligation

Page 10

[1] to only -- to -- to not report tax lien information that
[2] is misleading?
[3] **A.** Yes, we have an obligation.
[4] **Q.** When a consumer disputes a tax lien, what are
[5] the procedures that agents are supposed to follow?
[6] **A.** When a consumer disputes a tax lien, the agent,
[7] whether they're talking to the consumer or handling
[8] it -- handling a written document, would generate a
[9] dispute notification -- consumer dispute notification,
[10] which would be transmitted electronically to the public
[11] record vendor who is responsible for collecting that
[12] public record information in that particular location.
[13] **Q.** In this case, Mr. Yourke, Experian used
[14] LexusNexis as a vendor, correct?
[15] **A.** Yes, that's my understanding.
[16] **Q.** Does Experian have any written procedures
[17] concerning contacting tax authorities directly when
[18] there's a dispute?
[19] **A.** I'm -- I am not aware of any specific written
[20] procedures.
[21] **Q.** Well, in this case Mr. Yourke provided
[22] information provided to him concerning his tax liens to
[23] Experian -- well, let's take -- strike that.
[24] Let's go to the end of the road here.
[25] We're not going to go through all of these reports

Page 11

[1] because we've already done that with other witnesses.
[2] Let's go to Exhibit 32.
[3] **A.** Okay.
[4] **Q.** You will find that here somewhere. Here, right
[5] here.
[6] **A.** Okay.
[7] **Q.** This is Experian's, as far as I know, last
[8] report to Mr. Yourke, and -- last in a sequence of
[9] reports, and this one is dated April 28th, '06. And
[10] let's go to, say, page 3, just to take an example.
[11] Item 2 references a tax lien filed at the
[12] recorder of the city and county of San Francisco. It
[13] says claim amount $114, status tax lien paid. And then
[14] Experian added Yourke's own statement, which is Yourke
[15] says: I neglected to file timely tax returns,
[16] assessments were made upon incomplete information --
[17] Can you read the rest of it? Why don't
[18] you do that.
[19] **A.** (Witness reviews document.) Okay.
[20] **Q.** Okay. Well, you've seen there Mr. Yourke's
[21] complaint. The dispute is that he never paid any taxes,
[22] never owed any -- never owed any, never paid any, no
[23] interest, no penalties, all I paid was this collection
[24] fee of $114. And he's complaining that -- he's saying
[25] this should be deleted.

Page 12

[1] Now, in your view, is Experian in
[2] compliance with its procedures and the Fair Credit
[3] Reporting Act in reporting that he paid a tax lien,
[4] $114?
[5] **A.** Yes, I believe Experian is in compliance with
[6] the FCRA.
[7] **Q.** And what do you base that on?
[8] **A.** The FCRA requires us to have maximum possible
[9] accuracy and reasonable procedures in the collection of
[10] consumer data. We rely on a vendor -- a specific vendor
[11] to collect data from us and they go to the source to get
[12] the information. The information as reviewed by myself
[13] and others specifically identified the IRS and the
[14] Franchise Tax Board information regarding the liens that
[15] were filed against the plaintiff. There was no
[16] interpretation.
[17] **Q.** Well, that's the problem. And we're not here
[18] to argue.
[19] But wouldn't it be more accurate for
[20] Experian to simply either delete this entire reference
[21] to the tax lien, since he never paid any taxes, interest
[22] or penalty, or say a collection fee was collected on a
[23] tax lien but no taxes were ever due, in other words,
[24] essentially report what the consumer said?
[25] Wouldn't that be a maximum possible

Page 13

[1] accurate report?

[2] **A.** I don't believe so.

[3] **Q.** Why not?

[4] **A.** We have to rely also on the source of the

[5] information that was reported to us as the source most

[6] knowledgeable. The information came from the IRS and

[7] the Franchise Tax Board.

[8] **Q.** Well, that information you're referring to,

[9] aren't you talking about what was recorded at the

[10] recorder's office in San Francisco as opposed to coming

[11] directly from the tax authorities?

[12] **A.** Yes.

[13] **Q.** Let me -- you agree, don't you, that sometimes

[14] the information recorded on the public record could be

[15] inaccurate, misleading or incomplete?

[16] **A.** I agree that those types of situations could

[17] happen from time to time.

[18] **Q.** Now, the record shows that Mr. Yourke began

[19] disputing this tax lien information as early as

[20] April '03, and then with greater frequency and --

[21] starting in October '05.

[22] And look -- like Exhibit 9, let's look at

[23] that. It's probably in this file here.

[24] **A.** Okay.

[25] **Q.** I'm going to withdraw that.

Page 14

[1] Do you have any knowledge concerning how

[2] creditors view tax liens on consumers' reports, in other

[3] words, how it would affect their credit score?

[4] **A.** I don't have specific knowledge about exactly

[5] how it would affect a score, because it would be

[6] different for every consumer depending on what their

[7] credit history looked like. But it would be considered

[8] a public record and it would therefore have some

[9] negative impact to the consumer's file.

[10] **Q.** Well, do you have any knowledge concerning the

[11] extent to which a tax lien affects a consumer's credit

[12] score using any of the scoring methodologies in place?

[13] **A.** That's -- that's kind of an ambiguous question

[14] from the perspective, again, that each consumer has a

[15] different credit file, a different credit history, a

[16] different credit makeup, and the age and the amount of

[17] the accounts in general all impact the score.

[18] So there is no one answer that would tell

[19] you how a public record would impact a consumer's score

[20] unless you looked at that individual consumer.

[21] **Q.** Okay. It was an ambiguous question.

[22] Now, Experian has its own scoring system,

[23] right, as opposed to the one Fair Isaac, I-S-A-A-C

[24] has --

[25] **A.** Yes, Experian --

Page 15

[1] **THE REPORTER:** I'm sorry.

[2] **MR. ANDERSON:** As opposed to the one

[3] Fair -- it's two words, Fair Isaac.

[4] **Q.** (By Mr. Anderson) What's it called?

[5] **A.** Experian along with the other two credit

[6] bureaus developed a score called Vantage score.

[7] **Q.** Is that currently in use?

[8] **A.** It is available.

[9] **Q.** Under the Vantage score system, how does a tax

[10] lien affect the consumer's score?

[11] **A.** I would have to answer that question the same

[12] as the last one. And the last one we were talking about

[13] I was actually referring to the FICO score.

[14] The Vantage score, again, would be unique

[15] for every consumer, depending on the makeup of his

[16] credit report.

[17] **Q.** Okay. But it's fair to say a tax lien is an

[18] adverse item, right? It negatively affects the score?

[19] **A.** It could negatively affect the score, yes.

[20] **Q.** Would there be instances where it has no

[21] effect?

[22] **A.** There could be instances where it would have

[23] little or no effect depending on the age of the lien.

[24] **Q.** Understood.

[25] Now, let's say it's one year old or less.

Page 16

[1] Let me ask this. Would the amount -- let's say the

[2] report is -- as in Exhibit 32, state tax lien paid, and

[3] it says claim amount $114.

[4] Would the fact that this is a small dollar

[5] item affect the Vantage score differently as opposed to

[6] a large dollar item showing there?

[7] **A.** I don't actually know the answer to that.

[8] **Q.** Okay. Fair enough.

[9] Do you know if the score is affected

[10] differently if the tax lien is paid or not paid under

[11] the Vantage scoring system?

[12] **A.** I don't know.

[13] **Q.** Same question under FICO.

[14] **A.** Same answer under FICO. I'm sorry.

[15] **Q.** Fair enough. Don't know.

[16] Intuitively you'd think if someone owes a

[17] million dollars to IRS it's going to be worse than owing

[18] a hundred dollars, but these scoring models are all

[19] different, right?

[20] **A.** The basic premise behind the scoring model is

[21] the same; you want to get to a point of comfort that you

[22] can make based on that score. How they get to the score

[23] is a little bit different depending on the model.

[24] **Q.** Is there any public record information on --

[25] that anyone could consult to find the answer to my

## Page 17

[1] question of whether -- on how tax liens affect scoring
[2] based on the amount shown or if it's paid or not paid?
[3]        Is that public record?  Could I find it on
[4] the Internet or...
[5]    A.  I would suspect that you could find some of
[6] that information on myfico.com, which is Fair Isaac's
[7] consumer website, and Experian's site regarding Vantage
[8] score to some degree.  I don't know if you could get
[9] into that level of detail.
[10]   Q.  I may have asked you, but did you go through
[11] the entire history with respect to Mr. Yourke and his
[12] dealings with Experian?
[13]        I mean, like, have you looked at all of
[14] these -- like the D/R log and all these papers to see
[15] the whole sequence?
[16]   A.  Not in the last couple of days.  I had -- I had
[17] looked through the binder several weeks ago.
[18]   Q.  Okay.  Well, based on that review, did you see
[19] any instance where Experian was not in compliance with
[20] its own policies and procedures?
[21]   A.  No, I would have to say I did not see anything
[22] that garnered any kind of noncompliance.
[23]        MR. ANDERSON:  Okay.  No more questions.
[24]        MR. NICOL:  Okay.
[25]        (Proceedings concluded at 10:59 a.m.)

## Page 18

[1]             CHANGES AND SIGNATURE
[2] WITNESS NAME:  KATHY CENTANNI
[3] DATE OF DEPOSITION:  FEBRUARY 14, 2007
[4] PAGE       LINE      CHANGE              REASON
[5] _____
[6] _____
[7] _____
[8] _____
[9] _____
[10] _____
[11] _____
[12] _____
[13] _____
[14] _____
[15] _____
[16] _____
[17] _____
[18] _____
[19] _____
[20] _____
[21] _____
[22] _____
[23] _____
[24] _____
[25] _____

## Page 19

[1]        I, KATHY CENTANNI, have read the foregoing
[2] deposition and hereby affix my signature that same is
[3] true and correct, except as noted above.
[4]
[5]
[6]        _____
[7]             KATHY CENTANNI
[8] THE STATE OF _____)
[9] COUNTY OF _____)
[10]
[11]        Before me, _____, on
[12] this day personally appeared KATHY CENTANNI, known to me
[13] or proved to me on the oath of _____ or
[14] through _____ (description of
[15] identity card or other document) to be the person whose
[16] name is subscribed to the foregoing instrument and
[17] acknowledged to me that he/she executed the same for the
[18] purpose and consideration therein expressed.
[19]        Given under my hand and seal of office on this
[20] _____ day of _____, 20_____.
[21]
[22]
[23]        _____
[24]        NOTARY PUBLIC IN AND FOR
[25]        THE STATE OF _____
[25] My Commission Expires: _____

## Page 20

[1] STATE OF TEXAS    )
[2] COUNTY OF DALLAS  )
[3]
[4]        I, Susie Miller, Certified Court Reporter, duly
[5] qualified in and for the State of Texas, do hereby
[6] certify that, pursuant to the stipulations hereinbefore
[7] set forth, there came before me, KATHY CENTANNI, who was
[8] by me duly sworn to testify the truth, the whole truth
[9] and nothing but the truth of their knowledge concerning
[10] the matters in controversy in this case; and that they
[11] were thereupon carefully examined upon their oath and
[12] their examination reduced to typewriting by me or under
[13] my supervision; that the deposition is a true record of
[14] the testimony given by the witness, same to be sworn to
[15] and subscribed by said witness before any Notary Public,
[16] pursuant to the stipulations of the parties.
[17]
[18]        I further certify that I am neither attorney
[19] nor counsel for, nor related to or employed by any of
[20] the parties to the action in which this deposition is
[21] taken, and further that I am not a relative or employee
[22] or any attorney or counsel employed by the parties
[23] hereto or financially interested in the action.
[24]
[25]        In witness whereof, I have hereunto set my hand

Page 21

[1]   and affixed my seal this _2nd_ day of

[2]

[3]   _March_ , 20 _07_.

[4]

[5]

[6]       _Susie Miller_

          Susie Miller, Texas CSR No. 5033

[7]       Expiration date:  12/31/07

          Firm Registration No. 195

[8]       Steve Gentry & Associates, Inc.

          2379 Gus Thomasson Road, Suite 100

[9]       Mesquite, Texas  75150

          Telephone Number:  (214) 321-5333

[10]

[11]

[12]

[13]

[14]

[15]

[16]

[17]

[18]

[19]

[20]

[21]

[22]

[23]

[24]

[25]

Exhibit S to Anderson Declaration,
Yourke v Experian

# STEVEN R. YOURKE v.
## EXPERIAN INFORMATION SOLUTIONS, INC.

---

## KIM HUGHES
### February 14, 2007

---

### STEVEN GENTRY & ASSOCIATES, INC. (214) 321-5333
### Web: www.gentrycr.com  E-mail: gentrycr@swbell.net

Original File HUGHES,Kim2-14-07.txt, Pages 1-48



STEVEN R. YOURKE v.
EXPERIAN INFORMATION SOLUTIONS, INC.

KIM HUGHES
February 14, 2007

---

**Page 1**

[1]                    UNITED STATES DISTRICT COURT
                      NORTHERN DISTRICT OF CALIFORNIA
[2]
      STEVEN R. YOURKE,              )
[3]                                  )
                  Plaintiff,         )
[4]                                  )
      vs.                            )
[5]                                  )  CASE NO. C-06-2370 CW
                                     )
[6]   EXPERIAN INFORMATION           )
      SOLUTIONS, INC.                )
[7]                                  )
                  Defendant.         )
[8]
[9]
[10]                   ORAL DEPOSITION
[11]                     KIM HUGHES
[12]                 FEBRUARY 14, 2007
[13]
[14]
[15]
[16]        ORAL DEPOSITION OF KIM HUGHES, produced as a witness
[17]  at the instance of the Defendant and duly sworn, was
[18]  taken in the above-styled and numbered cause on the 14th
[19]  day of February, 2007, from 9:10 a.m. to 10:20 a.m.,
[20]  before Susie Miller, Certified Shorthand Reporter
[21]  No. 5033 in and for the State of Texas, reported by
[22]  machine shorthand at the offices of Jones Day, 2727
[23]  North Harwood Street, Dallas, Texas 75201, pursuant to
[24]  the Federal Rules of Civil Procedure and the provisions
[25]  stated on the record or attached hereto.

---

**Page 2**

[1]                      APPEARANCES
[2]
[3]   FOR PLAINTIFF:
[4]       MR. MARK F. ANDERSON
          KEMNITZER, ANDERSON, BARRON & OGILVIE, L.L.P.
[5]       445 BUSH STREET
          SIXTH FLOOR
[6]       SAN FRANCISCO, CALIFORNIA  94108
          Telephone: (415)623-3784 X101
[7]       Fax: (415)861-3151
          E-mail: MARK@KABOLAW.CO
[8]
[9]   FOR DEFENDANT:
[10]      MR. JONATHON D. NICOL
          JONES DAY
[11]      3 PARK PLAZA
          SUITE 1100
[12]      IRVINE, CALIFORNIA  92614-8505
          Telephone: (949)851-3939
[13]      Fax: (949)553-7539
          E-mail: JDNICOL@JONESDAY.COM
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

---

**Page 3**

[1]                          INDEX
[2]
[3]   KIM HUGHES                                         PAGE
[4]   Examination by Mr. Anderson ...................      5
[5]
      Signature Page  .............................       45
[6]
      Court Reporter's Certificate ..................     47
[7]
[8]
[9]
[10]
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

---

**Page 4**

[1]                      STIPULATIONS
[2]
[3]        It is agreed by and between the parties hereto,
[4]   through their attorneys appearing herein, that the
[5]   deposition of KIM HUGHES is being taken at this time
[6]   pursuant to notice and agreement and in accordance with
[7]   the Federal Rules of Civil Procedure.
[8]        It is further agreed that Rule 30(b)(4) is waived by
[9]   agreement of the parties.
[10]
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

---

**Page 5**

[1]                    KIM HUGHES,
[2]   having been first duly sworn, testified as follows:
[3]                    EXAMINATION
[4]   BY MR. ANDERSON:
[5]      Q.  Please state your name.
[6]      A.  Kimberly Hughes.
[7]      Q.  What's your business address?
[8]      A.  It's 701 Experian Parkway in Allen, Texas.
[9]      Q.  And what's your present position?
[10]     A.  I am a specialist in consumer affairs.
[11]     Q.  And what are your duties and responsibilities
[12]  in that position?
[13]     A.  I assist consumers with any questions, concerns
[14]  or disputes that they have with information on their
[15]  Experian reports when they're represented by a third
[16]  party such as an attorney or an attorney general's
[17]  office.  And in my current capacity I also assist with
[18]  litigation research and sometimes I'm asked to provide
[19]  deposition testimony in certain topic areas.
[20]     Q.  Are you in the CASS group?
[21]     A.  Yes.
[22]     Q.  And to whom do you report?
[23]     A.  Cristen Ransom.
[24]     Q.  And you're appearing in this deposition today
[25]  speaking for Experian?

**Page 6**

[1]      A.  Yes, sir.
[2]      Q.  And who gave you authority to do that?
[3]      A.  I was asked to do so by Experian's law
[4]   department.
[5]      Q.  On average in the last 12 months, what percent
[6]   of your time has been spent on litigation matters?
[7]      A.  I can't really percent it out, because it just
[8]   depends on what's asked of me or what I can assist with
[9]   at that time.  The majority of my work is spent on
[10]  current litigation cases.
[11]     Q.  How many times have you been deposed?
[12]     A.  I don't know.
[13]     Q.  Over 25?
[14]     A.  Yes.
[15]     Q.  Okay.  Have you ever testified at a trial in
[16]  which Experian was the defendant and a consumer was the
[17]  plaintiff involving the Fair Credit Reporting Act?
[18]     A.  Yes, sir, I have.
[19]     Q.  How many times?
[20]     A.  Just once.
[21]     Q.  What was the name of that case?
[22]     A.  It was Brown v Experian.  I believe it was
[23]  Lewis Brown v Experian.
[24]     Q.  What court it was in?
[25]     A.  I don't know the court, but it was in Hartford,

**Page 7**

[1]   Connecticut.
[2]      Q.  That narrows it down.
[3]           Was it state court or federal?
[4]      A.  I believe it was federal.
[5]      Q.  Yesterday we took a couple of depositions and I
[6]   learned some of the things I need to know about
[7]   Experian's reports, the admin report, disclosure log and
[8]   D/R log.  But there were a few things that the other
[9]   witnesses didn't know, and let me ask you.
[10]          We're not marking these as exhibits,
[11]  because they're marked confidential, but I'll just hand
[12]  you a set -- an extra set.  I'll hand you these.  I have
[13]  an extra set somewhere.  We'll make do here.
[14]          Let me ask you about the admin report
[15]  on -- what's the purpose of this report?
[16]     A.  The admin report is a document that's used
[17]  primarily by people in my position for research
[18]  purposes.  It will contain information that is currently
[19]  on a consumer's Experian report, and also some
[20]  historical information about what would appear on a
[21]  consumer's file.
[22]     Q.  So I take it the historical information does
[23]  not appear in a consumer disclosure?
[24]     A.  That's correct.
[25]     Q.  Okay.  On -- and this is the Bates stamp 418

**Page 8**

[1]   and following.  At the top it's got a PIN number, P-I-N.
[2]           What's that refer to?
[3]      A.  The PIN number is a number that's assigned to a
[4]   consumer's credit data and it has to do with the
[5]   location of that data in Experian's database.
[6]      Q.  So that's strictly for internal use?
[7]      A.  Yes, sir.
[8]      Q.  And then some of this is fairly obvious.  But
[9]   under name you've got, in this case, plaintiff, Steven
[10]  Yourke, different spellings of his name that came into
[11]  the database, right?
[12]     A.  Yes, sir.
[13]     Q.  There's a number, it says N equals and then
[14]  there's a long string of digits.
[15]           What is that?
[16]     A.  That's the name identification number and those
[17]  name rows as we refer to them will correspond with
[18]  various accounts that are in file and will let you know
[19]  what identification information is it attached to any
[20]  particular account.
[21]     Q.  That's got SSN.
[22]           That's a Social Security number, right?
[23]     A.  Yes, sir.
[24]     Q.  What's SD mean?
[25]     A.  SD is soft delete.

STEVEN R. YOURKE V.
EXPERIAN INFORMATION SOLUTIONS, INC.

KIM HUGHES
February 14, 2007

---

**Page 9**

[1]    Q.   Equals one, what's that mean?

[2]    A.   That would mean that that particular piece of

[3] identification information is currently soft deleted or

[4] not displaying on a consumer's disclosure.

[5]    Q.   If it is displaying that just wouldn't appear,

[6] you wouldn't see soft delete?

[7]    A.   That's correct.

[8]    Q.   Okay. What's SDD mean?

[9]    A.   That's the soft delete date.

[10]    Q.   And it's got a date range 9/15/98 to 10/18/05.

[11]      What's that refer to?

[12]    A.   That is the period of time where that

[13] particular string of identification information has been

[14] reported to Experian.

[15]    Q.   Okay. And then what's the 01 and then 13X

[16] mean?

[17]    A.   The 01 has to do with the source of the

[18] information. I don't have all the codes memorized, but

[19] it tells about where that information came from.

[20]    Q.   From type of business?

[21]    A.   It could. For instance, the row below that

[22] says AF. That's like reliable reporter. That means it

[23] came from a subscriber. Certain source codes may

[24] indicate the National Consumer Assistance Center. In

[25] other words, the consumer could have provided it to us

---

**Page 10**

[1] upon contact.

[2]    Q.   Okay. Also produced in this case is a glossary

[3] of codes starting with Bates stamped 434.

[4]      Just in general, what is that document?

[5]    A.   This is a document that's provided to our

[6] subscribers. It helps them read information on a

[7] subscriber report and interpret information, coded

[8] information.

[9]    Q.   Do those codes appear on this admin report,

[10] too?

[11]    A.   I don't use those for the purpose of reading

[12] the admin report. Some of them could -- like the

[13] statuses could appear. They're pretty interchangeable

[14] status. For instance, you have federal tax lien on

[15] here, that's if that -- if this admin contains one of

[16] those you'll see that information contained in the

[17] report as well as disclosure.

[18]    Q.   Yeah. Well, since this case centers on tax

[19] liens, let's talk about that a bit. It's go -- for

[20] example, this is page 1 on Bates stamped 424, it says

[21] federal tax lien, public record code and it's got a 30

[22] under version seven.

[23]      Now, how's that code used?

[24]    A.   It's my understanding that those are incoming

[25] codes that the creditors report to us, and if they

---

**Page 11**

[1] report a code, it means a certain thing, like a tax lien

[2] or a tax lien release, state, federal, county, so there

[3] are different codes for different statuses or conditions

[4] that they want to report.

[5]    Q.   Now, in the case of a tax lien, I mean, the IRS

[6] doesn't report directly to Experian, does it?

[7]    A.   No, sir.

[8]    Q.   So how -- I mean, do your vendors use these

[9] codes to report the tax lien?

[10]    A.   Ms. Centanni, which you'll speak to next, is

[11] actually the person who can talk to you about how we get

[12] that data.

[13]    Q.   Okay.

[14]    A.   Mine is more in the cases of disputed accuracy.

[15]    Q.   That's true.

[16]      What's the difference between version

[17] seven and version six codes?

[18]    A.   I don't know.

[19]    Q.   And then back to the admin report under

[20] address, I take it you've got a unique number assigned

[21] to each address?

[22]    A.   Yes, sir.

[23]    Q.   Now, if you go to page Bates stamped 425, under

[24] inquiries, what are those -- what are those inquiries?

[25]    A.   They're various inquiries that are a part of

---

**Page 12**

[1] this consumer's Experian file.

[2]      These particular inquiries on this page

[3] are Experian inquiries, but throughout the rest of the

[4] document you will have the inquiry source, the date of

[5] the inquiry and the code for the -- the purpose or type

[6] of the inquiry.

[7]    Q.   Some of these refer to a soft inquiry?

[8]    A.   Yes, sir.

[9]    Q.   And what's that mean? What's that term mean?

[10]    A.   Well, soft inquiry internally means that it's

[11] not displayable to a report that is published to a third

[12] party.

[13]    Q.   What would be an example of that, when Experian

[14] itself checks the record?

[15]    A.   Yes, it could be. Any consumer-initiated

[16] contact to Experian when Experian makes an inquiry,

[17] that's not published. Any prescreening activity by a

[18] creditor is not published.

[19]    Q.   Now, under some of these it says Experian and

[20] then it's got an N and an A.

[21]      Is that name and address?

[22]    A.   Yes, sir.

[23]    Q.   Does that mean someone at Experian accessed the

[24] consumer's data using name and address?

[25]    A.   That means that that refers to the name

---

Page 13

[1] identification number and the address identification
[2] number that are on page 1 of the admin. It'll tell you
[3] what identification information was associated with that
[4] inquiry.
[5]     Q.  And some say Experian Internet.
[6]         Is that -- what's that?
[7]     A.  That would be the consumer using Experian's
[8] Internet service to do some sort of activity.
[9]     Q.  And when -- across from the Experian entries
[10] it's got a number 3499953.
[11]        What's that refer to?
[12]     A.  Those are -- those series of numbers refer to
[13] subcodes.  For a creditor it would identify the actual
[14] creditor, but for Experian, for instance, the 3499953 is
[15] the code for Experian's National Consumer Assistance
[16] Center.
[17]     Q.  And then after that it's got a two-digit
[18] number, 30, in the case of Experian.
[19]        What's that mean?
[20]     A.  That has to do with the display level of the
[21] inquiry.  Display level 30 is consumer and National
[22] Consumer Assistance Center only.  In order words, it's
[23] indicating that would be excluded from a third-party
[24] report.
[25]     Q.  Okay.  In the final column it's got

Page 14

[1] designations like TII.
[2]        What's that mean?
[3]     A.  TII means administrative purposes.  It's just a
[4] classification for the type of inquiry that was done.
[5]     Q.  What's CNX mean?
[6]     A.  It's consumer NX or a copy of a consumer
[7] disclosure.
[8]     Q.  What's UTI?
[9]     A.  Where are you seeing that at?
[10]     Q.  Page 428 under Sprint.
[11]     A.  That's for utility, utility company, utility
[12] purpose.
[13]     Q.  And CFR?
[14]     A.  I'm not sure what the CFR is.
[15]     Q.  On page 432 it's got -- left column that's got
[16] CIC slash Experian credit.
[17]        What's that mean?
[18]     A.  That's consumerinfo.com.  The consumer is using
[19] that reseller to access their Experian credit report.
[20]     Q.  Consumerinfo.com is owned by Experian?
[21]     A.  I believe that they are owned by Experian, but
[22] they're not affiliated with our National Consumer
[23] Assistance Center.
[24]     Q.  That's where you can -- for a fee you can get
[25] your own credit score and that kind of thing?

Page 15

[1]     A.  I believe that's correct, yes, sir.
[2]     Q.  And what's CNF mean across from that entry?
[3]     A.  That's also consumer access.  That's the
[4] consumer doing some sort of activity with their
[5] information.
[6]     Q.  What about PPO?
[7]     A.  That's prescreen or promotional offer.
[8]     Q.  That's like a bank checking someone's credit
[9] and then send them an offer for a credit card or
[10] something?
[11]     A.  Yes.  It's my understanding they don't actually
[12] check their credit but they're given a list.  They send
[13] in criteria and if they match a certain criteria their
[14] contact information is sent out.
[15]     Q.  If you're in the right zip code and all of
[16] that?
[17]        Last page it says CIC slash Experian
[18] alerts.
[19]        What's that mean?
[20]     A.  I'm not certain what that is.  That, again, is
[21] consumer-driven activity through the Internet.
[22]     Q.  Did you review any documents in preparation for
[23] today's deposition?
[24]     A.  Yes, sir, I did.
[25]     Q.  Did you look through the -- well, what did you

Page 16

[1] look at just in general?
[2]     A.  In general, I looked at Experian's internal
[3] logs, the D/R log and the disclosure logs.  I looked at
[4] communications that Mr. Yourke had sent to Experian, and
[5] I reviewed some of the responses that Experian made in
[6] return to those.
[7]     Q.  Well, let's kind of take the first example.  If
[8] you'd start with Number 6, we're going to keep these
[9] straight.  If you would pull out 6, 7, 8 and 10.  Let's
[10] talk about those.
[11]        Now, 6 is the Experian report sent to
[12] Mr. Yourke on or about October 20, 2005, correct?
[13]     A.  It is a consumer disclosure for Mr. Yourke.  I
[14] would have to look at our disclosure log to know if it
[15] was actually sent to him or if it was just created for
[16] purposes of conducting an investigation.
[17]     Q.  Well, look at Exhibit 7, the letter from
[18] Mr. Yourke to Experian.
[19]        He references the same report number,
[20] correct?
[21]     A.  Yes, sir, he does.
[22]     Q.  So based on that it's a pretty safe assumption
[23] he received it, right?
[24]     A.  Yes, sir.
[25]     Q.  Okay.  And we don't have to look at the

STEVEN R. YOURKE, et al.
EXPERIAN INFORMATION SOLUTIONS, INC.

Case4:06-cv-02370-CW   Document48-4   Filed04/25/07   Page34 of 41

KIM HUGHES
February 14, 2007

Page 17

[1] disclosure log.
[2]         And then on the letter he's disputing the
[3] reporting of the tax liens, right?
[4]     A.  Yes, he is.
[5]     Q.  Okay.  And then let's look at Exhibit 8.
[6]         Now, what -- is that a consumer dispute
[7] verification Experian sent to a vendor?
[8]     A.  Yes, sir, it is.
[9]     Q.  Now, that number in the upper left page 1 of
[10] Exhibit 8 starts 515, what is that?
[11]         I mean, it's a number, but it's --
[12]     A.  Yes, sir, it is the report number along with
[13] the dispute number put together, the report than
[14] Experian accessed in order to process the request.
[15]     Q.  Okay.  And am I correct Experian sent this CDV
[16] to a vendor, in this case LexusNexis, right?
[17]     A.  Yes, sir.
[18]     Q.  And what does LexusNexis report back?  Let's
[19] take just page 1, which is one of the state tax liens.
[20]     A.  Yes, they reported back that the information
[21] should be reported as a state lien that's been released,
[22] and did confirm that it should remain a part of record.
[23]     Q.  Now, at the top it says -- of this page 1,
[24] Exhibit 8, it says consumer states lien withdrawn,
[25] cancelled or filed in error.

Page 18

[1]         D -- what's the D stand for?
[2]     A.  The D is a deletion code, so if the credit
[3] grantor, or in this case the public record vendor,
[4] doesn't respond back in a specified amount of time
[5] Experian will delete that information.
[6]     Q.  And it continues, no money was ever paid and
[7] after taxes were filed this lien was released.
[8]         Now, that's coming -- that's a
[9] condensation of what Yourke was saying, right?
[10]     A.  Yes, sir, that is Experian passing along the
[11] additional relevant information that Mr. Yourke provided
[12] with his dispute.
[13]     Q.  Now, here's my question.  How -- if the
[14] consumer complaint with no -- part of it was no money
[15] was ever paid, it's fair to say LexusNexis didn't
[16] respond to that part of the complaint.
[17]     A.  Well, they don't respond to -- that's
[18] additional relevant information that we're passing along
[19] about the dispute, so that's the dispute type.
[20]         What they're responding to is what
[21] information is reflected in the record, in this case
[22] the -- the tax lien record, what is appropriate for that
[23] tax lien that's on file.
[24]     Q.  Well, it's fair to say that at this point in
[25] time Experian -- save that question.

Page 19

[1]         Let's look at Exhibit 10, which is in
[2] front of you.
[3]         And that's got the report number on
[4] Exhibit 8, which is -- starts 515, correct?
[5]     A.  Yes, sir.
[6]     Q.  And this is the report that -- post CDV process
[7] that Experian sent to Mr. Yourke, right?
[8]     A.  Yes, sir.  This is the result summary letting
[9] him know what the results of the investigation were.
[10]     Q.  And on page 2 of Exhibit 10 it says -- it's got
[11] claim amounts, 51,655, federal tax lien paid, state tax
[12] lien paid and so on.
[13]         Now, why is it that when LexusNexis, your
[14] vendor, reports it was released but the report comes
[15] back that -- the report Experian generated says they
[16] were paid rather than released?  Why is that?
[17]     A.  Well, this is a disclosure that we convey to
[18] consumers so that they know information that's being
[19] reported about them.
[20]         Experian made a decision that the majority
[21] of the population would understand a paid tax lien, what
[22] that meant; whereas, before when Experian reported on
[23] the consumer disclosure that it was released we received
[24] numerous calls.
[25]         Consumers did not understand what that

Page 20

[1] meant.  They would constantly call in and say we've paid
[2] this, we don't owe this.  And we were constantly having
[3] to explain that yes, released meant that it was paid.
[4] And so a decision was made on our disclosure to make it
[5] more consumer friendly so that the average consumer
[6] could understand what was being reported about them.
[7]     Q.  Okay.  But looking at -- now, just this
[8] sequence on -- is it fair to say Experian did not
[9] investigate whether Mr. Yourke ever paid any money?
[10]     A.  Experian investigated what should be accurate
[11] in the file for the filing of that lien, and the
[12] response back to Experian was that the lien should show
[13] as a released state lien.  And based on the information
[14] available to Experian at that time that's the way we
[15] were reporting that lien, as one that had been released.
[16]     Q.  Well, wasn't Experian ignoring the information
[17] that Mr. Yourke provided in his letter, Exhibit 7, and
[18] the attachments thereto from the Franchise Tax Board of
[19] California which states clearly he never paid any taxes,
[20] never had to?
[21]     A.  No, sir.  Experian fully considered and
[22] reviewed all of that information that he provided, that
[23] being the additional relevant information that we passed
[24] along to the public record vendor that no money was ever
[25] paid.

Page 21

[1] And I want to make clear that although our
[2] consumer disclosure said paid, our vendor was telling us
[3] what was appropriate for that was for it to reflect
[4] released and that's what we would have been publishing
[5] on our third-party report, that it was a state tax lien
[6] that had been released, which is what they were telling
[7] us was accurate for that public record item.
[8]     Q.   But don't you agree that under the Fair Credit
[9] Reporting Act Experian had an obligation to go beyond in
[10] some cases what its vendor tells it?
[11]     A.   I can't tell you what the Fair Credit Reporting
[12] Act requires.  I can only tell you what Experian's
[13] policies and procedures are, and it's that we consider
[14] and review all information sent in by the consumer.
[15]     And the letters sent in do confirm that a
[16] lien was filed and was granted a release and that's what
[17] Experian was reporting.
[18]     We don't report in a lien how much money
[19] was paid by the consumer.  You know, Experian doesn't
[20] know if the consumer paid five dollars to settle that
[21] lien or the full amount to settle the lien.  All we're
[22] reporting is what the lien was filed for and what the
[23] status of the lien was, which is at that time it was
[24] released.
[25]     Q.   Well, wait a minute.  Let's go back to

Page 22

[1] Exhibit 7 and just take the first attachment, which
[2] is -- that's right, first attachment which is the letter
[3] from the Franchise Tax Board with the date 10/24/05 in
[4] the upper right.
[5]     It says -- and in the text it says total
[6] amount due for 2001, 2002, including penalties and
[7] interest amount is zero.  Yet Experian received that and
[8] then on November 12th, 2005 in Exhibit 10 reported that
[9] Yourke had had to pay $19,374 on that lien, state tax
[10] lien paid --
[11]     A.   Now, actually we don't -- we don't say what he
[12] paid.  We say what the claim amount was, which is
[13] confirmed by the letter, saying that a state tax lien
[14] with the San Francisco County Recorder's Office was
[15] filed for $19,374, which is exactly what we report.  And
[16] then by goes on to say that the tax board issued a
[17] release is what we further report.  We don't report what
[18] he actually paid in order to get that release.
[19]     Q.   Right.  Wouldn't you think that Mr. Yourke
[20] reading this would think Experian's reporting I had to
[21] pay 19,374 on that tax lien?
[22]     MR. NICOL:   Objection, requires the
[23] witness to speculate.
[24]     Q.   (By Mr. Anderson)  Wouldn't a reasonable person
[25] reading Exhibit 10 think that hey, this person had to

Page 23

[1] pay 19,374 on this tax lien?
[2]     A.   I can't tell you what a person would think.  I
[3] can only tell you what we report, and at this point in
[4] time, based on the information available to Experian, it
[5] looks as though we were reporting consistent and
[6] accurately with the public record item that was on file
[7] for Mr. Yourke.
[8]     Q.   Well, you do agree that under the Fair Credit
[9] Reporting Act Experian has an obligation to make their
[10] reports complete as well as accurate, right?
[11]     A.   I can't tell you what the Fair Credit Reporting
[12] Act requires, sir.  I can only tell you what our
[13] policies and procedures are.
[14]     Q.   Okay.  At this time, October, November 2005, is
[15] there any indication that Experian contacted the
[16] Franchise Tax Board directly to try to confirm what
[17] Mr. Yourke was saying?
[18]     A.   I know from reviewing Experian's internal logs
[19] that Experian made two separate -- in internal logs and
[20] documents that Experian did contact someone by telephone
[21] on two occasions to verbally verify the information that
[22] it was reporting.
[23]     Q.   Well, yesterday the witnesses -- I think
[24] Ms. Higginbotham said she called a Ms. Norwood at the
[25] Franchise Tax Board March 24th, '06, and we had

Page 24

[1] testimony about that.
[2]     Was there another time someone called?
[3]     A.   Yes, sir, I believe there was.
[4]     Q.   And when was that?
[5]     A.   On Experian/Yourke 411 we have an internal
[6] remark from a supervisor indicating that they phone
[7] verified tax lien with California Franchise Tax Board;
[8] the liens are correct as shown on the report; consumer
[9] contact number has been disconnected; could not give
[10] this info to the consumer.
[11]     Q.   Is there an agent number associated with that
[12] remark?
[13]     A.   Yes, sir.  It's E like egg, H like Henry
[14] 029917.
[15]     Q.   Do you know who that is?
[16]     A.   No, sir, I don't.
[17]     Q.   Would that be somebody in the CASS part of the
[18] national consumer center?
[19]     A.   At this point this file had not reached the
[20] CASS department.  I believe that is a supervisor in the
[21] National Consumer Assistance Center.
[22]     Q.   That was April 11th, '06?
[23]     A.   No, sir, that was December 12th --
[24]     Q.   Oh, I'm sorry.
[25]     A.   -- 2005.

STEVEN R. YOURKE v.
EXPERIAN INFORMATION SOLUTIONS, INC.

KIM HUGHES
February 14, 2007

---

Page 25

[1] Q. Okay. Why don't you return those exhibits to
[2] our pile and then we'll go on to some more.
[3] A. (Complies.)
[4] Q. Now, can you tell from the D/R log what
[5] prompted the agent you just described to -- just
[6] referred to, to call the Franchise Tax Board?
[7] And to help you, Exhibit 12 is a report
[8] that starts 0784, that is dated that date, December 12th
[9] '05.
[10] A. Yes, sir. Because the supervisor was unable to
[11] contact the consumer by telephone, they generated this
[12] document to let them know that they did do something
[13] with the liens.
[14] I do see a remark on 412.
[15] Q. 4/12/06?
[16] A. I'm sorry. Document number 412. It's in the
[17] D/R log exhibit.
[18] Q. Okay.
[19] A. On November 30th it indicates that the consumer
[20] telephoned in and the call was transferred to an AC,
[21] which is -- is an internal term for a supervisor in the
[22] National Consumer Assistance Center.
[23] That same agent that we talked about who
[24] made the phone verification on that day put a remark in
[25] there that the call was handled by a supervisor and that

---

Page 26

[1] she was waiting on a document from the consumer. It
[2] looks like the consumer sent in the document. She
[3] probably received it on December the 12th and proceeded
[4] to make phone verification of the document.
[5] Q. Okay. And it's a reference on December 12 to
[6] the call to the report to the Franchise Tax Board as opposed to IRS;
[7] is that right?
[8] A. That's correct.
[9] Q. Now, can you tell if there was a change made in
[10] any of the tax lien information on December 12th, 2005?
[11] A. It looks to me that at that time the supervisor
[12] just referred to -- the consumer to the report for the
[13] updates on the liens, meaning there were none, which
[14] would lead me to understand based on procedure that
[15] based on the phone call the agent would had to that the
[16] liens reflecting a release status with those amounts was
[17] accurate to be reporting.
[18] Q. Is there any detail in that -- in the D/R log
[19] or any other report -- just in the D/R log, about what
[20] exactly the person called at the Franchise Tax Board had
[21] to say about these liens?
[22] A. The sentence that's in there says the liens are
[23] correct as shown on the report.
[24] Q. Okay. Let's go on to Exhibits 13 and 14.
[25] Now, both of these are consumer

---

Page 27

[1] disclosures, correct? With the same report number,
[2] right, 3072 and so on?
[3] A. The Exhibit 13 is actually a result summary
[4] that was sent out on January the 26th. The
[5] January 31st, Exhibit 14, is a consumer disclosure. And
[6] although 13 is a result summary, it does contain the
[7] full contents of the disclosure at that time.
[8] Q. Wait. I'm a little confused now.
[9] 13 was a result of what activity?
[10] A. I'll have to find that. Just a moment.
[11] It looks like that on January the 19th,
[12] 2006 Experian received mail correspondence from
[13] Mr. Yourke. That correspondence was processed on
[14] January the 25th, and the result summary, which is
[15] Exhibit 13, was mailed out on January the 26th.
[16] Q. Yes, that's the mystery. If you would pull out
[17] Exhibit 39, which should be at the bottom.
[18] Okay. Exhibit 39, is that a letter that
[19] appears to have been received by Experian sometime in
[20] January '06?
[21] A. Yes, sir.
[22] Q. And that bears the same cap number as the
[23] reports Exhibits 13 and 14, right?
[24] A. Yes, it does.
[25] Q. Okay. And your D/R log says the letter was

---

Page 28

[1] received, and that's this letter, Exhibit 39, right?
[2] A. Yes, sir.
[3] Q. And after Exhibit 39 was received in
[4] January '06, what steps did Experian take to investigate
[5] this -- the disputes?
[6] A. The agent that reviewed these documents, based
[7] on the procedure that they took, came to the conclusion
[8] that these liens were -- should be showing as released
[9] for a certain amount, checked Experian report, saw that
[10] that was how they were reporting, referred the consumer
[11] to the report for updates on those.
[12] I see that there was a telephone number
[13] that was disputed. It was removed from the report and
[14] the consumer was sent an explanation regarding
[15] California tax liens as why information just can't be
[16] deleted from the credit report.
[17] Q. Now, the consumer was sent explanation of why
[18] tax liens can't just be deleted.
[19] Is that in writing? I don't see that
[20] anywhere.
[21] A. Why information just can't be deleted from a
[22] report, yes, sir. It's on Exhibit 13. It is the second
[23] paragraph at the bottom.
[24] Q. Good point. Okay. And tell me again why
[25] was -- why five days later was Exhibit 14 sent out?

---

Page 29

[1] **A.** This is dated January 31st.

[2] **Q.** Right.

[3] **A.** I would need Experian's disclosure log.

[4] Do I have it? Oh, sorry.

[5] I don't see anything in the disclosure

[6] log, but in the admin report I see on January 31st, 2006

[7] the consumer was on Experian's Internet website. The

[8] consumer can at any time go on there and request a copy

[9] of the disclosure.

[10] **Q.** So most likely he just requested through the

[11] Internet a disclosure?

[12] **A.** Yes, sir.

[13] **Q.** Once again, let's go back to Exhibit 39, third

[14] page in Bates stamped 6. It's a letter from the

[15] Franchise Tax Board dated 10/24/05. Franchise Tax Board

[16] says the amount due including penalty and interest

[17] amounted to $120.

[18] Now, how do you square that with -- that

[19] statement with Experian's report, Exhibit 13, that the

[20] state tax lien was paid and it's got the amount 741,167?

[21] **A.** Yes, because this letter does say that that's

[22] the amount of the filing of the lien and that it's

[23] released, which is how we're reflecting it. And then

[24] this agent can also see that in December of '05 a call

[25] was made to the California Franchise Tax Board and they

Page 30

[1] again confirm that that's what should be reporting.

[2] **Q.** Now, wait. How do you know that -- what the

[3] Franchise Tax Board told the agent in December '05, that

[4] that's what they should be reporting? How do you know

[5] that?

[6] **A.** Because that's what the agent put into the

[7] remarks. And the agent made a call to the Franchise Tax

[8] Board because the agent received these same documents

[9] that we went over -- or that I saw on the exhibit that

[10] was received by that supervisor who made that phone

[11] call.

[12] **Q.** Is it your view that Exhibit 13 accurately

[13] reported what transpired between Yourke and the

[14] Franchise Tax Board?

[15] **A.** We can never know ultimately what transpired

[16] between Mr. Yourke and the Franchise Tax Board, but

[17] based on the information that we were receiving from our

[18] public record vendor and from information directly from

[19] the California Franchise Tax Board, we believe we were

[20] accurately portraying that information on his report.

[21] **Q.** Now, there's no indication, is there, that

[22] anyone questioned what the authenticity of these

[23] attachments to Exhibit 39, Yourke's letter, December 10,

[24] right?

[25] I mean, nobody said hey, Yourke cooked

Page 31

[1] these up on his kitchen table, right?

[2] **A.** No, sir.

[3] **Q.** Put those away.

[4] Am I correct that you have personally

[5] never had any involvement in this -- any dealings with

[6] Yourke prior to this lawsuit, right?

[7] **A.** No, sir, I didn't.

[8] **Q.** Okay. Look at, if you would, Exhibit 15.

[9] Now, this is a disclosure sent to

[10] Mr. Yourke one year ago today, February 14th, 2006,

[11] right?

[12] **A.** Yes, sir.

[13] **Q.** And what -- if you'd look at the D/R log or

[14] disclosure log, what caused Experian to send this to

[15] Yourke?

[16] **A.** On the 14th I see an indication in the log that

[17] one of our CASS agents sent a report out to Mr. Yourke.

[18] **Q.** Was that Ms. Higginbotham?

[19] **A.** I believe that is Ms. Higginbotham's agent ID

[20] number.

[21] **Q.** What agent ID is showing there?

[22] **A.** It's C, like Charles; X, like X ray; 016299.

[23] **Q.** Did it say why she sent it out?

[24] **A.** No, sir. On -- I don't see a remark directly

[25] relating to the 14th, but I do see a remark that may

Page 32

[1] have been entered on the 14th that processed on the 15th

[2] that indicates that she received -- it would be a

[3] typical remark of receiving a phone call from a

[4] consumer.

[5] **Q.** All right. February -- well, no.

[6] Exhibit 17 -- or 16 actually. Let's look at 16. It's

[7] the same as 17.

[8] This is a letter that Ms. Higginbotham

[9] testified to yesterday that she sent to Mr. Yourke.

[10] Is there a remark in the D/R log

[11] reflecting that she sent a letter out?

[12] **A.** No, just the remark that took a phone call

[13] from the consumer. And oftentimes in the CASS

[14] department if we're dealing with a consumer who may want

[15] additional information or may not understand why we're

[16] doing something a certain manner it would not be

[17] uncommon for us to follow up as a courtesy with a

[18] letter.

[19] **Q.** Okay. And let's go to Exhibit 18. And this

[20] report number starts 388 and then some more numbers.

[21] Again, looking at your log or disclosure

[22] form, what caused Experian to send this report out?

[23] **A.** I see an access by what looks to be a CASS

[24] agent. Again, it looks like they just sent out --

[25] they -- they did the report type yearly free, so it

Page 33

[1] looks like they were just sending out a courtesy copy of
[2] the credit report.
[3]     **Q.** Did Yourke ask for it?
[4]     **A.** I can't know what happened in the phone call.
[5] He must have asked to -- asked for it or maybe asked a
[6] question that they thought they could confirm with a
[7] copy of the report.
[8]     **Q.** Let's talk about March 2006. And we've got a
[9] whole series of documents in that month. Let's start
[10] with -- well, let's pull out 19 -- you got 19 --
[11]     **A.** Uh-huh.
[12]     **Q.** Okay -- 22, 23, 24, 26, 27, 28, and 30.
[13]     Now, does your log show that Experian
[14] received letters from Yourke, Exhibits 19 and 22, around
[15] the first of March '06?
[16]     **A.** I -- I know that our log does not reflect
[17] receipt of each individual letter, because
[18] Ms. Higginbotham on February 24th had again contacted
[19] the franchise -- or the San Francisco County Recorder
[20] through our vendor to get all of the documents in the
[21] court record relating to these. So receipt of
[22] information at that time may have been held until that
[23] was processed.
[24]     I can confirm 19, because it has our stamp
[25] on it. I can't really confirm 22.

Page 34

[1]     **MR. ANDERSON:** Jonathon, do you have a
[2] version of 22 that has a stamp on it? I just have this.
[3]     **MR. NICOL:** Is that this one?
[4]     **THE WITNESS:** It looks like it, yes.
[5]     **Q.** (By Mr. Anderson) Okay. It was just that I
[6] used a copy that Yourke must have provided to me.
[7]     **A.** Yes, sir, it does look like we did receive this
[8] information.
[9]     **Q.** Okay. And you're referring to Exhibit 22?
[10]     **A.** Yes, sir.
[11]     **Q.** Which consists of four pages plus a copy of the
[12] envelope?
[13]     **A.** Yes, sir.
[14]     **Q.** Okay. So let's -- you have a good point.
[15] Let's back up to Exhibit 24, and let's start with 24.
[16] That's not 24. That's 23-A.
[17]     **A.** Sorry.
[18]     **Q.** Okay. And what is this document?
[19]     **A.** This is -- well, the first page is a CDV that
[20] Ms. Higginbotham initiated in late February to ask the
[21] public record vendor to return the documents that were
[22] on file to us pertaining to each of these public record
[23] items. And this exhibit looks like the return of her
[24] CDVs and the requested documentation.
[25]     **Q.** All right. And armed with that information,

Page 35

[1] can you tell from the logs what Ms. Higginbotham did
[2] with that information?
[3]     **A.** Yes, sir. It looks like from that point on and
[4] upon receipt of this information and the compilation of
[5] letters that Mr. Yourke was sending in during that
[6] period that Ms. Higginbotham was working with our law
[7] department to see if there was information that we could
[8] use to make a change to his file.
[9]     And it looks like, based on a decision
[10] from our law department on March 24th of '06, Experian
[11] made updates to those public record items.
[12]     **Q.** And is that reflected in Exhibit 26?
[13]     **A.** Yes, sir.
[14]     **Q.** And the change was on the state tax liens, the
[15] dollar figures were reduced from relatively large
[16] figures to very small figures like $114, 120 or 11,
[17] right?
[18]     **A.** Yes, sir, that is -- that does appear to be the
[19] update.
[20]     **Q.** I don't know if I asked you, but it's true,
[21] isn't it, that Experian received Exhibit 23, a letter
[22] from Yourke with attachments?
[23]     **A.** Yes, sir, I have Exhibit 23 and then I have a
[24] 23-A.
[25]     **Q.** Okay. 23-A is a letter dated April 17th, '06.

Page 36

[1]     **A.** Yes, sir.
[2]     **Q.** All right. Then let's look at Exhibit 27.
[3]     I believe that was a deletion of a
[4] duplicate entry on a tax lien, right?
[5]     That's what -- I think Ms. Higginbotham
[6] told us that yesterday.
[7]     **A.** Yes, sir, that's correct.
[8]     **Q.** Look at Exhibit 28.
[9]     **A.** Okay.
[10]     **Q.** What prompted Experian to generate this report
[11] which starts 160 and then some numbers?
[12]     **A.** I'm showing Ms. Higginbotham generated that she
[13] used the yearly free report, which would be a
[14] complimentary copy of a report. It looks like it was
[15] most likely an attempt to show Mr. Yourke at that time
[16] what had been updated.
[17]     **Q.** Was that in reaction to a phone call from him?
[18]     **A.** It doesn't say if it was from a phone call. It
[19] could have been or it could have been the completion of
[20] the updates that were made as a result of conversations
[21] with the law department. Those dates coincide.
[22]     **Q.** And if you'd look at Exhibit 30, please.
[23]     And what, according to your log, prompted
[24] the preparation of this report?
[25]     **A.** I don't have anything in my logs, but I see

Page 37

[1] consumerinfo.com inquiry for 3/30 of '06, so he could
[2] have gone through that Internet reseller to get the
[3] report.
[4]    Q.   And Exhibit 23-A is a letter dated April 17th,
[5] '06. I think I already asked you, but I'm not sure.
[6]         This was received by Bates -- received by
[7] Experian Bates stamped 78, 79 and 80?
[8]    A.   Yes, sir, it was.
[9]    Q.   Does your log show any activity as a result of
[10] this letter?
[11]    A.   Yes, sir. Our log shows that Ms. Higginbotham
[12] sent an explanation to Mr. Yourke regarding paid
[13] collection account and that a trade account and its
[14] collection are not duplicates regarding Asset and that
[15] information on Providian regarding what a transfer
[16] account means, and again that trade collections were not
[17] duplicates, and I show that that information was mailed
[18] to him on April 28th, 2006.
[19]    Q.   And that was Exhibit 32, right?
[20]    A.   It looks like 32 was confirming the addition of
[21] the statements that he added to his file through a phone
[22] call. So the April 28th for Asset and Providian would
[23] have been a different --
[24]    Q.   It could be 31.
[25]    A.   -- document.

Page 38

[1]         I don't see it here.
[2]         Our log says it would be a full report and
[3] it should contain a couple of remarks and paragraphs and
[4] it would be dated April 28th with a report number of
[5] 3617604287.
[6]    Q.   I don't know if I have that one.
[7]    MR. ANDERSON:   Do you have that one,
[8] Jonathon?
[9]    MR. NICOL:   I do. It's Bates labeled 382.
[10]    MR. ANDERSON:   Can I just look at it? I
[11] don't know if it's important.
[12]    MR. NICOL:   (Tenders document.)
[13]    MR. ANDERSON:   I see what happened. Two
[14] went out the same date and I think I probably assumed it
[15] was the same report. Oh, yeah, I've seen this.
[16]         Okay. It just concerned Providian and
[17] Asset Acceptance. I won't bother making that an
[18] exhibit.
[19]    Q.   (By Mr. Anderson)   Okay. If you look at
[20] Exhibit 38, a letter from Mr. Yourke addressed to
[21] Ms. Ransom dated March 23rd, 2006.
[22]    A.   Okay.
[23]    Q.   Was that letter received by Experian on or
[24] about March 27th, '06 as indicated?
[25]    A.   Yes, sir.

Page 39

[1]    Q.   With these attachments, Bates stamped 46
[2] through 55?
[3]    A.   Yes, sir.
[4]    Q.   And what -- okay. Now, Mr. Yourke is disputing
[5] the tax liens again.
[6]         What action did Experian take as a result
[7] of that letter?
[8]    A.   This was additional information that Experian
[9] received while Ms. Higginbotham was working with the law
[10] department to request a change in the reporting of those
[11] liens for Mr. Yourke.
[12]         It looks like on the very next day, March
[13] the 28th, those changes began occurring, and I believe
[14] that we have a letter where Ms. Ransom responded to
[15] Mr. Yourke regarding all the changes.
[16]    Q.   Is that Exhibit 35?
[17]    A.   Yes, sir.
[18]    Q.   Now, is Exhibit 31 the report that reflects the
[19] changes that were -- Ms. Ransom promised to make in the
[20] letter of April 3rd, '06?
[21]    A.   My records indicate that all of those changes
[22] were made by April the 3rd, so this report would reflect
[23] all of the changes that were made by Experian based on
[24] those decisions by the law department.
[25]    Q.   When you say "this report," you're referring to

Page 40

[1] Exhibit 31?
[2]    A.   Yes, sir.
[3]    Q.   Okay. Let's go to Exhibit 32. Oh, wait. Oh,
[4] I see. Yeah, I skipped one. What about Exhibit 30 --
[5] we already did 34. That was a deletion of a duplicate.
[6] Never mind.
[7]         Okay. We've got one more, Exhibit 32.
[8]         According to your records, what prompted
[9] the generation of this report which starts with report
[10] Number 375?
[11]    A.   Mr. Yourke telephoned Ms. Higginbotham and
[12] requested a specific item consumer statement be added to
[13] each of those public record items, and this is
[14] confirmation that that was completed.
[15]    Q.   Okay. Let me ask you a more general question.
[16]         Are you aware of any policy or procedure
[17] Experian has concerning the reporting of tax liens, in
[18] other words, anything in writing, in a manual or any
[19] place intended for use by agents in how to report on tax
[20] liens?
[21]    A.   Well, the actual reporting, what comes to file
[22] and what displays on file, you would need to discuss
[23] that with Ms. Centanni.
[24]         In Experian's policies and procedure
[25] manual that it has for its agents there are procedures

STEVEN R. YOURKE v.
EXPERIAN INFORMATION SOLUTIONS, INC.

KIM HUGHES
February 14, 2007

Page 41

[1] for disputing the tax liens and reviewing, you know, of
[2] course, any documentation that comes in with those. But
[3] actually what's maintained in the file and what we
[4] report would be -- would need to be talked with
[5] Ms. Centanni.
[6]     Q.   Now, I think the record is clear that no one at
[7] Experian ever called the Internal Revenue Service
[8] directly about Mr. Yourke's federal tax lien, correct?
[9]         You haven't seen any indication you ever
[10] did, right?
[11]     A.   No, sir.  The only record of the telephone
[12] verifications were to the California Franchise Tax
[13] Board.
[14]     Q.   Do you know of any reason Experian did not call
[15] the IRS?
[16]     A.   I can tell you that it is our procedure to
[17] contact the reporting source, which is actually the
[18] court, through our public record vendors; and then if
[19] the consumer sends in additional relevant information,
[20] such as Mr. Yourke did in this case, which were letters
[21] from the California Franchise Tax Board, we would
[22] contact that entity to talk about the letter or, you
[23] know, if we needed to verify its authenticity or what it
[24] meant to the reporting on our files we in that case
[25] would contact an outside source.

Page 42

[1]         But we wouldn't just arbitrarily call the
[2] Internal Revenue Service just because it was a tax lien.
[3]     Q.   I understand.  But Mr. Yourke did send in some
[4] documents from IRS on his tax lien.
[5]     A.   He may have.  I didn't review those
[6] specifically.  If there was contact information on there
[7] and the agent felt it appropriate to make that phone
[8] call or attempt to make that phone call, they could
[9] have.
[10]         But the letter regarding the reporting of
[11] the liens that we reviewed several times he kept
[12] submitting were from the California Franchise Tax Board.
[13] And it is my understanding that he also kept requesting
[14] that Ms. Higginbotham contact Ms. Norwood at the
[15] California Franchise Tax Board.
[16]     Q.   Ms. Higginbotham, when I asked her about this,
[17] why she didn't call IRS, she said well, it's been her
[18] experience that it was futile, you call IRS and they
[19] just won't tell you anything.
[20]         Do you know anything about that?
[21]     A.   No, sir, I can't ever remember calling them
[22] from any reason.  I can understand where that might be
[23] the case.  But again, if we have documentation from them
[24] that looks like their contact information such as on a
[25] letter we will call that third source.  But most of the

Page 43

[1] documents that I saw here were from the California
[2] Franchise Tax Board.
[3]     Q.   Is there anything in Experian's on-line manual
[4] or policy and procedures guide concerning contacting tax
[5] agencies when there's a dispute about tax liens?
[6]     A.   No, sir.  The policy and procedure manual is
[7] our basic procedures for investigating, which is how to
[8] go about initiating those disputes through the -- our
[9] CDV process and how to include additional relevant
[10] information processed by the consumer.
[11]         But the agents are then taught through
[12] training that if they receive proof documentation or
[13] supporting documents and there is a phone number on
[14] there and they're able to do that verification with that
[15] third party, they do have the ability to do so.
[16]     Q.   Can I see those documents you've got in front
[17] of you, the logs and all that?
[18]     A.   (Tenders documents.)
[19]     Q.   In your review of the record here, did you see
[20] any instance where Experian's agent failed to follow
[21] Experian's own policies and procedures?
[22]     A.   No, sir, I didn't.
[23]         MR. ANDERSON:  Those are all the questions
[24] I have.
[25]         THE WITNESS:  Okay.

Page 44

[1]         MR. NICOL:  Thank you.
[2]         (Proceedings concluded at 10:20 a.m.)

---

**Page 45**

[1]                    CHANGES AND SIGNATURE

[2]   WITNESS NAME:  KIM HUGHES

[3]   DATE OF DEPOSITION:  FEBRUARY 14, 2007

[4]   PAGE        LINE        CHANGE              REASON

[5]   _____

[6]   _____

[7]   _____

[8]   _____

[9]   _____

[10]  _____

[11]  _____

[12]  _____

[13]  _____

[14]  _____

[15]  _____

[16]  _____

[17]  _____

[18]  _____

[19]  _____

[20]  _____

[21]  _____

[22]  _____

[23]  _____

[24]  _____

[25]  _____

---

**Page 46**

[1]            I, KIM HUGHES, have read the foregoing

[2]   deposition and hereby affix my signature that same is

[3]   true and correct, except as noted above.

[4]

[5]                    _____

[6]                         KIM HUGHES

[7]

[8]   THE STATE OF _____)

[9]   COUNTY OF _____)

[10]

[11]         Before me, _____, on

[12]   this day personally appeared KIM HUGHES, known to me or

[13]   proved to me on the oath of _____ or through

[14]   _____ (description of identity card

[15]   or other document) to be the person whose name is

[16]   subscribed to the foregoing instrument and acknowledged

[17]   to me that he/she executed the same for the purpose and

[18]   consideration therein expressed.

[19]         Given under my hand and seal of office on this

[20]   _____ day of _____, 20_____.

[21]

[22]                    _____

[23]                    NOTARY PUBLIC IN AND FOR

[24]                    THE STATE OF _____

[25]   My Commission Expires: _____

---

**Page 47**

[1]   STATE OF TEXAS   )

[2]   COUNTY OF DALLAS )

[3]

[4]         I, Susie Miller, Certified Court Reporter, duly

[5]   qualified in and for the State of Texas, do hereby

[6]   certify that, pursuant to the stipulations hereinbefore

[7]   set forth, there came before me, KIM HUGHES, who was by

[8]   me duly sworn to testify the truth, the whole truth and

[9]   nothing but the truth of their knowledge concerning the

[10]  matters in controversy in this case; and that they were

[11]  thereupon carefully examined upon their oath and their

[12]  examination reduced to typewriting by me or under my

[13]  supervision; that the deposition is a true record of the

[14]  testimony given by the witness, same to be sworn to and

[15]  subscribed by said witness before any Notary Public,

[16]  pursuant to the stipulations of the parties.

[17]

[18]         I further certify that I am neither attorney

[19]  nor counsel for, nor related to or employed by any of

[20]  the parties to the action in which this deposition is

[21]  taken, and further that I am not a relative or employee

[22]  or any attorney or counsel employed by the parties

[23]  hereto or financially interested in the action.

[24]

[25]         In witness whereof, I have hereunto set my hand

---

**Page 48**

[1]   and affixed my seal this ___2nd___ day of

[2]

[3]   ___March___, 20_07_.

[4]

[5]

[6]                    _Susie Miller_

      Susie Miller, Texas CSR No. 5033

[7]   Expiration date:  12/31/07

      Firm Registration No. 195

[8]   Steve Gentry & Associates, Inc.

      2379 Gus Thomasson Road, Suite 100

[9]   Mesquite, Texas  75150

      Telephone Number:  (214) 321-5333

---