Attachment 5 to Decl of Mark
F Anderson (Opp to Summ Jmt)
*Yourke v Experian*

Exhibit T to Anderson Declaration,
Yourke v Experian

1          IN THE U.S. DISTRICT COURT
2        NORTHERN DISTRICT OF CALIFORNIA
3
4   STEVEN R. YOURKE,
5              Plaintiff,
6   VS.                    CASE NO. 06-02370CW
7   EXPERIAN INFORMATION SOLUTIONS,
8              Defendant.
9   _____/
10
11      DEPOSITION OF STEVEN R. YOURKE, ESQ.
12        Thursday, January 11, 2007
13              Pages 1 - 95
14
15
16   REPORTED BY:  R. CHAYO AYON, CSR NO. 12372
17
18
19
20
21
22
23
24
25

1

---

1                I N D E X
2   EXAMINATION BY:                          PAGE
3   Mr. Nicol                                  6
4
5            E X H I B I T S
6   EXHIBIT NO.        DESCRIPTION           PAGE
7   A        Complaint                        16
8   B        Handwritten notes, April 3, 2003 16
9   C        Experian report No. 2751393734,  26
10           May 8, 2003
11   D       Experian report No. 0515123094,  28
12           October 18, 2005
13   E       Experian report No. 1723106779,  28
14           October 18, 2005
15   F       Experian report No. 3065482092,  28
16           October 20, 2005
17   G       Experian report No. 0515123094,  40
18           November 12, 2005
19   H       Experian report No. 0784734815,  40
20           December 12, 2005
21   I       Letter to Experian from Mr. Yourke, 40
22           January 10, 2006
23   J       Experian report No. 3072609688,  40
24           January 31, 2006
25   K       Experian letter, February 14, 2006 40

3

---

1              A P P E A R A N C E S
2
3
4   FOR THE PLAINTIFF:
5       KEMNITZER, ANDERSON, BARRON & OGILVIE, LLP
6       BY:  KYRA N. MILLICH, ESQ.
7       445 Bush Street
8       6th Floor
9       San Francisco, California 94108
10      (415) 861-2265
11
12   FOR THE DEFENDANT EXPERIAN INFORMATION SOLUTIONS, INC.:
13       JONES DAY
14       BY:  JONATHON D. NICOL, ESQ.
15       3 Park Plaza
16       Suite 1100
17       Irvine, California 92614-8505
18       (949) 851-3939
19
20
21
22
23
24
25

2

---

1              E X H I B I T S
2   EXHIBIT NO.        DESCRIPTION           PAGE
3   L       Experian report No. 3880417867,  57
4           February 22, 2006
5   M       Letter from Mr. Yourke           58
6           to Ms. Higginbotham, February 28, 2006
7   N       Letter from Mr. Yourke           58
8           to Ms. Higginbotham, March 1, 2006
9   O       Letter from Mr. Yourke           58
10          to Ms. Helm, March 21, 2006
11   P      Letter from Mr. Yourke           61
12          to Ms. Ransom, March 23, 2006
13   Q      Experian report No. 3072609688,  61
14          March 23, 2006
15   R      Letter to Mr. Yourke from Ms. Ransom, 63
16          April 3, 2006
17   S      Experian report No. 16018635993, 66
18          April 4, 2006
19   T      Letter to Mr. Yourke from Wells Fargo, 66
20          January 8, 2006
21   U      Letter to Mr. Yourke from Citibank, 77
22          March 25, 2006
23   V      Experian report No. 2540951345,  77
24          March 25, 2006
25

4

---

```
 1              IN THE U.S. DISTRICT COURT
 2            NORTHERN DISTRICT OF CALIFORNIA
 3
 4   STEVEN R. YOURKE,
 5              Plaintiff,
 6   VS.                    CASE NO. 06-02370CW
 7   EXPERIAN INFORMATION SOLUTIONS,
 8              Defendant.
 9   _____/
10
11       DEPOSITION OF STEVEN R. YOURKE, ESQ.
12           Thursday, January 11, 2007
13                Pages 1 - 95
14
15
16   REPORTED BY:  R. CHAYO AYON, CSR NO. 12372
17
18
19
20
21
22        CERTIFIED REPORTING SERVICES
          801 East Second Street, Suite 102
23              Benicia, CA 94510
                (707) 747-9674
24
     email: Info@certifiedreportingservices.com
25      www.certifiedreportingservices.com
                                              1
```

```
 1          A P P E A R A N C E S
 2
 3
 4   FOR THE PLAINTIFF:
 5       KEMNITZER, ANDERSON, BARRON & OGILVIE, LLP
 6       BY:  KYRA N. MILLICH, ESQ.
 7       445 Bush Street
 8       6th Floor
 9       San Francisco, California 94108
10       (415) 861-2265
11
12   FOR THE DEFENDANT EXPERIAN INFORMATION SOLUTIONS, INC.:
13       JONES DAY
14       BY:  JONATHON D. NICOL, ESQ.
15       3 Park Plaza
16       Suite 1100
17       Irvine, California 92614-8505
18       (949) 851-3939
19
20
21
22
23
24
25
                                              2
```

```
 1                I N D E X
 2   EXAMINATION BY:                        PAGE
 3   Mr. Nicol                               6
 4
 5             E X H I B I T S
 6   EXHIBIT NO.      DESCRIPTION           PAGE
 7   A       Complaint                       16
 8   B       Handwritten notes, April 3, 2003    16
 9   C       Experian report No. 2751393734,    26
10           May 8, 2003
11   D       Experian report No. 0515123094,    28
12           October 18, 2005
13   E       Experian report No. 1723106779,    28
14           October 18, 2005
15   F       Experian report No. 3065482092,    28
16           October 20, 2005
17   G       Experian report No. 0515123094,    40
18           November 12, 2005
19   H       Experian report No. 0784734815,    40
20           December 12, 2005
21   I       Letter to Experian from Mr. Yourke,  40
22           January 10, 2006
23   J       Experian report No. 3072609688,    40
24           January 31, 2006
25   K       Experian letter, February 14, 2006   40
                                              3
```

```
 1             E X H I B I T S
 2   EXHIBIT NO.      DESCRIPTION           PAGE
 3   L       Experian report No. 3880417867,    57
 4           February 22, 2006
 5   M       Letter from Mr. Yourke             58
 6           to Ms. Higginbotham, February 28, 2006
 7   N       Letter from Mr. Yourke             58
 8           to Ms. Higginbotham, March 1, 2006
 9   O       Letter from Mr. Yourke             58
10           to Ms. Helm, March 21, 2006
11   P       Letter from Mr. Yourke             61
12           to Ms. Ransom, March 23, 2006
13   Q       Experian report No. 3072609688,    61
14           March 23, 2006
15   R       Letter to Mr. Yourke from Ms. Ransom,  63
16           April 3, 2006
17   S       Experian report No. 16018635993,   66
18           April 4, 2006
19   T       Letter to Mr. Yourke from Wells Fargo,  66
20           January 8, 2006
21   U       Letter to Mr. Yourke from Citibank,  77
22           March 25, 2006
23   V       Experian report No. 2540951345,    77
24           March 25, 2006
25
                                              4
```

```
 1              E X H I B I T S
 2  EXHIBIT NO.      DESCRIPTION              PAGE
 3  W        Letter to Mr. Yourke from Wells Fargo,   77
 4           March 30, 2006
 5  X        Experian report No. 3880417867,         77
 6           March 30, 2006
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

5

```
 1  procedures?
 2      A.  Yes.
 3      Q.  So you understand you are under oath right now,
 4  and that anything you do say is similar to as if you were
 5  in a courtroom; correct?
 6      A.  Yes, I understand that.
 7      Q.  And you understand a deposition can be used in
 8  a court just as if you were testifying there?
 9      A.  Yes.
10      Q.  And you understand it can be used by either
11  party?
12      A.  Yes.
13      Q.  Okay.  The role of the court reporter as you
14  know is to transcribe each word.  So let's try not to
15  talk at the same time.
16          Please limit yourself to verbal responses.  If
17  you shake your head or nod your head, also say "yes" or
18  "no" too.  And speak loud enough so that the court
19  reporter can hear us.
20          And if you don't understand something I say,
21  please stop me and ask me to explain it or say it again.
22          If you don't stop me, I'll assume that you
23  understood.
24      A.  I understand.
25      Q.  Is there any reason you can't give your best
```

7

```
 1          BE IT REMEMBERED that, pursuant to Notice of
 2  Taking Deposition, and on Thursday, January 11, 2007,
 3  commencing at the hour of 11:40 a.m. thereof, at
 4  555 California Street, San Francisco, California, before
 5  me, R. CHAYO AYON, a Certified Shorthand Reporter, there
 6  personally appeared
 7              STEVEN R. YOURKE, ESQ.,
 8  called as a witness by the Defendants and who, having
 9  been by me duly sworn, was thereupon examined and
10  testified as hereinafter set forth.
11              EXAMINATION
12  BY MR. NICOL:
13      Q.  Good afternoon.  My name is Jonathan Nicol.
14  I'm counsel for Experian, the only defendant in this
15  matter as you know.
16          This is the deposition of Steven Yourke, taken
17  pursuant to notice and agreement of counsel.
18          Would you please state and spell your full name
19  for the record.
20      A.  Steven Robert Yourke, Y-o-u-r-k-e.
21      Q.  Have you ever had your deposition taken before?
22      A.  Yes, I have.
23      Q.  And have you ever testified under oath before?
24      A.  Only at the deposition.
25      Q.  So you're still not familiar with the
```

6

```
 1  testimony today?
 2      A.  No.
 3      Q.  Are you currently taking any medications or
 4  have you taken any medications today that could affect
 5  your testimony?
 6      A.  No.
 7      Q.  Good.  Okay.
 8          Let's just start with general background.
 9          Your name is Steven Robert Yourke?
10      A.  That is correct.
11      Q.  Have you ever used any other name?
12      A.  No.
13      Q.  What is your date of birth?
14      A.  June the 18th, 1954.
15      Q.  Okay.  What is your Social Security number?
16      A.  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.
17      Q.  Have you ever used another Social Security
18  number?
19      A.  No.
20      Q.  Okay.  Are you married?
21      A.  No.
22      Q.  What is your current address?
23      A.  828 Franklin Street, Number 706, San Francisco,
24  California 94102.
25      Q.  Okay.  How long have you lived there?
```

8

```
1       A.  Approximately, five years -- four or five
2   years.
3       Q.  Does anyone live with you?
4       A.  No.
5       Q.  Have you recently lived with anyone else?
6       A.  No.
7       Q.  Do you currently rent or own?
8       A.  Rent.
9       Q.  Have you ever attempted to purchase a home?
10      A.  No.
11      Q.  Where did you live before your Franklin Street
12  address?
13      A.  1131 Shrader Street in San Francisco,
14  California.
15      Q.  And how long did you live there?
16      A.  Lived there for approximately ten years, best
17  estimate.
18      Q.  Do you own any real property anywhere?
19      A.  No.
20      Q.  Do you have any family with identical names?
21      A.  No.
22      Q.  Do you have any twins?
23      A.  No.
24      Q.  Do you have any friends or acquaintances with
25  similar names?

                                                        9
```

```
1       Q.  And you do legal work?
2       A.  Yes.
3       Q.  How long have you been self-employed?
4       A.  Well, many years.  It's hard to say exactly,
5   but quite a number of years.
6       Q.  Would you say ten years or fifteen?
7       A.  Probably a decade.
8       Q.  Did you work for a firm before that?
9       A.  Well, I worked together with an attorney named
10  John Burris in Oakland, California, for several years.
11  This would have been back in the '90s.  And we worked
12  together on a great number of cases, but -- I'm sorry.
13  Could you repeat the question.  I don't want to go off on
14  a tangent.
15      Q.  I was just asking where you worked before you
16  were self-employed?
17      A.  As I said, I worked.
18      Q.  What sorts of cases do you deal with?
19      A.  Civil rights cases, federal civil rights cases
20  have always been my particular interest area and
21  especially cases involving police misconduct.
22      Q.  Okay.
23      A.  Police brutality, false arrest.  That sort of
24  thing.
25      Q.  Does your income come solely from representing

                                                       11
```

```
1       A.  No.
2       Q.  Have you lived with family members in the last
3   ten years?
4       A.  No.
5       Q.  Let me just ask you a few questions about your
6   educational background.
7           Where did you go to law school?
8       A.  Hastings College of Law.
9       Q.  And when did you graduate from Hastings?
10      A.  1985, I believe, it was.
11      Q.  And where did you go for undergrad?
12      A.  I attended a couple of undergraduate
13  institutions in New York State.  I graduated from Vassar
14  College in -- I believe it was 1980.  And prior to that,
15  I had attended State University of New York at New Paltz,
16  N-e-w, P-a-l-t-z.
17      Q.  What did you study at those undergraduate
18  schools?
19      A.  I studied a variety of subjects.  I took a
20  degree in history from Vassar, but I was interested in
21  studying a variety of liberal arts, subjects.
22      Q.  And your degree was in history?
23      A.  That is correct, yes.
24      Q.  Are you currently employment?
25      A.  Self-employed.

                                                       10
```

```
1   in these cases?
2       A.  I'm not quite sure how to answer that.  I think
3   the answer basically is yes.  I don't have any other
4   source of income.
5       Q.  Okay.  During your self-employment, have you
6   ever pulled someone's credit report?
7       A.  Have I?
8       Q.  Yes.
9       A   No.
10      Q.  Have you ever pulled your own credit report
11  during that time?
12      A.  Help me out here.  When you say, "pulled my own
13  credit report," do you mean try to find out what's on my
14  credit report?
15      Q.  I mean, as part of your employment or part of
16  the resources available to you through your employment,
17  have you pulled your own credit report?
18      A.  No.
19      Q.  So you don't have other income from rental
20  property or dividends?
21      A.  No, I do not.
22      Q.  You said before that you've had your deposition
23  taken before?
24      A.  Yes.
25      Q.  In what situations?

                                                       12
```

1      A.  Well, in one instance, and that was in
2  connection with a civil case in which I was the
3  plaintiff.
4      Q.  Okay.  Was that case against Experian?
5      A.  No.
6      Q.  Who was the case against?
7      A.  City and County of San Francisco.
8      Q.  For this deposition, what have you done to
9  prepare?
10     A.  Nothing.
11     Q.  Have you reviewed any documents?
12     A.  No.
13     Q.  Have you consulted with counsel or anything?
14     A.  Counsel and I met this morning, and we had a
15  brief conversation.
16     Q.  Okay.  But you haven't reviewed any of the
17  credit reports or liens or anything before?
18     A.  No.
19     Q.  Would you say you're pretty familiar with it
20  already?
21     A.  Probably more than I would like to be.
22     Q.  I understand.
23         This is the complaint that you filed in April
24  of 2006.  Do you recognize it?
25     A.  Yes.

13

1      Q.  Other than my chicken scratch right there, this
2  is an accurate copy of the complaint?
3      A.  You know, I don't want to give you a yes or no
4  on that.  All I can tell you is that at some point in
5  time I did review a draft, well, what I understood was a
6  draft of the complaint to be filed on my behalf.  Whether
7  this particular document is exactly what I reviewed or an
8  amended version of that, I couldn't honestly say.
9      Q.  Okay.  Given that, let's just talk generally.
10         Generally, in your own words, what do you claim
11  Experian has done wrong?
12     A.  Experian has listed on my credit report items
13  which I believe are erroneous, misleading, and highly
14  detrimental to my creditworthiness.  And despite
15  innumerable attempts to persuade Experian to remove this
16  misleading information, they have refused to do so.
17     Q.  What made you decide to bring this lawsuit?
18     A.  After attempting without success for
19  approximately five months to persuade Experian to amend
20  the credit report, to delete the incorrect information, I
21  finally realized that I was going to have to seek legal
22  redress if I was ever going to.
23     Q.  Did you talk to anyone about bringing the
24  lawsuit?
25     A.  I'm sorry.  Anyone before I brought the

14

1  lawsuit?
2      Q.  Right.  Did you consult anyone on your claims
3  or your situation?
4      A.  Only -- only the law firm that is presently
5  representing me.
6      Q.  Did you do any of your own research about the
7  Fair Credit Reporting Act or anything like that?
8      A.  I know at one point I did look at the Fair
9  Credit Reporting Act.  I'm not sure whether that was
10  prior to contacting my counsel or shortly thereafter.
11     Q.  When you contacted your counsel, was it Mark
12  Anderson who you spoke with?
13     A.  That is correct.
14     Q.  Did you speak with anyone else?
15     A.  No.
16     Q.  And what did Mark say?
17         MS. MILLICH:  Objection.  Attorney-client
18  privilege.
19         Don't answer that.
20  BY MR. NICOL:
21     Q.  What do you want from Experian?
22     A.  Do you really want to know?
23     Q.  Absolutely.
24     A.  Well, I certainly want monetary damages to
25  compensate me.  But in addition, what I would like -- and

15

1  I know this is not going to happen -- but I would like to
2  see the people who are responsible for Experian's willful
3  refusal to amend my credit report punished severely.  I
4  want punitive damages and optimally, if applicable,
5  criminal sanctions.
6      Q.  Let's talk specifically about the liens.  For
7  what years did you not file tax returns?
8      A.  I can't give you that information off the top
9  of my head, but the documents that have been provided to
10  you should give you that information.
11     Q.  Why did you not file tax returns?
12     A.  I don't believe that that is relevant to any
13  issue in this case.  And with all due respect, I should
14  decline to answer that.
15     Q.  Were they both State and Federal returns that
16  you chose not to file?
17     A.  I failed to file certain income tax returns.
18  If I recall correctly, there were four State income tax
19  returns and one Federal.
20     Q.  Would you please read the fourth paragraph in
21  the complaint.
22         (Defendant's Exhibits A and B were marked for
23  identification.)
24         MS. MILLICH:  Let the record reflect that the
25  witness is looking at Exhibit A.

16

1       THE WITNESS:  I've read the fourth paragraph.
2  BY MR. NICOL:
3     Q.  Would you please read that allowed for the
4  record.
5     A.  Sure.
6     Q.  Thank you.
7     A.  Paragraph 4, "Plaintiff's dispute with
8  Defendant Experian.
9       "During certain years, plaintiff had no income
10  from his business of stock trading.  Consequently, he did
11  not owe any Federal or State taxes.
12     "Plaintiff failed to file tax returns for the
13  years he owed no taxes on a timely basis.  His failure
14  caused the IRS and Franchise Tax Board to file tax liens
15  against plaintiff.
16     Q.  Is that an accurate statement?
17     A.  No.
18     Q.  What is inaccurate about this?
19     A.  Well, what's inaccurate about it is that the
20  paragraph states that, quote, "Plaintiff had no income
21  from his business of stock trading," unquote.  I don't
22  know what that's doing there, but I have never been in
23  the business of stock trading.
24     Q.  You've said you've only done legal work?
25     A.  That is correct.

17

1     Q.  Interesting.
2     A.  Yes, it is.
3     Q.  Is there anything else inaccurate about that
4  paragraph?
5     A.  I believe it is correct -- the second
6  sentence -- where it says that I did not owe any Federal
7  or State taxes and that I failed to file tax returns in
8  those years on a timely basis and that that caused the
9  IRS and Franchise Tax Board to file tax liens against
10  plaintiff.  I believe all of that information is correct.
11  But that first sentence is entirely incorrect.
12     Q.  Thank you.  So then would it be fair to say
13  that you didn't file tax returns because you didn't owe
14  any taxes?
15     A.  That is correct.
16     Q.  Okay.
17     A.  That's correct.
18     Q.  The Franchise Tax Board and IRS filed liens
19  against you.  How many liens were filed in total?
20     A.  As I recall, there were five.  I may be
21  mistaken on this point, but I'm pretty sure there were
22  five -- four State tax liens and one Federal.  I couldn't
23  tell you the years.  I would have to look at the
24  documents.
25     Q.  Yeah.  I have five liens from the documents

18

1  that we've read so far in this case.
2     A.  That sounds right to me.
3     Q.  Five liens are at issue -- four State liens and
4  one Federal tax lien?
5     A.  That's correct.
6     Q.  I won't bother telling you what codes and the
7  years and when they were released and the amounts.  But
8  is it accurate to say that the claim amounts varied from
9  $9,000 to $700,000?
10     A.  Yes, I think one did reach that staggering sum.
11     Q.  I have in the records that I received from you
12  9,000; 19,000; 130,000; 50,000; 740,000.
13     Do those sound accurate?
14     A.  Yes, that does sound accurate.  I seem to
15  recall there may have been a second one for $9,000, and
16  I'm not sure about that or whether that was ever a
17  problem in this case or not.  But certainly, the ones
18  that you have enumerated are what I recall.
19     Q.  So then the claim amounts range from the low
20  9,000 up to 700,000?
21     A.  That's correct.
22     Q.  So did you ever file tax returns for these
23  years?
24     A.  I did.
25     Q.  And when did you file these tax returns?

19

1     A.  Again, I would not be able to tell you the
2  years that I did that.  But I do think that that
3  information would be reflected on the releases.
4     There were releases of liens that I believe
5  you've been provided with, and those should reflect when
6  the necessary documents were filed.
7     Q.  So just give me a summary of what happened
8  after you filed your tax returns.  What happened?
9     A.  Well, as I recall, the liens were, all of them,
10  released upon the filing of the tax returns.  So that
11  whenever I filed the necessary return, within a day or
12  two, or perhaps even on the same day, the release would
13  be issued.
14     Q.  And did you have to pay any fees for this
15  process?
16     A.  I believe on a couple of occasions, yes.  As I
17  recall, I went to the State Franchise Tax Board, their
18  office here in San Francisco.  And I know on at least one
19  occasion, they asked me to make payments of I think 20 or
20  $30, maybe a little more, to cover some transactions
21  costs associated with it.
22     Q.  So the original claim amounts were for
23  thousands of dollars, but you were able to essentially
24  get out of the liens for, maybe, zero to small processing
25  fees in the 30 to $50 range?

20

1    MS. MILLICH:  Objection.  Mischaracterizes the
2  testimony.  He never said he had to get out of the liens.
3    THE WITNESS:  I can -- do you want to rephrase
4  the question?
5  BY MR. NICOL:
6    Q.  I'm just getting at -- I mean, a better way of
7  putting it, you were able to be released from the liens?
8    A.  I satisfied the liens.
9    Q.  You satisfied the liens?
10    A.  I satisfied the liens when I filed the tax
11  returns.  As I understand it -- and again, this is what
12  I've been given to understand from the good people at the
13  State Franchise Tax Board -- the liens were filed because
14  I failed to file timely tax returns.  And upon filing the
15  tax returns, the liens were released, subject to some
16  transaction costs.
17    And I couldn't tell you exactly what those
18  transaction costs were or what precisely they covered,
19  but my understanding is they basically reimbursed the
20  State for whatever costs were incurred in filing the
21  liens in the first place.
22    Q.  Did you end up owing any taxes?
23    A.  No, I did not.
24    Q.  So the lien claim amounts, you would say were
25  not accurate, based on your tax liability?

21

1    A.  No; that is correct.
2    Q.  When did you first believe there was a problem
3  with your Experian credit report?
4    A.  I'm not sure when I first came to realize that.
5  It was probably the same time.
6    Q.  Did you pull your credit report and you saw
7  information that you believed was inaccurate or were you
8  denied credit?
9    A.  No.  I think the former.  I think I pulled a
10  credit report to find out what was going on, where things
11  stood.  Well, let me back up on this.
12    You know, I don't -- I really don't want to
13  speculate as to when and how I came to realize this.  I
14  know I knew it by October of 2005 because that's when I
15  started to call Experian and tried to straighten the
16  situation out.  Whether I had ever previously realized
17  it, I'm not sure.
18    Q.  So when was the first time that you contacted
19  Experian about this issue?
20    A.  The first time that I can recall was in October
21  of 2005.  Whether I ever tried to contact them
22  previously, I can't say.  I may have, but I can't
23  honestly tell you.
24    Q.  Let me help you out.  This is an April 2003
25  request for investigation that I would like to call

22

1  Exhibit B.
2    A.  Uh-huh.
3    Q.  Would you please look at that and see if you
4  recognize it?
5    Do you recognize this?
6    A.  I recognize the handwriting.  That's about it.
7  It was about, what, April '03.  That is almost four years
8  ago.
9    I do recall that sometime around that date I
10  had contacted a credit -- a consumer credit --
11    Q.  Clinic?
12    A.  Clinic.  And forgive me, the name escapes me.
13  But I remember I paid them the sum of $50, and they
14  pulled credit reports for me at that time.  And I
15  remember having a 15- or 20-minute discussion on the
16  telephone with somebody about it.
17    So what we're looking at here is probably a
18  request that I made at that time regarding the tax liens.
19    Q.  So do you recall what prompted you to mail this
20  request for investigation?
21    A.  I can't honestly say that I remember making
22  this request as we sit here today.  But as I say, it is
23  my signature, my handwriting, and so I acknowledge the
24  request.
25    Q.  Okay.  What did you dispute in this request?

23

1    A.  Well, in reviewing the request for
2  investigation form, it would appear that there are two
3  tax liens.
4    Can you see this?
5    It would appear that there are two tax liens
6  that I was disputing and that there was a debt to a
7  company called Verizon, which I stated correctly that
8  I've never owed them any money.
9    Q.  Can you tell if these are Federal or State tax
10  liens?
11    A.  I wouldn't be able to say that just based on
12  this document whether these were State or Federal tax
13  liens.
14    Q.  And what is the reason you include for the
15  alleged inaccuracy here?
16    A.  I think that at this time, the liens had been
17  released, but that fact was not reflected on the credit
18  report.
19    Q.  Had you received confirmation from the
20  Franchise Tax Board and the IRS that these liens had been
21  released?
22    A.  I can only say I assume I did because I put
23  that information on the investigation form, and I don't
24  think I would have done that unless I was confident that
25  the liens had, in fact, been released.

24

```
1         Q.  So your dispute in this request for
2    investigation to me sounds like the liens had been
3    released, but the Experian credit report was not
4    reflecting that.
5              Does that sound accurate?
6         A.  You know, again, I would be making an
7    assumption here.  I can't honestly say from my own memory
8    that I remember what transpired.  But that would be my
9    assumption based on this document.
10        Q.  Did you include any evidentiary documents with
11   this dispute?
12        A.  I honestly don't recall.  I may have.
13        Q.  Shortly after this April 2003 dispute, you
14   received a credit report from Experian dated May 8, 2003.
15             Do you recognize this document?
16        A.  It appears to be an Experian credit report
17   dated May 8, 2003.  It's not ringing any bells for me.
18        Q.  Does it look like your credit report?
19        A.  Well, it's addressed to me.  Yes, it looks like
20   my credit report.
21        Q.  Now, I know this was a few years ago, but do
22   you remember going over this report?
23        A.  I don't remember as we sit here today.
24      . Q.  As we're looking at it now, what appears to be
25   inaccurate with regard to the tax liens?

                                                            25
```

```
1    verified and updated on May of 2003."  And I believe that
2    that item was one that I had asked them to correct the
3    status of because it had been released.  That's what I'm
4    putting two and two together.  That seems to be what I'm
5    coming up with there.
6         Q.  What about the other liens that you disputed?
7         A.  That docket number.  I don't see that
8    particular docket number reflected on the Experian credit
9    report that you're showing me.
10             MS. MILLICH:  Have you looked at the entire
11   report?
12             THE WITNESS:  I've looked through the entire
13   14-page report, and the docket number of the tax lien
14   that I was complaining about, I do not see that docket
15   number reflected on this particular report, but I see two
16   others.
17   BY MR. NICOL:
18        Q.  So of the liens you disputed in April 2003,
19   only one is reflected on this report?
20        A.  That would appear to be the case of the two
21   liens that I was complaining about in April of 2003.  One
22   of them, and only one of them, is reflected on the report
23   dated May the 8th.
24        Q.  Okay.  I know that you may not recall, but do
25   you remember what you did after you reviewed this report?

                                                            27
```

```
1              MR. NICOL:  This will be Exhibit C.
2              (Defendant's Exhibit C was marked for
3    identification.)
4              THE WITNESS:  I'm sorry.  Can you read the
5    question again.
6              (Record read.)
7              THE WITNESS:  If you're asking me now what
8    appears to be wrong with it or what I thought to be wrong
9    with it at the time, because I honestly don't recall, you
10   know, May 8, 2003, what I was thinking at that time.  I
11   really couldn't tell you.
12   BY MR. NICOL:
13        Q.  What I'm asking is based on the dispute I
14   showed you in Exhibit B.  The liens you disputed from
15   that.
16        A.  Uh-huh.
17        Q.  Considering these are the results of our
18   investigation, do you think there are still inaccuracies?
19        A.  Well, yeah, it looks that way to me.  I see
20   one.
21        Q.  What do you see?
22        A.  Well, the very first number, the very first
23   number listed, number one, on the Experian report, states
24   a claim amount of $129,986.  And then it says, "Status,
25   State tax lien filed."  And then it says, "This item was

                                                            26
```

```
1    It's okay if you don't remember.
2         A.  No, I honestly don't.
3         Q.  Okay.  It might make sense.  I have a gap in
4    our communications from this time, April/May 2003 until
5    October 2005, which is what you referenced before.  So
6    let's move onto that.
7              Do you remember receiving Experian reports
8    around October 18, 20th of 2005?
9         A.  Sounds about right.
10        Q.  Let me provide you with copies of these
11   reports.  These are Experian reports from October 18, two
12   from the 18th, and one from October 20.
13             MR. NICOL:  These will be Exhibits D, E, and F.
14             (Defendant's Exhibits D, E, and F were marked
15   for identification.)
16   BY MR. NICOL:
17        Q.  So let's start with the first October 18
18   report.
19             Do you recognize that one?  I understand that
20   they look very similar.
21        A.  They do.
22        Q.  But do they seem to be your credit report from
23   this time?
24        A.  Well, it's got my name right there on the top.
25   So yes, I think it does.  Uh-huh.

                                                            28
```

1    Q. It does seem to be your accounts?

2    A. Yes.

3    Q. Do you remember seeing this in the mail?

4    A. Not specifically, no.

5    Q. Can you please, like we did with the last one,

6  identify any inaccurate information with this report

7  regarding the tax liens?

8    A. Sure.

9    Q. I believe they're all on the second page.

10    A. On page 2 of this 12-page report, which is the

11  one dated October 18, 2005 -- you know, I should point

12  out you handed me two reports with that exact date. Is

13  that deliberate? Is there a difference between them?

14    Q. It is deliberate. If you notice, there are two

15  different report numbers.

16    A. Correct.

17    Q. I assume that you had two reports ran in the

18  same day, and they could be different. I haven't

19  compared them line by line.

20    A. Fair enough.

21    Q. That is deliberate.

22    A. Okay. So I'm looking at report number

23  0515123094, which counsel is marking as Exhibit D.

24    Q. Thank you.

25    A. And on page 2 of Exhibit D are listed five

29

---

1  public records, five tax liens -- one Federal, four

2  State.

3    Q. Are these the tax liens that you are disputing

4  in this matter?

5    A. That is correct.

6      Do you want me to just review them and tell you

7  what I think is incorrect about them?

8    Q. Please.

9    A. The first one is listed as a Federal tax lien

10  in the claim amount of $51,655.

11    Q. What's the status of that lien?

12    A. The status of that lien, according to this

13  report, it says, "Status, Federal tax lien paid." And in

14  fact, I believe the lien had been released at that time.

15      Well, I can stop right there and tell you that

16  the lien was never actually paid. What this report is

17  telling us is that I paid some sum of money in

18  satisfaction of this lien. That is simply not true. I

19  never paid any money, not even transaction costs to have

20  that lien released.

21      I never owed any money to the Federal

22  government in connection with that lien. And when I

23  filed the necessary tax return, the lien was released.

24      And my objection to this is that it's

25  negatively misleading.

30

---

1    Q. What about the next lien?

2    A. Well, the next lien is a State tax lien in the

3  amount of $129,986. The status of which says, "State tax

4  lien filed." It does not indicate the status of the

5  lien, whether it was paid or satisfied, released or not.

6  It simply says, "State tax lien filed."

7      Again, this tax lien had been released. I

8  didn't owe any taxes on it. And this particular entry

9  does not even indicate that the lien had ever been

10  released.

11    Q. Does that entry reflect that the lien has been

12  verified?

13    A. It says that, quote, "This item was verified

14  and updated May 2003."

15    Q. What does the next one say?

16    A. The next lien, State tax lien, claim amount of

17  $741,000, and the status says, "State tax lien paid."

18  Again, same objection as to the first one.

19      I never paid to have this lien -- I never paid

20  any taxes in connection with this lien, not $740,000 or

21  any part of it.

22      The next item, same situation here. We have a

23  claim amount. This is the fourth one listed. Claim

24  amount of $9,916, and it indicates the status as "State

25  tax lien filed."

31

---

1      Again, this lien had been released upon my

2  filing of the appropriate documents, and no money was

3  ever owed toward that claim amount. And the same would

4  be true for the fifth item in the amount of $19,374 where

5  it says, "Status State tax lien filed."

6      The lien had been released, and I never owed or

7  paid the claim amount or any part thereof.

8    Q. Would you please review the next -- October 18

9  report, Exhibit E?

10    A. Okay. In Exhibit E -- may I compare that with

11  Exhibit D --

12    Q. Please.

13    A. -- to see if we have any substantive

14  differences?

15    Q. Please. Take your time.

16    A. Well, in reviewing page 2 of Exhibit D, we see

17  what appears to be the same five tax liens listed, and I

18  don't see any difference between page 2 of Exhibit D and

19  page 2 of Exhibit E. They appear to be identical. So I

20  would have the same problems with the liens listed on

21  Exhibit E as with Exhibit D.

22    Q. Okay. Let's look at Exhibit F now.

23    A. Sure. Now, this one is dated October the 20th,

24  and I see the same five tax liens listed in the same

25  claim amounts.

32

---

1    Q. What about the statuses? You can compare it if
2  you'd like.
3    A. And again, I don't see any changes, any
4  difference between the liens listed in Exhibit F and
5  those listed in "D" and in "E." They appear to be
6  identical.
7    Q. So after you reviewed all of these liens --
8  sorry -- all of these reports, do you remember what you
9  did in response to these reviews?
10    A. Well, I'm sure I was disappointed, and the
11  problems were persisting, and I'm fairly confident I
12  tried to reach Experian to ask them again to correct the
13  inaccuracy.
14    Q. Do you remember how you tried to reach
15  Experian?
16    A. Not specifically. I'm sure I made telephone
17  calls. I believe you've been provided with copies of
18  phone records from that period of time. And I'm sure
19  that those reflect the various phone calls that I made to
20  Experian.
21    Q. Yeah, for instance, I have a record that you
22  called on October 18, the day of those two first liens,
23  Exhibits D and E.
24       Did you call to dispute these liens?
25    A. (Witness nods head.)

33

1    Q. Can you please say "yes" instead of nodding.
2    A. If there is anything you would like me to say,
3  just articulate it for me.
4    ... Not to put too fine a point on it, as I sit
5  here today do I remember calling on October 18, 2005, of
6  course not. But if that is what is reflected in my phone
7  records, undoubtedly that is correct.
8       I'm sure I took prompt action regarding these
9  reports. And whether I called on October 18, October 20,
10  or some other date in there, I couldn't tell you.
11    Q. So given that time frame, this period, the 18th
12  to the 20th of October 2005, what was the nature of the
13  dispute?
14    A. Well, the dispute remains the same as I've
15  articulated it. In looking at these three Experian
16  reports, which you have labeled as Exhibits D, E and F,
17  all three of them contain the same misleading,
18  incomplete, inaccurate, negative information regarding
19  the five tax liens.
20    Q. So would you say you disputed all five liens?
21    A. Yes.
22    Q. In April of 2003, you only disputed these two,
23  and now you've disputed five; is that correct?
24    A. Well, you're asking me to compare the
25  complaints that I made in 2003 with that in 2005. That

34

1  would appear to be correct. I don't know. I can only
2  assume that they're probably -- well, I'm not going to
3  speculate as to what the differences might be.
4       But in 2005, I was complaining about five tax
5  liens, yes.
6    Q. Was that the first time you contacted Experian
7  since the April 2003 request for reinvestigation?
8    A. I can't say for sure, but I'm reasonably sure
9  that that is the case.
10    Q. If that is the case, why did you wait so long
11  to contact Experian again?
12    A. Well, again, I cannot -- I don't know the
13  answer to that question. Except I'm sure I was occupied
14  with a number of other things. I don't know. I was
15  simply busy with a lot of other things.
16    Q. Do you remember contacting Experian shortly
17  after this period?
18    A. Which period are we talking about?
19    Q. This is the October 2005 period.
20    A. I contacted Experian innumerable times between
21  October 2005 and when I finally contacted an attorney in,
22  I believe, April of 2006.
23       Yeah, there were innumerable contacts both by
24  telephone and letter.
25    Q. I know you may not remember, but do you recall

35

1  an October 27 request for reinvestigation?
2    A. Not as I sit here, I couldn't tell you the
3  date.
4    Q. Okay. After your October contacts, do you
5  remember receiving a November 12, 2005, Experian report?
6    A. I cannot say that I remember, no.
7    Q. Would you review this and make sure it's your
8  report from that period.
9    A. Well, the report you just handed me indicates
10  that it was prepared for me. There's the date of
11  November 12, 2005, and it indicates on the front page
12  that Experian has investigated five public records, which
13  I assume are the tax liens.
14    Q. And which records did Experian investigate?
15    A. Do you want me to read the numbers to you?
16  They appear to be the five tax liens that are the subject
17  of my complaints.
18    Q. Maybe we'll just read the amounts and whether
19  or not their Federal or State to be sure.
20    A. Sure. They seem to be the same ones, if I can
21  compare.
22       The amounts are all the same. The first one is
23  listed as a Federal. And the next four are State tax
24  liens.
25       The Federal indicates the status remains as

36

**Page 37**

1   paid, and then it indicates that it was verified November
2   2005 and remains unchanged.
3         The second lien indicates, again, "State tax
4   lien paid."
5        Q.  What amount is that lien for?
6        A.  That's the amount for $129,986.  So this one
7   has been changed from "State tax lien filed" to "State
8   tax lien paid."  And then it indicates it was verified
9   and updated November of 2005.
10        The third one remains the same, "State tax lien
11  paid," and then it indicates that it was verified on November
12  2005 and remains unchanged.
13       The fourth one remains the same, "State tax
14  lien paid," and it indicates that it was verified and
15  updated November 2005.
16       And the fifth one has been changed from
17  "Status, State tax lien filed," to "Status, State tax
18  lien paid," and that it was verified and updated on
19  November 2005.
20      Q.  Are all these liens reflecting as "paid"?
21     A.  Yes, they are.
22     Q.  And do you find there to be inaccuracies in
23  this reporting?
24     A.  Yes.
25     Q.  What are those inaccuracies?  Same as before?

**Page 38**

1     A.  Well, they're slightly different because one
2  says, "filed," and one says, "paid," but they're both
3  inaccurate.  I guess paid is better than unpaid, but the
4  fact is I never paid any money regarding any of these tax
5  liens because I did not owe any money.
6       What I was trying to get Experian to do -- what
7  I'm still trying to get Experian to do is to delete this
8  negative, misleading information.
9     Q.  After you reviewed this report -- and again,
10  you may not remember, but did you do anything in response
11  to this?
12     A.  Aside from constantly pulling my hair out?  I'm
13  sure I persisted.  I'm very persistent when I know that
14  I'm right about something, and it matters.  And this did
15  matter very, very much, and it still does.
16      So I persisted in trying to get through to
17  somebody at Experian who would correct this problem.
18      Now, I know at some point in time -- in this
19  period of time, I know that I provided Experian with
20  copies of the releases of liens.
21      I actually went down to the Records Office in
22  San Francisco, got copies of the releases of liens that
23  were on file that pertained to each of these five liens
24  and sent those to Experian, and I also requested and
25  received letters of explanation from the State Franchise

**Page 39**

1   Tax Board, which explained, set forth in black and white,
2   the reasons for the filing of the liens, the releases,
3   and what, if any, money had been paid in connection with
4   it.  And I gave all of that to Experian.  I sent that all
5   to Experian.
6       I can't give you the dates of those documents.
7   I'm pretty sure you have received those, and they would
8   indicate the dates that I sent them.
9     Q.  After this October/November 2005 period, did
10  you contact the Franchise Tax Board or the IRS about your
11  dispute with Experian?
12     A.  I know I contacted both the IRS and the
13  Franchise Tax Board several times.  I couldn't give you
14  the dates, but it was in and around this period of time.
15     Q.  Did you continue disputing in November and
16  December of 2005?
17     A.  Yes.
18     Q.  Did you remember particular disputes from that
19  period?
20     A.  No.  I mean, the dispute remains the same.  The
21  essence of my complaint is what I'm explaining to you
22  about these liens.
23      But what particular actions I took, I'm sure I
24  made many phone calls in December, November, to Experian.
25  I made numerous phone calls to the Franchise Tax Board.

**Page 40**

1   The ladies there knew my voice.
2     Q.  So in November and December of 2005, did you
3  continue with this same dispute of the same five liens?
4     A.  Yes; that's correct.
5     Q.  And did you receive any reinvestigation results
6  from Experian in response to these disputes?
7     A.  I'm sure I received additional reports from
8  them.
9     Q.  Do you remember receiving this document?  This
10  is the December 12, 2005, report from Experian.
11      MR. NICOL:  This will be Exhibit H.
12      (Defendant's Exhibits G, H, I, J, and K were
13  marked for identification.)
14      THE WITNESS:  I can't recall this specific
15  particular report.
16  BY MR. NICOL:
17     Q.  Do you recognize it as your report?
18     A.  I certainly wouldn't dispute it.  I know they
19  were sending me reports again and again with what appears
20  to be the same problems, just repeated.
21     Q.  Would you like to compare -- please compare
22  this report to -- this is the most reason one,
23  November 12.
24     A.  Is that "G"?
25     Q.  Yes.

1    A.  Okay.  Comparing the report Exhibit G with
2   report exhibit -- do you want to put that on?
3    Q.  Yes.
4    A.  Comparing Exhibit G with Exhibit H, I don't see
5   any difference between the list of the liens as reported
6   in Exhibit G and that report in Exhibit H.  It appears to
7   me to be unchanged.
8    Q.  Is there any change in the status of these
9   liens?
10    A.  Not that I can see.
11    Q.  Are the amounts the same as in the November 12
12   report?
13    A.  Yes, they are.
14    Q.  Do you remember what you did in response to his
15   report?  Did you again dispute?
16    A.  Yes.
17       Pardon me.  I just want to get some more water.
18    Q.  Sure.
19       MR. NICOL:  Can we go off the record.
20       (Recess taken.)
21   BY MR. NICOL:
22    Q.  Mr. Yourke, you understand that we're back on
23   the record?
24    A.  Uh-huh.
25    Q.  You understand you're still under oath?

41

1    A.  Yes.
2    Q.  Let's continue with our examination of
3   Exhibit H, the December 12, 2005, Federal report.  Did
4   you determine that that report was similar to the report
5   in Exhibit G, the November 12 report?
6    A.  If memory serves, I think we just compared them
7   and determined that they were, or maybe we didn't.
8       Looking at page 4 of Exhibit H, I don't see any
9   difference between the treatment of the tax liens on the
10   reports.
11    Q.  Do you remember contacting Experian after you
12   received the December 12 report?
13    A.  I don't specifically remember it, but I'm sure
14   I did.
15    Q.  What I had marked as Exhibit I is a letter from
16   you to Experian dated January 10, 2006.
17       Do you recognize this letter?
18    A.  Yes.
19    Q.  And just in general, what is the content of
20   this letter?
21    A.  Well, I mean, obviously the document speaks for
22   itself.  But I would characterize it as a letter written
23   on or about January 10 by me to the Experian legal
24   department, explaining the problems that I have with the
25   Experian credit reports, and particularly with the tax

42

1   liens that we've been discussing.
2    Q.  Did you include any attachments to this letter?
3    A.  Well, I would note that the letter indicates,
4   the third paragraph down, that I enclosed letters from
5   the California Franchise Tax Board.
6    Q.  Are those letters part of the exhibit?
7    A.  Are they part of the exhibit that I'm looking
8   at here, Exhibit I?
9    Q.  Yes.
10    A.  They are part of that exhibit.
11    Q.  And what are these letters in reference to?  Is
12   there one for each lien?
13    A.  Well, if you'll allow me to look at the letters
14   for a minute.
15       These are letters that I requested from the
16   State Franchise Tax Board explaining what the tax liens
17   were about basically.
18       One of them relates to the tax lien, the
19   assessment of 1997.  One letter refers to the assessments
20   of 2001/2002.  One refers to an assessment for 1999 and
21   2000.  And one for an assessment from 199 6.
22       So that would account -- those assessments
23   would account for the four California State tax liens
24   that are reflected on the reports.  In addition, I
25   included a letter from the Treasury Department, Internal

43

1   Revenue Service, relating to the Federal tax period, the
2   1995 Federal tax lien.
3    Q.  And are these the same five liens that you've
4   disputed over the past few months in December 2005,
5   October 2005?
6    A.  Yes.
7    Q.  Okay, let's look at the four letters regarding
8   the State tax liens.
9    A.  Uh-huh.
10    Q.  Can you tell me if these letters include the
11   claim amounts?  What is exactly included in these
12   letters?
13    A.  You're referring to the letters from the State
14   Franchise Tax Board that I attached to my letter of
15   January 10; correct?
16    Q.  Yes.
17    A.  Do you want me to just characterize the letter
18   and explain to you -- I'm not sure exactly what it is
19   you're asking.
20       MS. MILLICH:  Could you ask the questions one
21   at a time.
22   BY MR. NICOL:
23    Q.  Why don't you please read the main paragraph of
24   the first letter.
25    A.  Out loud?

44

**Page 45**

```
 1        Q.  Yes.
 2        A.  Okay.  Quote, "The Franchise Tax Board created
 3   a filing enforcement assessment for 1997, based on
 4   information available, because there was no record of you
 5   filing your 1997 California State income tax return.
 6             "Franchise Tax Board then filed a California
 7   State tax lien with the San Francisco County Recorders
 8   offices for $741,167.
 9             "On 6/23/00, Franchise Tax Board received your
10   delinquent California tax return.  The total amount due,
11   including penalties and interest, amounted to $120.  The
12   payment of $120 you made was sufficient to satisfy the
13   balance due.
14             "After your account was updated, the Franchise
15   Tax Board issued a release of lien to the San Francisco
16   County Recorders office that was recorded on 10/25/00."
17             And that is from Christy Norwood, who I
18   understand has the lien approval.
19        Q.  And is that letter form the same for each of
20   the tax liens?  I don't want to make you read it again.
21        A.  Thank you.
22             Yes, it is.  The form is the same.  We're just
23   dealing with different assessment periods, different
24   amounts of assessment, yes.
25        Q.  So the letter includes the original claim
```

**Page 46**

```
 1   amount?
 2        A.  The original assessment; that's correct.
 3        Q.  And then it includes the amount that you paid
 4   to satisfy the lien?
 5        A.  No, I would differ with that characterization.
 6        Q.  What would you call the amount, for instance,
 7   that you read, the $120?
 8        A.  Well, if we read the sentence, it says the
 9   total amount due, including pen'ies and interest,
10   amounted to $120.  It does not say that any of that $120
11   was paid in satisfaction of taxes that were owed, of
12   satisfaction of the assessment.
13        Q.  And for the Federal tax lien letter, the last
14   letter, what is the content of that letter?
15        A.  The very last letter is basically -- let me
16   just review it, and if you want, I'll tell you what we're
17   looking at here.
18        Q.  Yeah.
19        A.  It's a cover letter.  At my request, the IRS
20   provided me with a transcript of the 1995 tax period,
21   basically is what that is, and I attached to that the
22   account transcript for the tax period ending
23   December 31, 1995, which is two pages.
24        Q.  Do any of these letters, particularly the state
25   tax lien letters, do any of these letters indicate that
```

**Page 47**

```
 1   the claim amount was less than what Experian had ever
 2   reported?
 3        A.  That the claim amount was less?
 4        Q.  You can refer to the exhibit if you prefer.
 5        A.  When you're talking about the claim amount, are
 6   you talking about the assessment?  Is that what you're
 7   talking about?
 8        Q.  For instance, in this first letter, the claim
 9   amount, I read to be $741,167.
10             So then my question is do any of these letters
11   indicate a claim amount different than whatever Experian
12   has ever reported?
13        A.  No, I don't think that was ever the problem.
14             And again, when we're talking about the claim
15   amount, we're talking about the assessment.  That's the
16   word used by the Franchise Tax Board.  They call that an
17   "assessment," and I guess Experian calls that a "claim"
18   in their reports, but those numbers seem to correspond.
19        Q.  So after you submitted this information to
20   Experian, did you get a response?
21        A.  You're referring now to Exhibit I?
22        Q.  Yeah, after you submitted this dispute letter.
23        A.  I'm sure I got some kind of a response.
24        Q.  As Exhibit J, I have a January 31 credit report
25   from Experian.  Could you please review that and see if
```

**Page 48**

```
 1   you recognize this as your credit report?
 2        A.  I do.
 3        Q.  Do you remember receiving this report?
 4        A.  Not specifically, but I'm sure I did.
 5        Q.  Would you mind taking a look at it and seeing
 6   if there are any inaccuracies at that time?
 7        A.  May I compare it to the previous report?
 8        Q.  Sure.
 9        A.  In just reviewing Exhibit H and Exhibit I -- is
10   that right?  This is "J."  Okay.
11             Exhibit H and Exhibit J, I don't see any
12   difference in the treatment of the liens.  The only
13   difference -- and I'm not sure it's a material
14   difference -- is that the date filed is indicated -- the
15   month is indicated numerically in Exhibit H, and in
16   Exhibit J, it's indicated with an abbreviation of the
17   month alphabetically.
18        Q.  Let's focus on the status of the liens.  Is
19   there any difference in the status between these two
20   exhibits?
21        A.  I do not detect it.
22        Q.  And at that time, did you find the
23   January 31, 2006, report status of the liens to be
24   inaccurate?
25        A.  Yes.
```

1     Q.   Are they all reporting as paid?
2     A.   Yes, they are.
3     Q.   And after this, did you contact Experian again?
4     A.   I'm sure I did.
5     Q.   Do you remember what that request was?
6     A.   I don't specifically recall the request, but
7   I'm sure it was along the lines of the thousand or more
8   requests -- I used the term loosely -- that I had
9   previously made, just reiterating, probably in tones
10  reflecting increased frustration, that the reports do not
11  accurately reflect the liens and the status of the liens.
12    Q.   Do you remember making several telephonic
13  request for reinvestigation in the beginning of 2006?
14    A.   Yes, innumerable.
15    Q.   Do you remember who you spoke with during these
16  times?
17    A.   The name Higginbotham, H-i-g-g -- forgive me.
18  It's either an "E" or an"I."
19    Q.   I believe it's H-i-g-g-i-n-b-o-t-h-a-m.
20         Do you remember speaking with anyone else?
21    A.   Well, I attempted on several occasions to
22  contact Ms. Higginbotham's supervisor, Ms. Ransom, but
23  although I left several phone messages with Ms. Ransom,
24  she never returned my calls.
25    Q.   What did you discuss with Ms. Higginbotham?

                                                          49

1     A.   Just what we're talking about here today.  I
2   explained to her ad nauseam that the liens that were
3   reflected on the credit reports were inaccurate and
4   misleading;
5         That I had never owed any debts, any taxes
6   pertaining to any of these liens; that at most, I had
7   paid a few dollars in transaction costs when I filed the
8   required documents, and I asked her again and again to
9   please delete the liens.
10    Q.   And what was her response to that demand?
11    A.   Her response was consistently in the negative.
12  I don't know how many conversations I had with
13  Ms. Higginbotham, but it was quite a few.  And on one
14  occasion, she actually told me that it made no difference
15  at all to Experian whether or not I ever owed any taxes
16  pertaining to any of the liens, and that as long as those
17  liens were being reported as valid liens, that they would
18  be reported on my credit report.
19    Q.   Do you mean as long as they were being reported
20  validly by the Franchise Tax Board and the IRS Experian
21  would report then?
22    A.   Well, more specifically, as long as the County
23  Recorder's office in San Francisco was reporting them as
24  valid liens because that's apparently where they were
25  getting their information, the County Recorder's office.

                                                          50

1         She told me, basically, as long as those liens
2   are being reported as valid liens at the County
3   Recorder's office, they're going to appear on your
4   Experian credit report.  And frankly -- I'm not
5   giving you an exact quotation, but the gist of what she
6   was saying was that it didn't matter if I owed a debt or
7   not.
8         Q.   And at that time was the San Francisco County
9   Recorder validly recording these liens?
10    A.   As far as I know, they were, yes.  I went down
11  there several times to talk to them, but they were being
12  recorded as valid.
13    Q.   Yet you still wanted Experian to delete these
14  liens from your credit report?
15    A.   That's correct.  I wanted them to delete all
16  reference to these liens.
17    Q.   During the telephonic conversations and these
18  requests for investigation, how would you describe the
19  attitude of Ms. Higginbotham and other people you
20  contacted?
21    A.   Unhelpful.  I remember specifically on one
22  occasion Ms. Higginbotham -- am I -- on one occasion,
23  Ms. Higginbotham told me that -- forgive me.  I lost my
24  train of thought.
25         Yes, I remember on one occasion asking

                                                          51

1   Ms. Higginbotham why they would not delete all reference
2   to the Federal tax lien as I had supplied them with the
3   cover letter and the transcript that you have attached to
4   Exhibit I, which clearly indicates that I did not owe any
5   Federal taxes or paid any Federal taxes for that year and
6   that the lien had been released without any payment of
7   money, why she would simply not delete that as there was
8   no debt relating to that lien.
9         And her response to me was that the documents I
10  had provided them, which were documents that I was
11  provided by the IRS, did not meet Experian's standards of
12  authenticity.  And I asked her what she meant by that,
13  and she said, "I'm sorry.  That's proprietary
14  information, can't disclose that."  And I said, "Well, if
15  you don't tell me what's wrong with what I've sent you,
16  how can I correct it?  Is there anything else that you
17  need that I can possibly get to prove that I never owed
18  any taxes to the IRS in 1995?"  And she refused to answer
19  that question.
20         And this is just one indication of the sort of
21  unhelpfulness and what I regarded as, if anything,
22  obfuscation of what should be a pretty simple and
23  straightforward process.  You know, "Are there documents
24  I can provide you that can clarify this?  If the
25  documents I've provided you that bear the IRS logo right

                                                          52

1  on them don't meet your standards criterion of whatever,
2  you know, what can I do to remedy this situation?"
3        I'm asking her to work with me on this, and I'm
4  getting absolutely nowhere. And I remember at one point
5  becoming so exasperated that I asked to speak to her
6  supervisor, and I asked the name of the supervisor, and I
7  told Ms. Ransom, and I asked to be connected to
8  Ms. Ransom, and I was put onto a voice message machine.
9  And I left several messages for a period of weeks for
10  Ms. Ransom, and she never once got back to me.
11        Q.  Did anyone ever raise their voice at Experian?
12        A.  I don't remember that.
13        Q.  Did you ever raise your voice?
14        A.  I may have.
15        Q.  Other than this problem with the authenticity,
16  did they answer your questions otherwise?
17        A.  well, as I sit here today, I remember that
18  specific problem; that they would not tell me what the
19  problem was, if there was a problem, with the documents
20  that I provided and why it didn't satisfy them.
21        I don't recall as I sit here today whether
22  there were other instances like that, but there may have
23  been.
24        Q.  Did you receive this letter, Exhibit R or K --
25  sorry -- Exhibit K from Carrie Higginbotham?

53

1        A.  Yes, I remember receiving this letter from
2  Ms. Higginbotham.
3        Q.  Did you receive this in February 2006?
4        A.  Yes.  I would assume so because that's the date
5  on the letter, is February 14, 2006. So I probably
6  received this a couple of days later.
7        Q.  will you please read the second paragraph out
8  loud.
9        A.  The letter says, paragraph 2, "Because a tax
10  lien was rendered against you, it is part of Public
11  Records, and it may be reflected on the credit report.
12        "Therefore, we must respectfully decline your
13  request to remove the tax lien from your personal credit
14  report.
15        "Please note that unpaid tax liens may remain
16  on the credit report indefinitely.  Experian has chosen
17  to keep unpaid tax liens on file for a period of
18  15 years.  Paid or released tax liens, however, only
19  remain on file for seven years from the date that they
20  were paid or released."
21        Q.  Now, here we're dealing with paid tax liens;
22  correct?
23        A.  No, sir.  Are you referring to my tax liens?
24  No.
25        Q.  Are we dealing with released tax liens?

54

1        A.  No, sir.
2        Q.  In terms of those categories listed, do you
3  think your tax liens fall under any of those categories?
4        A.  No, sir.  I would characterize them as having
5  been satisfied by the filing of the documents.  The term
6  "paid" infers is that money was exchanged for the release
7  of the tax liens, and that is clearly misleading.  No
8  money was owed.  No money was paid.
9        Q.  Do you still consider the San Francisco office
10  to be reporting these liens validly?
11        MS. MILLICH:  To the extent you're able to know
12  what "valid" or "invalid" for the agency is, you can
13  answer.
14        THE WITNESS:  well, this is my understanding,
15  and I can't speak for the County Recorder's office.
16        But what I've been given to understand is that
17  the County Recorder's office simply puts out there what
18  they've been told by the various reporting agencies, be
19  it the California Franchise Tax Board or the IRS.
20        The question is not -- let me see if I can
21  explain it.
22        This is my understanding, and I'm not a legal
23  expert in this area of the law, but what I have been
24  given to understand is that a lien may be valid without
25  necessarily reflecting a valid debt in terms of monetary

55

1  debt, and that's the situation that I'm looking at.
2        The lien was valid in the sense that the State
3  Franchise Tax Board followed proper procedure in filing
4  the lien.  That does not have anything to do with whether
5  or not there was an actual lawful monetary debt reflected
6  by the lien.  Those are two totally separate things.
7        It took me a little while to understand that
8  difference, but after a while, I finally got the idea.
9  As long as they followed proper procedure in filing the
10  lien, then the lien is valid.
11        So what I was trying to do is get past the
12  issue of whether the lien was valid to look underneath it
13  to see if it reflected a monetary debt, by failure to pay
14  taxes, which is what is being reflected by these tax
15  liens on my credit report for these ludicrous amounts of
16  money shown as "paid."
17  BY MR. NICOL:
18        Q.  Is that the only status of the liens that you
19  dispute?
20        A.  I'm not sure I follow you.
21        Q.  what I mean is the status regarding "paid" or
22  "released" or "filed," is that the only portion of the
23  tax liens that you dispute?
24        A.  My problem with the tax liens is that they are
25  extremely misleading.  Anybody looking at those tax liens

56

1    would reasonably think that they reflect a failure on my
2    part to pay rather sizable amounts of money in taxes,
3    i.e., a failure on my part to pay a lawful debt.  They do
4    not.  Therefore, they are wildly misleading, and they
5    have no relevance to the issue of my creditworthiness,
6    which is extensibly what a credit report is supposed to
7    be about.
8          This has nothing to do with whether the liens
9    are reported as valid or not.  That's what I'm trying to
10   say.
11      Q.  Are you experienced with reviewing credit
12   reports for the granting or denial of credit?
13      A.  Am I personally, no.
14      Q.  Okay.  Let's move on to the February 22, 2006,
15   credit report.
16      MR. NICOL:  This is Exhibit L.
17      (Defendant's Exhibit L was marked for
18  identification.)
19  BY MR. NICOL:
20      Q.  This is probably in response to your disputes
21  in February.
22      Do you remember receiving this report?
23      A.  No, but I'll assume that I did receive it
24  sometime on or about February 22, 2006.  That's the
25  report date.

57

1      Q.  And once again, can I trouble you to look at
2  the liens?
3      A.  Sure.
4      Q.  And describe any inaccuracies with the liens.
5      Is it the same?
6      A.  It certainly seems to be the same.  Let me take
7  a look at Exhibit J.  Yeah, they are the same.  The claim
8  amounts are the same.  The status is all listed as the
9  same.
10     Q.  Do you remember what your next contact with
11  Experian was?
12     A.  No, but I'm sure you'll remind me.
13     (Defendant's Exhibits M, N, and O were marked
14  for identification.)
15  BY MR. NICOL:
16     Q.  I have three exhibits here of letters that you
17  sent to Experian, Exhibits M, N, and O.  Let's start with
18  "M" and "N."  First is a letter to Ms. Higginbotham from
19  you and so is the second.
20     Will you make sure that these are letters that
21  you recognize.
22     A.  Yeah, I recognize the letters and the
23  attachments.
24     Q.  And are the disputes in these letters the same
25  as the previous disputes?

58

1      A.  Yes.
2      Q.  And in Exhibit M and in Exhibit N, did you
3  suggest that Experian contact anyone at the Franchise Tax
4  Board?
5      A.  Yes, I did.
6      Q.  Who did you suggest that we contact?
7      A.  I suggested that Ms. Higginbotham contact
8  Ms. Christy Norwood of the California Franchise Tax
9  Board, and I provided a phone number for Ms. Norwood.
10     Q.  And why did you pick her?
11     A.  Well, Ms. Norwood was the person in charge of
12  the lien department at the California Franchise Tax
13  Board, and I had had many conversations with Ms. Norwood
14  regarding the problem I was having with the credit
15  report.  And she had been kind enough to provide me with
16  the explanatory letters.
17     Q.  From Exhibit I?
18     A.  Correct, and which I had previously provided to
19  Experian.  I should point out that this was probably not
20  the first time that I suggested to Ms. Higginbotham that
21  she contact Ms. Norwood.  It would appear to be the first
22  time that I actually put that suggestion in writing.
23     Q.  You think maybe on the phone?
24     A.  Yeah, several times.  In fact, I can say there
25  was one occasion where Ms. Higginbotham told me she had

59

1    tried to reach Ms. Norwood but was unable to figure out
2  what buttons to push on the telephone.  I then took the
3  time to explain to her specifically what buttons she
4  could push.
5      Q.  Do you recognize Exhibit O?  This is a letter
6  you wrote to Ms. Helm in also March of 2006?
7      A.  Yes.
8      Q.  And does the content of this letter differ from
9  the March 28 and -- sorry -- February 28 and March 1
10  letters?
11     A.  Give me a moment to review it.
12     Q.  Take your time.
13     Is this the same story?
14     A.  Yes.
15     Q.  Are there any attachments to this letter?
16     A.  Yes.
17     Q.  What attachments are there?
18     A.  Well, the attachments are my most current
19  Experian credit report at that time, showing the five tax
20  liens at issue.
21     Q.  Which date is that report from?
22     A.  It says January 26 on it.  The second
23  attachment is a cover letter from the IRS for tax period
24  1995 together with the two-page account transcript from
25  the IRS for 1995.

60

1    Q.  Is that the same attachment from Exhibit I?

2    A.  I believe so.  Yes, that is correct.

3    I provided copies of the summaries of personal

4  income tax accounts for the State of California, about

5  six pages, pertaining to the dates of the corresponding

6  liens, and finally, the letters of explanation that I had

7  previously provided from the state Franchise Tax Board.

8    Q.  As a whole, that letter disputes the same five

9  liens for the same reasons?

10    A.  That's correct.

11    (Defendant's Exhibits P and Q were marked for

12  identification.)

13  BY MR. NICOL:

14    Q.  Okay.  Do you recognize Exhibit P?  It is a

15  letter that you wrote to Ms. Ransom on March 23, 2006?

16    A.  Uh-huh, yes.

17    Q.  Is this the same story as Exhibit O, the letter

18  to Ms. Helm?

19    A.  I will take my time to review it briefly, but

20  I'm sure it has to do with the same subject matter.

21    That's correct.

22    I also mention in this letter sort of a

23  secondary problem that I had with the report, and that is

24  there appears to be a duplication of another debt, and

25  that would be the printed items, number 6 and number 11,

61

1  which basically reflect a single debt that was sold by

2  the original creditor to a second creditor and are listed

3  as two separate, negative items.

4    I felt, as there is only one debt, it shouldn't

5  be reflected as two negatives just because it was sold

6  from one creditor to another.

7    But aside from that, yes, I think everything is

8  pretty much the same.

9    I think what happened here, if I'm not

10  mistaken, I wrote the March 21 letter to a

11  Ms. Carolyn Helm, thinking that she was the appropriate

12  person to direct it to.  And then I think I was informed

13  that, in fact, Ms. Ransom would be the person in charge

14  of special handling.

15    So I felt, well, just to be on the safe side,

16  let's cover a letter to Ms. Ransom as well.

17    In other words, one of these two people is in

18  charge of special handling.  One of them is bound to be

19  the appropriate person.

20    Q.  So after sending all these letters, did you get

21  a response from Experian?

22    A.  Whether I got a response after the letter of

23  March 23, as I sit here, I'm not sure if I did or not.  I

24  may have.  I seem to recall receiving a report sometime

25  in April.  April 4 rings a bell.

62

1    Q.  Do you remember receiving Exhibit Q, which is a

2  March 23 report?

3    A.  I don't actually, as I sit here today, remember

4  it, but --

5    Q.  But you recognize it?

6    A.  I recognize it.  Again, it's a report dated

7  March 23, prepared for Steven Yourke, number 26 in a

8  series.  And it appears to be the same thing with the

9  same misleading information.

10    Q.  Do you do anything after this report?  Do you

11  remember contacting Experian?

12    A.  I honestly don't know.  At some point I

13  basically -- this date is dated March 23, which is the

14  date of Exhibit P, the letter to Ms. Ransom.  So I can

15  only assume that I wrote the letter before I actually

16  received Exhibit Q.

17    I don't know what I did after receiving the

18  report dated March 23.  I may have...

19    (Defendant's Exhibit R was marked for

20  identification.)

21  BY MR. NICOL:

22    Q.  Do you remember receiving this letter from

23  Ms. Ransom.  It's Exhibit R.

24    A.  As I sit here today, I do not recall this

25  particular letter.

63

1    Q.  Will you read the second paragraph of that

2  letter?

3    A.  Paragraph 2, "Pursuant to your request,

4  Ms. Higginbotham has contacted Ms. Norwood with the

5  California Franchise Tax Board.

6    "Ms. Norwood verified that the tax liens were

7  valid and later released."

8    Q.  So do you acknowledge that this letter states

9  that Experian contacted the person you asked from the

10  March 1 and February 28 letters?

11    A.  You're asking me to read the letter, and I just

12  did.  That's what the letter states, "Higginbotham

13  contacted Norwood."

14    Q.  Would you please read the third paragraph out

15  loud?

16    A.  "Please be aware that the California Franchise

17  Tax Board and Internal Revenue Service indicate that

18  their records reflect there were tax liens filed against

19  you.  The liens are, therefore, a matter of public record

20  and may be reported on your personal credit report.

21    "Experian may report this information on your

22  credit report pursuant to Section 605(a) -- little "A" --

23  paragraph 5 of the FCRA."

24    Q.  Let me see this for one second.

25    So do you acknowledge that these liens are part

64

1  of the public record?
2      A.  When you say "public record," I'm not sure what
3  that term means.
4      Q.  When I say "public record," I'm referring to
5  records that are reported by the Franchise Tax Board, the
6  Internal Revenue Service, and the San Francisco County
7  recorder.
8      A.  My understanding is that liens were reported
9  from the Franchise Tax Board and the IRS to the
10  San Francisco County Recorder's office.
11      Q.  Do you acknowledge that they're still recording
12  these liens?
13      A.  The last time I checked, they were still
14  reporting them.
15      Q.  Can you please read the fourth paragraph out
16  loud?
17      A.  "After careful review of the documents provided
18  and discussions with Ms. Norwood and our legal
19  department, we have updated the amount of the appropriate
20  tax liens to reflect the actual amounts that were due to
21  the California Franchise Tax Board and the IRS upon the
22  filing of your tax returns."
23          That's -- do you want me to continue?
24      Q.  No.
25      A.  Okay.

65

1      Q.  So do you acknowledge that Experian decided to
2  update these amounts to the smaller amounts and eliminate
3  the claim amount?
4          MS. MILLICH:  Objection.  He doesn't know what
5  decisions were made by Experian.  He can only testify to
6  what's in the letter.
7          MR. NICOL:  Okay.
8          (Defendant's Exhibit S and T were marked for
9  identification.)
10  BY MR. NICOL:
11      Q.  Do you recognize Exhibit S?  This is your
12  April 4th, 2006, credit report.
13      A.  I see there's a report dated April 4, 2006,
14  prepared for Steven Yourke, Exhibit S.
15      Q.  Could you please review the tax liens listed on
16  the second page.  What are the claim amounts for these
17  tax liens?
18      A.  The claim amounts have now been changed for the
19  various tax liens.  Do you actually want me to read to
20  you what the claim amounts are?
21      Q.  Please.
22      A.  The first one has a claim amount of zero, the
23  second of $114, the third of $120, the fourth of $11, and
24  the fifth of zero.  All five of the liens are indicated
25  as having been paid.  How one pays the amount of zero, I

66

1  don't know.
2      Q.  And in what other ways do you find these
3  records to be inaccurate?
4      A.  All right.  Let me see if I can explain this
5  very, very carefully.
6          The claim amounts that are listed here are not,
7  in fact, part of the assessment against me.  The
8  assessments have no bearing whatsoever on these supposed
9  claim amounts.
10          These are transaction costs reflected on the
11  report.  They have nothing to do with any underlying
12  debt.  They were simply compensation to the Tax Board for
13  their out-of-pocket expenses in filing the liens.  They
14  do not reflect a valid, lawful debt.
15          That's the point here.  They are tangential.
16  They are completely tangential and unrelated to the
17  assessments.
18          So, in effect, what Experian has done is
19  continued to report tax liens as public records, under
20  the public records section, negative tax liens.
21          Each one of these has a negative in front of
22  it.  Each one of these states:  "Items listed with dashes
23  before and after the number may have a potentially
24  negative affect on your future credit extension and are
25  listed first on the credit report."  And yet, by the same

67

1  token, they seem to be saying that I either owed no money
2  at all or some niggling amount of money.
3          They're grossly misleading.  They should be
4  deleted.  I repeat they do not reflect my failure to pay
5  any lawful debt, period.
6      Q.  Did you contact anyone other than Experian
7  about these problems with your credit report?
8      A.  Eventually I contacted my attorney.
9      Q.  What I mean is did you contact Transunion?
10      A.  I did.
11      Q.  And what was the process with them?
12      A.  Well, in the case of TransUnion, as in the case
13  with Equifax, I spent a great deal of time on the
14  telephone, going up the chain of command, getting past
15  the person who answered the phone and talking to their
16  supervisor and ultimately to their supervisor, and
17  finally made it clear to them what the problem was,
18  provided them with the same documents that I provided to
19  Experian.  And all of those liens -- and by "all," I mean
20  all the liens on TransUnion and all the liens on
21  Equifax -- were ultimately deleted per my request.
22      Q.  Did it take more than one request with
23  TransUnion?
24      A.  It certainly did.
25      Q.  And with Equifax?

68

1    A.  Yes.
2    Q.  How long did it take from beginning to end with
3  Transunion to have the liens removed?
4    A.  You know, I honestly couldn't tell you how long
5  it took.  If I'm not mistaken --
6    Did we provide --
7    I think we provided a document at the beginning
8  of the deposition that showed a fax that I sent to
9  Transunion.
10   Q.  I don't have it here.
11   A.  That would give you some idea.
12   MS. MILLICH:  I have a copy.  Would you like
13  the witness to refresh his recollection?
14   MR. NICOL:  That's okay.
15   THE WITNESS:  All I can say is this.  The
16  telephone records that I've provided you would also
17  reflect phone calls that I made to Transunion and to
18  Equifax on this very same problem, and I know that they
19  have all been deleted.
20   I must say they first show them as released,
21  and ultimately they show them as having been deleted.  So
22  they don't show up on those reports at all.
23  BY MR. NICOL:
24   Q.  You mentioned earlier that you contacted a
25  credit clinic or credit counseling?

69

1    A.  That was in 2003.
2    Q.  Which company was that?
3    A.  CCCS.
4    MS. MILLICH:  Consumer Credit Counseling
5  Services?
6    THE WITNESS:  Yes.
7  BY MR. NICOL:
8    Q.  And what did they tell you?
9    A.  All they did for me at the time was to pull up
10  the free credit reports, have them mailed to me, and we
11  reviewed them together.
12   Q.  Did they process the dispute for you?
13   A.  I don't think they processed anything for me.
14  I think they told me how to go about doing it, and they
15  provided me with a form to fill out.  I'm not sure they
16  did anything more than that, provide me with a form and
17  talking to me on the phone and explaining what the
18  procedure was.
19   Q.  Did anyone at Experian ever represent to you
20  that all the information on your report was 100%
21  accurate?
22   A.  I don't know if those precise words were used.
23   Q.  What did they say?
24   A.  As I recounted in the letters that I wrote to
25  Ms. Ransom and Ms. Helm, basically I was told that as

70

1  long as these liens appear as public records they'll be
2  reported.
3    And I know that Ms. Higginbotham at one time
4  told me that it made no difference whether I owed any
5  taxes or not, which I found extraordinarily -- I just
6  found that extraordinary.
7    Q.  I completely understand that you believe
8  Experian failed to delete accurate information, but do
9  you believe they did this intentionally?
10   A.  You're -- you might want to rephrase the
11  question, because the way you said it, "I completely
12  believe that you believe that Experian failed to delete
13  accurate information?"
14   Q.  I'll make it two questions.
15   Do you believe Experian failed to delete
16  inaccurate information from your credit report?
17   A.  Yes.
18   Q.  Do you believe they did it intentionally?
19   A.  Do I personally believe they did it
20  intentionally?
21   Q.  Yes.
22   A.  I don't think it makes any difference what I
23  believe on that particular score.  I think that's a
24  question for the jury.
25   Q.  Well, what do you think?

71

1    A.  I think that they considered my complaints and
2  did exactly what they wanted to do.  Do I think -- if
3  you're using the term "intentional" as opposed to
4  "negligent," yes, I think it was an intentional decision.
5    I think after all the documentation that I
6  provided them, after all of the time I spent on the
7  telephone talking to them, there's no way that they could
8  have misunderstood what I was asking them to do and why.
9    There was no way that this could have been the
10  result of failure to communicate.
11   Q.  Have you been granted credit since April of
12  2004?
13   A.  Have I been granted any credit since April of
14  2004?
15   Q.  Yes.
16   A.  Yes, I have.
17   Q.  Have you been denied credit since April of
18  2004?
19   A.  Yes.
20   Q.  In what cases have you been denied credit?
21   A.  Well, the case that comes to mind was an
22  application for credit that I made at Wells Fargo Bank
23  sometime -- I believe it was in January, early January of
24  2006.
25   Q.  Does Exhibit T reflect this application?

72

1    A. Yes.

2    Q. Or rather the denial of the application?

3    A. That's correct.

4    Q. And if you wouldn't mind, would you please read

5    to me the reasons that Wells Fargo cites for the denial?

6    A. Well, they listed a couple of things, more than

7    a couple. I see something that says, "Collection action

8    judgment, comma, tax lien, comma, or charge-off." That

9    line is stated twice. A third line says, "Serious

10   delinquency, comma, derogatory public record, comma, or

11   collection filed." And then finally, "Too few accounts

12   paid as agreed."

13   Q. So you acknowledge that they cite several

14   reasons for denial?

15   A. I agree, yeah, and I would also note that these

16   reasons are given in the disjunctive, which means that it

17   could be this, or it could be that, or it could be the

18   other thing. It's not a particularly clear explanation,

19   but it does say "tax liens" twice.

20        MR. NICOL: Can we go off the record for a

21   second.

22        (Recess taken.)

23   BY MR. NICOL:

24   Q. Mr. Yourke, do you understood we're back on the

25   record?

73

1    A. I do.

2    Q. And that you are still under oath?

3    A. I am.

4    Q. And let's continue with the Exhibit I (sic),

5    the Wells Fargo denial letter.

6    A. Uh-huh.

7    Q. I wanted to -- one second. Exhibit T is the

8    Wells Fargo denial.

9        Again, what were the reasons that Wells Fargo

10   gave for denying credit?

11   A. Well, I mean, there are several reasons listed

12   on Exhibit T.

13   Q. And what are those reasons?

14   A. "Collection action, comma, tax lien, or

15   charge-off." And that's listed twice. That entire line

16   is listed twice. Then they say, "Public record or

17   collection filed." And finally, "Too few accounts paid

18   as agreed."

19   Q. Okay. Do you recognize Exhibit J?

20   A. Exhibit J. We looked at this before.

21   Q. Just remind me, what is Exhibit J?

22   A. This is an Experian credit report prepared for

23   yours truly dated January 31, 2006.

24   Q. Can you please look at page 3 of Exhibit J.

25        Can you please tell me the status of the

74

1    accounts on that page?

2    A. The status of the accounts?

3    Q. Right. Status. For instance, what is the

4    status of the Asset Acceptance, LLC, account?

5    A. It's says, "Status account of collection

6    account."

7    Q. And for Bank of America?

8    A. It says, "Status, paid, closed, current, was

9    passed due 60 days."

10   Q. And the other Bank of America?

11   A. The third one says, "Status, closed, past due

12   30 days."

13   Q. And can you please go to page 4 and tell me the

14   status of CBA collection account?

15   A. The CBA collection account says, "Status,

16   collection account $381, past due as of April 2005."

17   Q. And First U.S.A.?

18   A. And First U.S.A. Bank is given as "Status,

19   account charged off slash past due, $180."

20   Q. And Providian?

21   A. Providian says, "Status, transferred, closed

22   account, charge-off."

23   Q. And finally, on page 5, can you tell me the

24   status of the Toyota Motor Credit account?

25   A. The Toyota Motor Credit says, "Status, paid,

75

1    closed slash current, was past due 60 days."

2    Q. Mr. Yourke, do you understand that those are

3    all negative items?

4    A. I do.

5    Q. And do you understand that any of those items

6    may be the reason for the denial of Wells Fargo's credit?

7        MS. MILLICH: Objection. He's not qualified to

8    testify why Wells Fargo denied credit.

9    BY MR. NICOL:

10   Q. Mr. Yourke, the reasons listed here, do these

11   reasons seem to correspond?

12   A. To be perfectly honest, the letter from Wells

13   Fargo, as I've said before, is rather unclear as to

14   specifically what the reasons were.

15   Q. Is one of the reasons potentially a collection

16   action?

17   A. Well, if you're asking me to interpret the

18   document, which I think is improper, because I have no

19   particular insight into what Wells Fargo is actually

20   stating here.

21        MS. MILLICH: Don't speculate. Don't speak for

22   Wells Fargo. Just speak as to what you know, please.

23   BY MR. NICOL:

24   Q. Let me rephrase.

25        Mr. Yourke --

76

1    A.  Yes.
2    Q.  -- does it say, "collection action" as one of
3    the potential reasons for denying your wells Fargo credit
4    application?
5    A.  The letter does say, "collection action," and
6    as I read it, which means nothing, I would --
7        MS. MILLICH:  Well, then don't testify if it
8    means nothing.  Just answer the question.
9        THE WITNESS:  I hate to sound lawyerly here,
10   but the document really speaks for itself, and I can't
11   really get inside the head of the person who wrote the
12   document.
13       (Defendant's Exhibit U, V, W, and X were marked
14   for identification.)
15   BY MR. NICOL:
16   Q.  Okay.  Let's move on to Exhibit U.  This is
17   another one of the denial letters.  which denial is this
18   for?
19   A.  This would appear to be a letter regarding an
20   application I made to Citibank, and I'm not sure whether
21   this was an application for a credit card or for a loan.
22   Q.  You don't remember what it's for?
23   A.  I don't.
24   Q.  Does this letter provide any reasons why you
25   may have been declined credit?

77

1    A.  The reasons it indicates to, one is -- one
2    states, "A delinquent credit obligation, either paid or
3    unpaid was recorded on your credit bureau report."  And
4    two, it says, "Your credit bureau report shows that your
5    balances on your open accounts are too high when compared
6    to your credit limits."
7        Those are the two reasons given.
8    Q.  Again, what is the date of that letter?
9    A.  March the 25th
10   Q.  Okay.  Do you --
11       MS. MILLICH:  Can you state the year.
12       THE WITNESS:  2006.
13       MR. NICOL:  Thank you.
14   BY MR. NICOL:
15   Q.  Do you recognize Exhibit V?
16   A.  I do.  Exhibit V, as in victor.
17   Q.  And what is Exhibit V?
18   A.  This is an Experian credit report prepared for
19   myself, dated March the 25th, 2006.
20   Q.  And that's the same date as this denial letter
21   from Citibank; correct?
22   A.  That is correct.
23   Q.  Can you please turn to page 3.  Can you tell me
24   the status of the accounts on that page?
25   A.  Appear to be the same as the ones that we've

78

1    just looked at.  Was it exhibit -- whatever the previous
2    one was.
3    Q.  Exhibit J.
4    A.  Can I compare the two because maybe it will --
5    there seems to be a lot of identical accounts.  I'm not
6    sure if it's exactly the same as what is listed on
7    Exhibit J.
8    Q.  The CBA collection account --
9    A.  The CBA collection account seems to be the
10   same, yes.  Now you're --
11   Q.  This is J.
12   A.  What were we just looking at before?
13   Q.  This is the one we were looking at.
14   A.  Okay.
15   Q.  So I'm asking about the status of V.  Let's go
16   back to page 3.
17   A.  Okay.
18   Q.  On V.
19   A.  Fair enough.
20   Q.  What is the status of Asset Acceptance?
21   A.  The Asset Acceptance account indicates it's a
22   collection account, past due.
23   Q.  And the Bank of America accounts?
24   A.  "Status is paid, closed, slash, current, was
25   past due of 60 days."

79

1    Q.  That's for both Bank of America accounts?
2    A.  No.  The second one, second Bank of America is,
3    "Status, closed, past due 30 days."
4    Q.  And on page 4, please, the Providian account?
5    A.  "Status, transferred, closed, slash, account
6    charge-off."
7    Q.  And the Toyota Motor Credit account?
8    A.  Toyota Motor Credit account is listed as
9    "Status is paid, closed, slash, current, was past due
10   60 days."
11   Q.  And you recognize that these are all negative
12   items; correct?
13   A.  I do.
14   Q.  And you also recognize that Citibank may have
15   relied on these items in denying your credit?
16       MS. MILLICH:  Again, he's not qualified to
17   testify with regard to what Citibank considered at the
18   time they are considering his credit for credit.  That
19   would be expert testimony or Citibank testimony.
20   BY MR. NICOL:
21   Q.  Can you please just tell me again what the
22   first reason is that Citibank provided --
23       MS. MILLICH:  In Exhibit U?
24   BY MR. NICOL:
25   Q.  -- in Exhibit U.

80

1  A. Again, to read the letter, Exhibit U, it
2  indicates that one of the reasons for denying the
3  approval of the account was, quote, "delinquent credit
4  obligation, either paid or unpaid, was recorded on your
5  credit bureau report."
6  Q. Okay. Let's look at Exhibit W. What is
7  exhibit W?
8  A. Well, Exhibit W appears to be a letter dated
9  October 30 from Wells Fargo Bank addressed to myself.
10  Q. Is this a denial letter?
11  A. It appears.
12  Q. Do you remember what the credit application was
13  for?
14  A. I think, and I want to be clear I'm not
15  absolutely certain about this, but I seem to recall I
16  asked them to reconsider the application that I had made
17  in January. Now, I'm not sure about that. That's to the
18  best of my recollection.
19      MR. NICOL: Let's go off the record.
20      (Recess taken.)
21  BY MR. NICOL:
22  Q. We're back on the record. We were discussing
23  the denial letters. I believe we were on the Wells Fargo
24  denial letter, Exhibit W?
25  A. Uh-huh.

81

1  Q. Can you tell me what the reason is that Wells
2  Fargo cites for denying this credit?
3  A. I would say that the letter speaks for itself.
4  Q. Okay.
5  A. The only thing I see listed on this letter that
6  you're asking me to look at, it says, "Delinquent credit
7  obligation," and it gives Experian.
8  Q. Does the letter mention tax liens?
9  A. Not as far as I can tell.
10  Q. Can you look again. Does that letter mention
11  tax liens as a reason for credit denial?
12  A. I don't see.
13  Q. Back on Exhibit T, which you mentioned was in
14  the disjunctive, does this one mention tax liens?
15  A. Exhibit T, yeah, it does.
16  Q. Okay.
17  A. It also mentioned derogatory public records.
18  The only thing I have in the public records is tax
19  records.
20  Q. And finally, one last thing I would like you to
21  look at is Exhibit X, which is your March credit report.
22      Do you recognize this?
23  A. It appears to be a report prepared for myself,
24  dated March 30, 2006, from Experian.
25  Q. Can you please turn to page 3.

82

1  A. Uh-huh.
2  Q. And tell me about the status of the accounts on
3  that page?
4  A. Did we compare this with one we just looked at?
5  My guess nothing has changed between March 25 --
6      MS. MILLICH: Exhibit V.
7      THE WITNESS: Yeah. I'm making a comparison
8  here of Exhibit V and Exhibit X.
9  BY MR. NICOL:
10  Q. Which accounts are you looking at?
11  A. I'm looking at page 3, which begins "Asset
12  Acceptance," on the March 30 report and the same page,
13  same item, on the March 25 report.
14      Those two items are identical on both reports.
15  Q. What is the status?
16  A. The status is "collection account." And we can
17  go on to the next one. I assume that's where you're
18  going?
19  Q. Yes.
20  A. "Bank of America, same status, paid, closed,
21  current." Another Bank of America, "Status, closed, past
22  due 30 days."
23  Q. What about Providian on page 4?
24  A. Providian, the status says, "Transferred,
25  closed, account charged off." And the Toyota Motor

83

1  Credit says, "Status, paid, closed, current, was past due
2  60 days."
3  Q. And what's the date of Exhibit X again?
4  A. March the 30, 2006.
5  Q. And please, can you tell me the date of the
6  Wells Fargo denial letter, Exhibit W?
7  A. March 30, 2006.
8  Q. Okay. Let's talk about damages.
9      How have you been injured by Experian's
10  actions?
11  A. Well, there are basically two ways. One way is
12  the emotional distress. That I have suffered as a result
13  of trying in vain since October of last year to get this
14  erroneous, misleading information deleted from my credit
15  report.
16  Q. What kind of symptoms?
17  A. Anxiety, headaches, insomnia, anger, feelings
18  of frustration, and helplessness, feelings of rage. That
19  entire period of time, between October 2005 of April
20  2006, was largely consumed with trying to correct this
21  problem. Most of that time on the phone with people from
22  Experian, writing letters to them.
23      It's hard to describe how upsetting that entire
24  experience was. It goes far beyond the amount of time
25  that it took me to write the various letters, far beyond

84

1   the amount of time that I actually spent on the telephone
2   trying to get somebody at Experian to talk to me about
3   the situation.
4           I was trying the best I could to correct what
5   was to my mind an obvious injustice, an obvious mistake.
6   And I felt basically that no matter what I did,
7   everything I did was simply being ignored.
8           Q.  Were you also disputing with Experian and
9   Transunion during this time?
10          A.  I was -- that's correct -- and Equifax.  And so
11  I was dealing with all three of them initially.  And I
12  got quite a runaround from all three.  But as I say, the
13  other two, ultimately I was able to get past the sort of
14  knee-jerk reaction, "It's a valid lien.  That's the end
15  of the discussion.  It's being reported as a valid lien.
16  That's all that matters."  Eventually, I was able to get
17  past that.
18          With Experian, I really reached a point where I
19  felt that this was a situation in which a very large,
20  powerful corporation just didn't give a royal damn about
21  Steve Yourke and his credit problems.
22          It took time to realize this, but I ultimately
23  came to the realization that this was deliberate.  This
24  was not just a question of them understanding what the
25  problem was but that they understood perfectly well what

85

1   the problem was, and they just weren't going to fix it
2   for their own mercenary reasons.
3           I'm sorry.  It's hard to explain how upsetting
4   that was.
5           Q.  Did you see any professionals about this
6   distress?
7           A.  No.
8           Q.  What makes you think that the stress was caused
9   by Experian and not by some other sources?
10          A.  Well, because most of my time in this situation
11  was dealing with Carrie Higginbotham.  You know, I'm not
12  trying to say anything about the lady personally, but I
13  don't know what else I could say.
14          The exasperation is beyond belief.  For me to
15  write, what, six, seven, eight letters, eventually going
16  to Ms. Ransom and Ms. Helm, going back and forth to the
17  Franchise Tax Board, getting letters and transcripts from
18  the IRS -- at one point I called, I believe, the Federal
19  Trade Commission that's supposed to keep some oversight
20  over Experian and corporations like that.  I contacted
21  them.  I filed a complaint with them.
22          Your -- I can just say that the sense of
23  complete helplessness is pretty much overwhelming because
24  you've got no place to go.  If they say no, it's
25  basically that's it unless you can file a lawsuit.  And I

86

1   didn't want to go down that road.
2           I am an attorney.  I know how time-consuming
3   and expensive litigation can be, and I really didn't want
4   to go down that road, but I was left with no alternative.
5   Either that or shut up and take it, and I'm not going to
6   do that.  That's about it.
7           Q.  You said before that you spoke with
8   Ms. Higginbotham.  Did you speak to anyone else
9   at Experian?
10          A.  I tried to speak with Ms. Ransom, but she never
11  returned my phone call.
12          Q.  Was everyone at Experian polite?
13          A.  It's hard to describe somebody as being polite
14  when they're not returning your phone calls, ignoring
15  your calls.  I think that's pretty rude.
16          Q.  Did anyone hang up on you?
17          A.  Not that I recall.  I think Ms. Higginbotham
18  might have been short with me once or twice.
19          Q.  Do you feel you were being treated worse than
20  other consumers?
21          A.  I have no way and still have no way to judge
22  based on my own personal experience.  My sense is that
23  Experian probably treats a lot of people the way they
24  treated me.
25          Q.  Do you feel Experian did anything intentionally

87

1   to harm you?
2           A.  Yes.  I mean, when you say "intentionally," are
3   you saying a specific intent to cause me personal harm?
4   I don't think they were out to specifically make my life
5   miserable.  I just don't think they cared.
6           Q.  Did they ever refuse to send you a credit
7   report?
8           A.  Not to my knowledge.
9           Q.  Do you have any evidence that someone at
10  Experian was willfully trying to harm your credit?
11          A.  I'll say what I said before.  I think the
12  actions of Experian, in failing to delete this negative
13  misinformation from my credit report, is willful as
14  opposed to mere negligence.
15          Q.  What is the total amount of damages you're
16  seeking?
17          MS. MILLICH:  Objection.  This calls for a
18  legal conclusion.  I'm going to ask him not to answer for
19  the total amount.
20          THE WITNESS:  I'll only say this.  The longer
21  this litigation drags on, chances are my demands are
22  going to go higher, not lower, because this is an ongoing
23  wrong.
24          Every day that this credit report reflects this
25  misinformation is a continuing wrong to me.

88

BY MR. NICOL:

   Q.  Do you have any other evidence of damages other than the denial letters that you've provided?

   A.  Well, when you say "evidence of damages," I would say this. I have been very reluctant to seek any credit because of the Experian credit report.

   My understanding is that the lending institutions in California pretty much all use the Experian report. And every time I seek credit and am denied, my understanding is that that can impact negatively on the report, and so I've been loathe even to seek credit.

   MS. MILLICH:  I'll represent that we have provided all of the credit and financial denial applications and letters that Mr. Yourke has sought.

   THE WITNESS:  And I'll also say that the small amount of credit that I have been able to get has been very limited in terms of the credit limits available -- made available to me on credit cards.

   But I don't want to speculate to what extent that may be due to these particular liens.

BY MR. NICOL:

   Q.  What credit limits have you received?

   A.  I received very low credit limits with very high ARPs (sic) or APRS.

89

---

   Q.  Has there been anyone a witness to your emotional distress?

   A.  Nobody comes to mind that I've discussed this with other than my attorneys.

   Q.  Other than the expert witness disclosure, have you contacted anyone who might testify in this matter?

   A.  Have I personally?

   Q.  You or your attorneys.

   MS. MILLICH:  Objection. That would be expert witness, attorney work-product.

   MR. NICOL:  We didn't disclose expert witnesses yet.

   MS. MILLICH:  We're going to give you the expert witness reports Tuesday.

   MR. NICOL:  That's the report. I'm talking about the person. Aren't we required to disclose expert witnesses?

   MS. MILLICH:  Right.

   MR. NICOL:  Have we done it?

   MS. MILLICH:  Yes.

   MR. NICOL:  Who is it?

   MS. MILLICH:  We've done it, and his name is Evans, and we're going to review his report on Tuesday. So I'm going to instruct him not to answer as to any people he's contacted as a result of communications with

90

---

his attorneys. Whether or not he's contacted somebody independent of our advice, I'll let him answer.

   THE WITNESS:  Yeah, I second that objection.

BY MR. NICOL:

   Q.  Have you?

   A.  I agree with whatever she said.

   Q.  Have you contacted anyone independent of your attorney's advice?

   A.  No.

   Q.  Have you provided all documents and materials so far that are pertinent to your allegations?

   A.  Everything that I've got you've got.

   Q.  Are there any other facts or matters that are important that we haven't discussed?

   MS. MILLICH:  To your knowledge.

   THE WITNESS:  Not that I can think of, no.

BY MR. NICOL:

   Q.  Is there anything else important that you feel we should discuss today?

   MS. MILLICH:  To your knowledge.

   THE WITNESS:  I'm here to answer your questions, sir.

   MR. NICOL:  That's all I have.

   (whereupon, the January 11, 2007, deposition of STEVEN R. YOURKE, ESQ., ended at 3:14 p.m.)

91

---

_____

STEVEN R. YOURKE, ESQ.

92

```
1           I, R. CHAYO AYON, duly authorized to administer
2   oaths pursuant to Section 2093(b) of the California Code
3   of Civil Procedure, do hereby certify that the witness in
4   the foregoing deposition was by me duly sworn to testify
5   the truth in the within-entitled cause; that said
6   deposition was taken at the time and place therein cited;
7   that testimony of said witness was reported by me and
8   thereafter transcribed under my direction into
9   typewriting; that the foregoing is a complete and
10  accurate record of said testimony; and that the witness
11  was given an opportunity to read and correct said
12  deposition and to subscribe the same.
13          Should the signature of the witness not be
14  affixed to the deposition, the witness shall not have
15  availed himself/herself of the opportunity to sign or the
16  signature has been waived.
17          I further certify that I am not of counsel nor
18  attorney for any of the parties in the foregoing
19  deposition and caption named nor in any way interested in
20  the outcome of the cause named in said caption.
21  DATED:  February 5, 2006
22
23
24          _____
                R. CHAYO AYON
25              CERTIFIED SHORTHAND REPORTER NO. 12372

                                                              93
```

```
1               DISPOSITION OF TRANSCRIPT REVIEW
2
3       I certify that the witness was given the statutory
4   allowable time within which to read and sign the
5   deposition, and that:
6
7           The witness failed to appear for such
        reading and signing.
8
            A stipulation was made that the witness
9       will waive review/signature on the
        record.
10
            The witness has reviewed and signed the
11      transcript and has made no changes.
12          A correction letter has been submitted
        and is attached to the transcript.
13
14
15
            R. CHAYO AYON, CSR No. 12372
16
17          Date:
18
19
20
21
22
23
24
25

                                                              95
```

```
1               Deponent's Correction Sheet
    To add testimony, indicate "Add" and print the exact
2   words you wish to add.  To delete testimony, indicate
    "Delete" and print the exact words you wish to delete.
3
    Deposition of:          STEVEN R. YOURKE, ESQ.
4   Deposition Date:        JANUARY 11, 2007
5   I, STEVEN R. YOURKE, ESQ., have the following changes to
    my deposition transcript:
6
7   PAGE   LINE      CHANGE (Add/Delete)
8      /      /
9      /      /
10     /      /
11     /      /
12     /      /
13     /      /
14     /      /
15     /      /
16     /      /
17     /      /
18     /      /
19     /      /
20     /      /
21     /      /
22
23                              /
                STEVEN R. YOURKE, ESQ.    DATE
24
25
                                                              94
```

1

Deponent's Correction Sheet

To add testimony, indicate "Add" and print the exact

2

words you wish to add.  To delete testimony, indicate

"Delete" and print the exact words you wish to delete.

3

Deposition of:          STEVEN R. YOURKE, ESQ.

4

Deposition Date:        JANUARY 11, 2007

5

I, STEVEN R. YOURKE, ESQ., have the following changes to

my deposition transcript:

6

7

PAGE    LINE          CHANGE (Add/Delete)

8

/        /

9

10

p. 44:18  "has the lien approval" should read "heads the lien department"

11

p. 53:6-7  "and I told" should read "and I was told"

12

p. 56:13  the word "by" should read "my"

13

p. 57:6  "extensibly" {is that a word?} should read "ostensibly".

14

/        /

15

/        /

16

/        /

17

/        /

18

/        /

19

/        /

20

/        /

21

/        /

22

23

✗              ✗

STEVEN R. YOURKE, ESQ.    DATE

24

25

Exhibit U to Anderson Declaration,
Yourke v Experian



Citibank (South Dakota), N.A.
Office of the General Counsel

701 East 60th Street, North
P.O. Box 6034
Sioux Falls, SD 57117-6034

Tel: 605-331-1567
Fax: 605-330-6745

VIA UPS OVERNIGHT DELIVERY

October 24, 2006

Mark F. Anderson, Esq.
Kemnitzer, Anderson, Barron & Ogilvie, LLP
445 Bush Street, 6th Floor
San Francisco, CA 94108

Re:     Steven R. Yourke v. Experian, Case #C 06 02370 CW

Dear Mr. Anderson:

This letter is in response to your Subpoena issued to Citicorp Credit Services, Inc. USA.  The creditor is Citibank (South Dakota), N.A.  Enclosed is a copy of the credit report used to evaluate the request for credit submitted via the Internet.  The consumer information submitted to us on the Internet is listed under the "Input" column of the enclosed record.  We do not retain a copy of letters mailed to applications; however, the letter you attached to your subpoena is a true and correct copy of the text of the letter application to this application.

I am a Custodian of Records of Citibank (South Dakota), N.A., and hereby state and declare as follows:

1.   That I am a duly authorized custodian of the records or other qualified witness and have authority to certify the attached records.
2.   That the attached records are copies of the requested records described in the Subpoena which are currently available.
3.   That the attached records were prepared by the personnel of the business in the ordinary course of business at or near the time of the act, condition or event.

I certify under penalty of perjury that the foregoing is true and correct.

We understand that by providing you with this information, we have complied with the terms of the Subpoena.

Sincerely,

Cathrine R. Hoben, Paralegal
(605) 331-2632

Enclosure

A member of citigroup



*Citibank (South Dakota), N.A.*
*c/o Citicorp Credit Services, Inc.*
*P.O. Box 6020*
*Hagerstown, MD  21749-6020*

March 25, 2006

STEVEN R YOURKE
828 FRANKLIN ST
APT 706
SAN FRANCISCO CA  94102-6309

REFERENCE NUMBER
200603240002397

Dear STEVEN R YOURKE:

Thank you for applying for a Citi Simplicity℠ Rewards account. We regret we are unable to approve an account for you at this time because of the following:

- A delinquent credit obligation, either paid or unpaid, was recorded on your credit bureau report.

- Your credit bureau report shows that your balances on your open accounts are too high when compared to your credit limits.

Our credit decision was based in whole or in part on information obtained in a report from the consumer reporting agency listed below. You have a right under the Fair Credit Reporting Act to know the information contained in your credit file at the consumer reporting agency. The reporting agency played no part in our decision and is unable to supply the specific reasons why we have denied credit to you.

You also have a right to a free copy of your credit report from the consumer reporting agency if you request it no later than 60 days after you receive this notice. In addition, if you find that any information contained in the report you receive is inaccurate or incomplete, you have the right to dispute the matter with the reporting agency.

*Experian*
*P.O. Box 2002*
*Allen, TX 75013-0036*
*1-888-EXPERIAN(397-3742)*

If your credit report is not correct, we would be willing to consider your application again. Please send a copy of your updated credit report within 30 days and be sure to include the reference number listed above.

We appreciate your interest and hope to have the opportunity to fulfill your request in the future.

Sincerely,

*K. Aberson*

K. Aberson
Mgr., Consumer Credit Services
FEDERAL REGULATIONS REQUIRE THE STATEMENT PRINTED ON THE REVERSE SIDE

A member of citigroup↑

```
JOB: BAFACBPF
PGM: BAFACB3P
RPT: BAFACBPF

                                                    REPORT DATE: 04/30/06
                                                    WORK OF DATE: 04/29/06
                                                    PAGE:        716
                                                    START TIME:  00:32:25

33,752                        ACCOUNT FULFILLMENT
                         PRIORITY QUEUE PURGED MICROFICHE
                                 DETAIL REPORT

REPORT DATE  03/24/06      CREDIT BUREAU SUMMARY REPORT   SITEID IRCB
REPORT TIME  06:21:13      REF # 160820567917      BUR USED( TW )ALT( TU )
                           ...INPUT...BUREAU...                  M VAR  HIT IND
NAM  YOURKE STEVEN R         YOURKE STEVEN R                     Y %    -BUR  Y
STR  828 FRANKLIN            828 FRANKLIN                        Y      -SYS  Y
APT                          706                                 Y      -FRD  N
DIR                                                              Y      MULT N1/1
CTY  SAN FRANCISCO CA        SAN FRANCISCO CA                    Y
ZIP  94102                   94102 6309                          N      TIME-ADDR
SSN  129382457              129382457                            N  4   03/11
DOB  06/18/54               06/18/54                             N
PHON 637-8102                                                    N 99   C#H TCA6
                                    FR ALRT    PH  -             N  5   ADR MIS N
HIGH SINGLE BAL $       6873 LAST ACTIVITY 03/17/06 LATEST INQUIRY 01/04/06
FILE-DT 11/05/84 REPORT TYPE C      ---CURRENT TRADE MOP MATRIX---
#30          6 SLDP                0  1  1  2  3  4  5  *  7  8  9  TTL
#60          2 PR MAJ              0  1  1  1                     8  2  5
#90+         3 TR MAJ    099  BANK
# INQ        2 TR MIN    #120+ BANKCARD
# SAT        3 # PAST  1  WRST  FINANCE
#TNTR        N BNKRPT   N  L12M  RETAIL
OLD TR 256  WORST RTG MJ   C  TOTAL              1  1  1         1  3  9
ERROR MESSAGE:                                   2  1  2         2  1  4
RISK SCORE  INTERNET RIS 00402 P  FICO V2 BANK 00628 P
            TYPE   SCORE  REASON DESCRIPTION
RSK INTERN  00402 P  70  ONE OR MORE ACCOUNTS RECENTLY PAST DUE
                     64  INSUFFICIENT CREDIT HISTORY
                     71  UNUSED CREDIT LINES
RSK FICO V  00628 P  38  SERIOUS DELINQUENCY AND PUBLIC RECORD OR COLLECTION
                         FILED
                     15  INSUFFICIENT OR LACK OF BANK REVOLVING ACCOUNT
                         INFORMATION
                     18  NUMBER OF ACCOUNTS DELINQUENT
                     02  DELINQUENCY REPORTED ON ACCOUNTS
SSN              SSN      ST DTE    DTH FLG
SSN VARIATION   129382457
HOUSE#          STREET NAME      STR TYPE  BOX  ROUTE  DR APT
     828  CITY       ST  ZIP     PHONE  R/O/B  RES DT  REP DT CD
ADR  828  FRANKLIN CA 941026309  ST                   706
     SAN FRANCISCO                             03/02  03/06  2
ADR  1131 SHRADER  CA 941174216  ST            07/90  10/05  1
     SAN FRANCISCO                                    ROUTE  DR APT
HOUSE#          STREET NAME      STR TYPE  BOX  R/O/B  RES DT  REP DT CD
     18   CITY       ST  ZIP     PHONE  DR            04/91  07/98  1
ADR  18   HORIZON HILL NY 126035514       CITY        STATE DATE  OCCUPATION
     POUGHKEEPSIE                                      03/02
EMP          EMPLOYER                     LIAB   STAT-DT BAL$  ECOA  COURT
RPT-DT       ATTORNEY                     DT-ASGN PD-DT       IND REP/DAT OLDDATE PRPD
CASE#        STATUS                       HD   PR  COLL
BK  DEC/DBH     CD                              1 SAN FRANCISCO CNTY R
PRD 09/23/05 STATE TAX RE  09/04   19374        0  3041351
0001                                           BKI717PG05166Q2004H
PRD 06/13/05 STATE TAX RE  3  O  9916           006  006          P
                            3                   0  3041351
```

```
JOB: BAFACBPF
PGM: BAFACB3P
RPT: BAFACBPF
```

ACCOUNT FULFILLMENT
PRIORITY QUEUE PURGED MICROFICHE
DETAIL REPORT

```
REPORT DATE: 04/30/06
WORK OF DATE: 04/29/06
PAGE:        717
START TIME:  00:32:25
```

```
0002                    02/03        3        O      1 SAN FRANCISCO CNTY R
                                                       BKOPGSQ00583
     RPT-DT   STATUS        3      LIAB   STAT-DT BAL$     COURT #       009          P
     CASE#                        DT-ASGN PD-DT  ECOA    COURT   IND REP/ATTY PRPD
BK   DEC/DEH        COLL PYM  LN   HD   PR   COLL  PD/DAT  OLDDATE
PRD  06/13/05  STATE TAX RE       01/03           1 SAN FRANCISCO CNTY R
0003                                              009          BKI315PG0583SQ2003H
                                                  0 3031351       009
PRD  09/28/04  FED TAX REL         3     51655    1 SAN FRANCISCO CNTY R
0004             8                04/04           SQ2004H708905
                                                  0      018          017
PRD  10/25/00  STATE TAX RE       3    74167     1 SAN FRANCISCO CNTY R
0005             8               06/00            SQ2000H6630519
                                                  0 3041351       064
PRD  08/09/99  STATE TAX RE       3   129986     1 SAN FRANCISCO CNTY R
0006             8               01/99            BKH3110PG0664SQ99GS0
                                                       079
RTG    DESC    8      3        3        CRDLMT KOB MEMBER#              079       P
 ACCOUNT#                RPT-DT OPN-DT PAY-DT HI-CR$  BAL$    P/DS PD#  30 60 90 DT-USD
BK   DEC DEH   COLL PYM  LN  IND  AGE  CMT    CLO  STA  PD  REP       DAT OLDDATE
TRD  DELINQ 180  FIRST USA BANK          7000 BC 1260958         INDIVID  0 12/99
0001  441712274519 12/99 12/94 12/99      7000 C  6873           INDIVID  1 4 12/99
      96543321CCCCCC-CCCCCCCC   CLDT                CHARGE OFF              075   TERMS R
TRD    N      9    9      R   11/99  B   135              O    075         081
0002  19238951      03/06 09/04 1139 O         0 FF 2612244    INDIVID    1 10/04
      9999999999-99-999          CUST DISP ACCT-RPTD BY SU  1259 16  0  0  03/06
TRD    N      9    9      N   03/06             CLDT         MAXDQ 000000 00/00 FACTORING C
0003  297 CHARGE OFF  PROVIDIAN FINAN        018           O    000        017
      2900689883    03/02 02/99                560 BC 3206450  INDIVID    0  03/02
      B--------9954321C-1CCCC PURCH BY ANOTHER LENDER       0  02  2  1  3  03/02
TRD    N      U      9      B                  04/01  0      O  0      T   TRANSFERRED   R
0004  4024112014120  10/05 04/03 08/04  1500 BC 3202754     INDIVID    0  10/05
      B1CCCCCCCCCCCCCCC         ACCT CLSD AT GRANT REQUES  CLOSED      1  0  08/04
RTG    DESC    8      3        3        CRDLMT KOB MEMBER#     MAXDQ 000000 00/00 CC,  TERMS R
 ACCOUNT#                RPT-DT OPN-DT PAY-DT HI-CR$  BAL$    P/DS PD#  30 60 90 DT-USD
BK   DEC DEH   COLL PYM  LN  IND  AGE  CMT    CLO  STA  PD  REP       DAT OLDDATE
TRD    N      R      B                  R      B        035      O    005  005   TERMS R
0005  7040031303 09/03 05/96  CR   14035 O        0 FA 3604040  JT-CONTR   60 09/03
      B---------         DISP RESD/DT-CONS DISAGREE    PAID     0 00  5  1  0  09/03
TRD    N      1      3      N                  I    A  118       O    005        006
0006  43361068300  06/01 12/88  11020 BC 2216420     JT-CONTR   0  06/01
      B0000000000000C21CCC1CCCC ACCT CLSD AT CONS REQUEST  PAID     0 00  2  1  0  06/01
```

JOB: BAFACBPF
PGM: BAFACB3P
RPT: BAFACBPF

REPORT DATE: 04/30/06
WORK OF DATE: 04/29/06
PAGE: 718
START TIME: 00:32:25

ACCOUNT FULFILLMENT
PRIORITY QUEUE PURGED MICROFICHE
DETAIL REPORT

```
N   1   3   04/00        03/00   B   B     CLDT         MAXDQ 000000 00/00 CC, TERMS  R
RTG     DESC             N   R   B   B     207   0   C  O   P   057  071   076      STA-DT
ACCOUNT#        MEMBER NAME         CRDLMT KOB MEMBER#       ECOA   TERMS   DT-USD
BK  DEC DEH     RPT-DT OPN-DT PAY-DT HI-CR$  BAL$ P/D$ PD# 30 60 90  DAT  OLDDATE
TRD  R11 CURR ACCT  COLL PYM LN IND AGE CMT  CLO  STA  PD REP         INDIVID   0  06/99
0007 5291071154986  06/99 04/99       0 BC 1270246      0  00  00   0   0   0  06/99
     BC0                           39 H         0
                    ACCT CLSD AT CONS REQUEST  PAID

N   1   1   1   N   R   B   B     CLDT         MAXDQ 000000 00/00 CC, TERMS  R
TRD  I11 CURR ACCT          083   0  C  O   P   081  000   SIGNER    60  04/97
0008 704003013032  04/97 05/96  TOYOTA MOTOR CR     0 PA 3604040      0  00  0   0   04/97
     BCCCCCCCCCCC               14025  0                  PAID

N   1   1   1   N   I   A     CLDT         MAXDQ 000000 00/00 AUTO
TRD  IA2 PAID  1            118   0  C  O   P   107  000   INDIVID   60  05/98
0009 12938245700l  05/98 11/84  PHEAA/CALIF STU     0 EL 1909137      0  00  0   0   05/98
     B                           3000  0                  PAID

N   U   1   N   I   E     CLDT         MAXDQ 000000 00/00 EDUCATION  L
DATE            MEMBER NAME         256   KOB  MEMBER #          P   094   000
INQ  01/04/06  WELLS FARGO BANK NEV BM  2175860
INQ  04/13/05  SPRINT PCS          UW  2940527
FFT  0019 CONSUMER EMPLOYMENT LENGTH INVALID
     CKPT: AMUSEMENT-RECREATION BUSINESS ON FACS+ FILE/JOHN YANDELL TENNIS SC
IND  FACS+ HOOL/828 FRANKLIN ST/SAN FRANCISCO CA 94102/415.885.6959
     FROM 20051201 NUMBER OF INQS. WITH THIS SSN#= 0001
          SSN FIRST YEAR OF ISSUE:  1962   LAST YEAR OF ISSUE: 1965
     CONSUMER REFERRAL LOCATION INFORMATION
CNR  EXPERIAN
     701 EXPERIAN PARKWAY
     PO BOX 2002
     ALLEN                              TX  75013    (888) 397-3742
     ***********************  END OF REPORT  ***********************************
```

```
JOB: BAFACBPF
PGM: BAFACB3P                                                    33,752
RPT: BAFACBPF
```

```
                    ACCOUNT FULFILLMENT                          REPORT DATE: 04/30/06
              PRIORITY QUEUE PURGED MICROFICHE                          DATE: 04/29/06
                        DETAIL REPORT                            WORK OF     PAGE:    716
                                                                START TIME: 00:32.25
```

```
REPORT DATE  03/24/06      CREDIT BUREAU SUMMARY REPORT    SITEID IRCB
REPORT TIME  06:21.13      REF # 16082056/7917       BUR USED( TW )ALT( TU )
     ....INPUT...              .....BUREAU...              M  VAR        ( ALT. TU )
NAM  YOURKE STEVEN  R          YOURKE STEVEN R             M  VAR  $     HIT IND
STR  828 FRANKLIN              828 FRANKLIN                Y                -BUR    Y
APT                            706                         Y                -SYS    Y
DIR                                                        Y                -FRD    N
CTY  SAN FRANCISCO CA          SAN FRANCISCO CA            Y              MULT N1/1
ZIP  94102                     941026309                   N  4
SSN  129382457                 129382457                   N          TIME-ADDR
DOB  06/18/54                  06/18/54                    Y              03/11
PHON 637-8102                                              Y  99
                                                          N   5        CB# TCA6
                                                                      ADR MIS N
HIGH SINGLE BAL $      6873  LAST ACTIVITY 03/17/06  LATEST INQUIRY 01/04/06
FILE-DT 11/05/04  REPORT TYPE C              ----CURRENT TRADE MOP MATRIX----
#30     1   PR MAJ    6   SLDP                0   1   2   3   4   5   *   7   8   9  TTL
#60     2   PR MIN    .   099          BANK   1   1   1   1                       2   5
#90+    3   TR MAJ    3   #120+        BANKCARD
# INQ   2   TR MIN    2    1           FINANCE
# SAT   3   # PAST    1   WRST         RETAIL
#INTR       BNKRPT        L12M         OTHER             1   1                   1   4
OLD TR 256  WORST RTG  MJ    C         TOTAL             2   1   2               1   3
ERROR MESSAGE:
RISK SCORE  INTERNET RIS 00402 P  FICO V2 BANK 00628 P
  TYPE     SCORE   REASON DESCRIPTION
RSK INTERN 00402 P  70  ONE OR MORE ACCOUNTS RECENTLY PAST DUE
                    64  INSUFFICIENT CREDIT HISTORY
                    71  UNUSED CREDIT LINES
RSK FICO V 00628 P  38  SERIOUS DELINQUENCY AND PUBLIC RECORD OR COLLECTION
                        FILED
                    15  INSUFFICIENT OR LACK OF BANK REVOLVING ACCOUNT
                        INFORMATION
                    18  NUMBER OF ACCOUNTS DELINQUENT
                    02  DELINQUENCY REPORTED ON ACCOUNTS
         SSN VARIATION     SSN        ST  DTE   DTH FLG            CODE
SSN                      129382457
         HOUSE#   STREET NAME     STR TYPE   BOX    ROUTE  DR  APT
         CITY        ST   ZIP      PHONE    R/O/B  RES DT  REP DT  CD
ADR  828    FRANKLIN         ST                                 706
     SAN FRANCISCO  CA 941026309  ST                    03/02  03/06   2
ADR  1131    SHRADER         ST                  07/90  10/05   1
     SAN FRANCISCO  CA 941174216            BOX    ROUTE  DR  APT
         HOUSE#   STREET NAME     STR TYPE          R/O/B  RES DT  REP DT  CD
ADR   18    POUGHKEEPSIE  HILL DR                 04/91  07/98   1
     POUGHKEEPSIE HORIZON NY 126035514   CITY    STATE DATE   OCCUPATION
EMP                EMPLOYER                       03/02
         ATTORNEY                    LIAB  STAT-DT BAL$         COURT #    PLTF/ATTY
RPT-DT   STATUS          DT-ASGN PD-DT ECOA  IND  REP/DAT  OLDDATE   PRPD
CASE#    DEC/DEH   CD    HD   PR   COLL         0  3041351
BK   09/23/05 STATE TAX RE  19374   09/04    1 SAN FRANCISCO CNTY R
PRD                                                 BKI717PG05165Q2004H
0001                                           0  3041351       006       P
PRD  06/13/05 STATE TAX RE    3   9916    3   O
                              8            0  3041351
         N    8
```

JOB: BAFACBPF
PGM: BAFACB3P
RPT: BAFACBPF

ACCOUNT FULFILLMENT
PRIORITY QUEUE PURGED MICROFICHE
DETAIL REPORT

REPORT DATE: 04/30/06
WORK OF DATE: 04/29/06
PAGE: 717
START TIME: 00:32:25

```
0002                          02/03         1 SAN FRANCISCO CNTY R
                                              BKOPGSQO583
     RPT-DT  STATUS     3    LIAB  O   STAT-DT BAL$   009           P
     CASE#                    DT-ASGN PD-DT ECOA    COURT #
     BK      DEC/DEH   CD  HD  PR  COLL  IND REP/DAT OLDDATE PLIF/ATTY
PRD  06/13/05 STATE TAX RE  9916          0 3041351          PRPD
0003                          01/03         1 SAN FRANCISCO CNTY R
                                              BKIJ315PG0583SQ2003H
     N           8          3             009           009
PRD  09/28/04 FED TAX REL  51655          0 3031351              P
0004                          04/04         1 SAN FRANCISCO CNTY R
                                              SQ2004H708905
     N           8          3             009
PRD  10/25/00 STATE TAX RE  741167        018           017
0005                          06/00         1 SAN FRANCISCO CNTY R
                                              SQ2004H630519          P
     N           8          3             3041351
PRD  08/09/99 STATE TAX RE  129986        065           064
0006                          01/99         1 SAN FRANCISCO CNTY R
                                              BKH310PG0664SQ99GS0
     N           8          3             079           079           P
RTG  DESC      MEMBER NAME   CRDLMT KOB MEMBER#  ECOA    TERMS   STA-DT
     ACCOUNT#  RPT-DT OPN-DT PAY-DT HI-CR$  BAL$  P/D$ PD# 30 60 90 DT-USD
     BK  DEC DEH  COLL PYM LN  IND AGE  CMT  CLO  STA  PD  REP  DAT  OLDDATE
TRD  R84 DELINQ 180  FIRST USA BANK  7000 BC 1260958  INDIVID  1  4 12/99
0001 4417122745J9  12/99 12/94 12/99 7000 C  6873   0 01  1  1  4 12/99
     9654321CCCCCCC--CCCCCCCC
                              12/99        CLDT   MAXDQ 000000 00/00 CC,  TERMS R
     I93 COLLI ACCT          N  R  B  B    135       C  0 075  INDIVID  075  081
TRD  1938951    03/06 09/04   1139 O FF 2612244  1259    INDIVID  1 10/04
0002 9999999999-99-999       CUST DISP ACCT-RPTD BY SU  1259 16  0  0 03/06
                              02/06        CLDT   MAXDQ 000000 00/00 FACTORING C
     R97 CHARGE OFF  PROVIDIAN FINAN     018         C  0 000  INDIVID  000  017
TRD  2900689883    03/02 02/99     560 BC 3206450    0 02  2  1 03/02
0003 B--------9954321C-1CCCC PURCH BY ANOTHER LENDER  0    0 02  2  1  3 03/02
     BICCCCCCCCCCCCCCC       TRANSFERED
                              04/01        CLDT   MAXDQ 000000 00/00 CC,  TERMS R
     N  U      9              N  R  B  B   085   T   0 048  INDIVID  048  067
RTG  DESC      MEMBER NAME   CRDLMT KOB MEMBER#  ECOA    TERMS   STA-DT
     ACCOUNT#  RPT-DT OPN-DT PAY-DT HI-CR$  BAL$  P/D$ PD# 30 60 90 DT-USD
     BK  DEC DEH  COLL PYM LN  IND AGE  CMT  CLO  STA  PD  REP  DAT  OLDDATE
TRD  R71 30 DAY DEL  BANK OF AMERICA  1500 BC 3202754  INDIVID  0 10/05
0004 4024112011420  10/05 04/03 08/04  5060 H       0 00  1  1 08/04
     BICCCCCCCCCCCCCCC       ACCT CLSD AT GRANT REQUES  0  0    0  0  0 08/04
                              09/05        CLDT   MAXDQ 000000 00/00 CC,  TERMS R
     N  2      2              N  R  B  B   035   G   0 005  CLOSED  005  006
TRD  I37 CUR WAS 60  TOYOTA MOTOR CR  14035 O FA 3604040  JT-CONTR  60 09/03
0005 7040030113032  09/03 05/96         DISP RESLVD-CONS DISAGREE  1  0 09/03
     B--------------     03/00        CLDT   MAXDQ 000000 07/99 AUTO
     07/99 R-2  05/00              118       O    0 080  080   080
     N  1    3    N  I  A                         PAID
TRD  R37 CUR WAS 60  BANK OF AMERICA  10000 BC 2216420  JT-CONTR  0 06/01
0006 433601068300  06/01 12/88  11028 H    0 02  2  1 06/01
     B000000000000C21CCCICCCC ACCT CLSD AT CONS REQUEST  PAID
```

JOB: BAFACBPF
PGM: BAFACB3P
RPT: BAFACBPF

REPORT DATE: 04/30/06
WORK OF DATE: 04/29/06
PAGE: 718
START TIME: 00:32:25

```
                              ACCOUNT FULFILLMENT
                      PRIORITY QUEUE PURGED MICROFICHE
                                 DETAIL REPORT

     N    1    3         04/00    CLDT         MAXDQ 000000 00/00 CC, TERMS R
     RTG  DESC        N       B  B     207  0  C               071   057   076
     ACCOUNT#         RPT-DT OPN-DT PAY-DT HI-CR$  CRDLMT KOB MEMBER#  ECOA  TERMS  STA-DT
     BK  DEC DEH  COLL PYM  LN  IND  AGE  CMT  BAL$ P/D$ PD#  30  PDM 30 60 90 DT-USD
TRD  R11 CURR ACCT      CAP ONE BK            CLO STA  PD  REP  DAT  OLDDATE
0007 529107154986  06/99 04/99              0 BC 1270246      INDIVID   0    06/99
BC0                                         39 H         0 00 0    0  0   06/99
                             ACCT CLSD AT CONS REQUEST  PAID
     N    1    1         N    R  B  B   CLDT         MAXDQ 000000 00/00 CC, TERMS R
TRD  I11 CURR ACCT       TOYOTA MOTOR CR  083  0  C  0  P  081  000
0008 704003013032  04/97 05/96              0 FA 3604040    SIGNER    60  04/97
     BCCCCCCCCCCC                     14025 0              0 00 0  0  0  04/97
                                                        PAID
     N    1    1         N    I  A.     CLDT         MAXDQ 000000 00/00 AUTO
TRD  IA2 PAID        N    PHEAA/CALIF STU  118  0  P  107       INDIVID  60  05/98
0009 129382457001  05/98 11/84              0 EL 1909137    0 00 0    0  0   05/98
B                                     3000 0              0 0 0   0  0   05/98

     N    U    I  N  I  E       CLDT         MAXDQ 000000 00/00 EDUCATION L
     DATE           MEMBER NAME       KOB  MEMBER #      0  P  094  000
INQ  01/04/06  WELLS FARGO BANK NEV   BM  2175860
INQ  04/13/06  SPRINT PCS            UW  2940527
FPT  0019 CONSUMER EMPLOYMENT LENGTH INVALID
FPT  CRKP1. AMUSEMENT-RECREATION BUSINESS ON FACS+ FILE/JOHN YANDELL TENNIS SC
     HOOL/828 FRANKLIN ST/SAN FRANCISCO CA 94102/415.885.6959
IND  FACS+ FROM 20051201 NUMBER OF INQS. WITH THIS SSN#= 0001
          FROM 20051201 NUMBER OF INQS. WITH THIS ADDR= 0010
          SSN FIRST YEAR OF ISSUE.   1962
          SSN LAST YEAR OF ISSUE. 1965
          CONSUMER REFERRAL LOCATION INFORMATION
CNR  EXPERIAN
     701 EXPERIAN PARKWAY
     PO BOX 2002
     ALLEN                         TX 75013    (888) 397-3742

*****************************   END OF REPORT   *****************************
```