Attachment 6 to Decl of Mark
F Anderson (Opp to Summ Jmt)
*Yourke v Experian*

Exhibit V to Anderson Declaration,
Yourke v Experian

1    UNITED STATES DISTRICT COURT
           NORTHERN DISTRICT OF CALIFORNIA
2
     STEVEN R. YOURKE,            )
3                                 )
                 Plaintiff,       )
4                                 )
     vs.                          )
5                                 )  CASE NO. C-06-2370 CW
                                  )
6    EXPERIAN INFORMATION         )
     SOLUTIONS, INC.              )    COPY
7                                 )
                 Defendant.       )
8

9

10              ORAL DEPOSITION

11              CRISTEN RANSOM

12             FEBRUARY 13, 2007

13

14

15

16        ORAL DEPOSITION OF CRISTEN RANSOM, produced as a

17   witness at the instance of the Defendant and duly sworn,

18   was taken in the above-styled and numbered cause on the

19   13th day of February, 2007, from 9:33 a.m. to

20   11:18 a.m., before Susie Miller, Certified Shorthand

21   Reporter No. 5033 in and for the State of Texas,

22   reported by machine shorthand at the offices of Jones

23   Day, 2727 North Harwood Street, Dallas, Texas 75201,

24   pursuant to the Federal Rules of Civil Procedure and the

25   provisions stated on the record or attached hereto.

2

1                          APPEARANCES

2


3     FOR PLAINTIFF:

4          MR. MARK F. ANDERSON
           KEMNITZER, ANDERSON, BARRON & OGILVIE, L.L.P.
5          445 BUSH STREET
           SIXTH FLOOR
6          SAN FRANCISCO, CALIFORNIA  94108
           Telephone: (415)623-3784 X101
7          Fax:  (415)861-3151
           E-mail: MARK@KABOLAW.CO
8

9     FOR DEFENDANT:

10         MR. JONATHON D. NICOL
           JONES DAY
11         3 PARK PLAZA
           SUITE 1100
12         IRVINE, CALIFORNIA  92614-8505
           Telephone: (949)851-3939
13         Fax:  (949)553-7539
           E-mail: JDNICOL@JONESDAY.COM
14
           MS. CINDY W. ANDREW
15         JONES DAY
           2727 NORTH HARWOOD STREET
16         DALLAS, TEXAS  75201-1515
           Telephone: (214)220-3939
17         Fax:  (214)969-5100
           E-mail: CANDREW@JONESDAY.COM
18

19

20

21

22

23

24

25

**INDEX**

PAGE

**CRISTEN RANSOM**

Examination by Mr. Anderson ................... 8
Signature Page ............................... 45
Court Reporter's Certificate ................. 47

**EXHIBITS**

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Amended Notice of Depositions | 8 |
| 2 | Defendant Experian Information Solutions, Inc.'s Objections to Plaintiff Steven R. Yourke's Amended Notice of Depositions | 8 |
| 3 | Request for Investigation Form, April 3, 2003, with Handwritten note | 15 |
| 4 | Experian credit report for Steven Yourke, dated May 8, 2003 | 15 |
| 5 | Experian credit report for Steven Yourke, dated October 18, 2005 | 15 |
| 6 | Experian credit report for Steven Yourke, dated October 20, 2005 | 15 |
| 7 | Letter to Experian from Steven R. Yourke, dated October 27, 2005, with attachments | 15 |
| 8 | Consumer Dispute Verification, Bates stamped EXP/YOURKE 00083 - 00087 | 15 |

| | EXHIBITS (cont.) | |
|---|---|---|
| EXHIBIT | DESCRIPTION | PAGE |
| 9 | Experian credit report for Steven Yourke, dated November 2, 2005 | 15 |
| 10 | Experian credit report for Steven Yourke, dated November 12, 2005 | 15 |
| 11 | Correspondence to Steven R. Yourke from Internal Revenue Service, dated 11-18-2005 | 15 |
| 12 | Experian credit report for Steven Yourke, dated December 12, 2005 | 15 |
| 13 | Experian credit report for Steven Yourke, dated January 26, 2006 | 15 |
| 14 | Experian credit report for Steven Yourke, dated January 31, 2006 | 15 |
| 15 | Experian credit report for Steven Yourke, dated February 14, 2006 | 15 |
| 16 | Letter to Steven Yourke from Carrie Higginbotham, dated February 14, 2006 | 15 |
| 17 | Signed copy of Exhibit 16 | 15 |
| 18 | Experian credit report for Steven Yourke, dated February 22, 2006 | 15 |
| 19 | Letter to Carrie Higgenbotham from Steven R. Yourke, dated February 28, 2006, with attachments from California Franchise Tax Board | 15 |
| 20 | (Withdrawn by Mr. Anderson) | 15 |

**EXHIBITS** (cont.)

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| 21 | (Withdrawn by Mr. Anderson) | 15 |
| 22 | Letter to Carrie Higgenbotham from Steven R. Yourke, dated March 1, 2006, with attachments from California Franchise Tax Board | 15 |
| 23 | Letter to Carolyn Helm from Steven R. Yourke, dated March 21, 2006, with attachments | 15 |
| 23A | Letter to Kristen [sic] Ransom from Steven R. Yourke, dated April 17, 2006, with attachments | 15 |
| 24 | Consumer Dispute Verification dated 2/27/06 with attached documents | 15 |
| 25 | Letter to Kristen [sic] Ransom from Steven R. Yourke, dated March 23, 2006 | 15 |
| 26 | Experian credit report for Steven Yourke, dated March 25, 2006 | 15 |
| 27 | Experian credit report for Steven Yourke, dated March 29, 2006 | 15 |
| 28 | Experian credit report for Steven Yourke, dated March 29, 2006 | 15 |
| 29 | Online Experian credit report for Steven Yourke, dated 3/29/06 | 15 |
| 30 | Experian credit report for Steven Yourke, dated March 30, 2006 | 15 |

**EXHIBITS** (cont.)

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| 31 | Experian credit report for Steven Yourke, dated April 11, 2006 | 15 |
| 32 | Experian credit report for Steven Yourke, dated April 28, 2006 | 15 |
| 33 | Experian credit report for Steven Yourke, dated March 23, 2006 | 15 |
| 34 | Experian credit report for Steven Yourke, dated April 4, 2006 | 15 |
| 35 | Letter to Steven Yourke from Cristen Ransom, dated April 3, 2006 | 16 |
| 36 | Handwritten note of Carrie Higginbotham dated 3/23/6 | 17 |
| 37 | Redacted Handwritten notes, Bates stamped EXP/YOURKE-A 00002 - 00009 | 19 |
| 38 | Letter to Kristen Ransom from Steven R. Yourke, dated March 23, 2006, with attachments | 41 |

1                          **STIPULATIONS**

2

3          It is agreed by and between the parties hereto,

4     through their attorneys appearing herein, that the

5     deposition of CRISTEN RANSOM is being taken at this time

6     pursuant to notice and agreement and in accordance with

7     the Federal Rules of Civil Procedure.

8          It is further agreed that Rule 30(b)(4) is waived by

9     agreement of the parties.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

|   | |
|---|---|
| | 1 | *P R O C E E D I N G S* |
| | 2 | *(Exhibits 1 and 2 marked.)* |
| | 3 | **CRISTEN RANSOM,** |
| | 4 | having been first duly sworn, testified as follows: |
| | 5 | **EXAMINATION** |
| 09:33:44 | 6 | *BY MR. ANDERSON:* |
| 09:33:53 | 7 | Q.   Please state your name. |
| 09:33:55 | 8 | A.   Cristen Ransom. |
| 09:33:56 | 9 | Q.   And what's your business address? |
| 09:33:59 | 10 | A.   701 Experian Parkway, Allen, Texas. |
| 09:34:04 | 11 | Q.   And you're employed by Experian, correct? |
| 09:34:08 | 12 | A.   That's correct. |
| 34:08 | 13 | Q.   And what's your current position with Experian? |
| 09:34:12 | 14 | A.   Supervisor. |
| 09:34:14 | 15 | Q.   Okay.  Is that your complete title, or what are |
| | 16 | you supervisor of? |
| 09:34:21 | 17 | A.   Consumer affairs special services. |
| 09:34:24 | 18 | Q.   Have you ever had your deposition taken before? |
| 09:34:26 | 19 | A.   I have. |
| 09:34:27 | 20 | Q.   How many times? |
| 09:34:27 | 21 | A.   Once. |
| 09:34:27 | 22 | Q.   Was that in a case involving -- well, what was |
| | 23 | that case involving? |
| 09:34:34 | 24 | A.   I don't recall. |
| 0  34:35 | 25 | Q.   How many years ago? |

| | | |
|---|---|---|
| 09:34:36 | 1 | A.   Less than a year. |
| 09:34:39 | 2 | Q.   Who was the plaintiff's attorney? |
| 09:34:41 | 3 | A.   I don't recall. |
| 09:34:42 | 4 | Q.   Okay.   What's your educational background? |
| 09:34:45 | 5 | A.   I have a degree in criminal justice and a |
| | 6 | paralegal certification. |
| 09:34:59 | 7 | Q.   How long have you been in your present |
| | 8 | position? |
| 09:35:04 | 9 | A.   Approximately two years. |
| 09:35:10 | 10 | Q.   To whom do you report? |
| 09:35:12 | 11 | A.   Carolyn Helm. |
| 09:35:13 | 12 | Q.   And what's her title? |
| 0  35:18 | 13 | A.   Compliance manager. |
| 09:35:28 | 14 | Q.   What are your duties and responsibilities in |
| | 15 | your current position? |
| 09:35:32 | 16 | A.   I'm responsible for managing the workflow |
| | 17 | within the department and leading the team. |
| 09:35:39 | 18 | Q.   Okay.   And what's the nature of the workflow? |
| 09:35:44 | 19 | A.   We receive third-party requests for disputes |
| | 20 | from consumer. |
| 09:35:59 | 21 | Q.   How many employees report to you? |
| 09:36:01 | 22 | A.   Fourteen. |
| 09:36:04 | 23 | Q.   How do you refer to your group?   There must be |
| | 24 | a name or a team or -- what do you call them? |
| 0  36:11 | 25 | A.   It's called CASS.   It's an acronym for consumer |

1    affairs special services.

09:36:18  2        Q.    Now, some of these reports I've seen references

3    to badge numbers.

09:36:27  4              Do you have one?

09:36:28  5        A.    I do.

09:36:28  6        Q.    What's your number?

09:36:30  7        A.    CX03 -- I'm sorry.  It's escaping me.

09:36:37  8        Q.    Well, we'll look at that later.

09:36:42  9        A.    Okay.

09:36:42  10        Q.    Now, the X in your badge number, does that

11    designate someone in the CASS department, C-A-S-S?

09:36:49  12        A.    Not necessarily.

09:36:49  13        Q.    What does it mean?

09:36:50  14        A.    It's -- it's a different office within the

15    system.

09:36:55  16        Q.    What office is that?

09:36:57  17        A.    Well, there are different log-ins for the

18    computer system, so it enables us to do different

19    functions.

09:37:05  20        Q.    And so depending on your position, you have

21    access to different parts of the computer system?

09:37:11  22        A.    The ability to make different selections.

09:37:17  23        Q.    Do you have any direct contact with Experian's

24    in-house legal department from time to time?

0:37:23  25        A.    I do.

09:37:24  1    Q.   And -- strike that.

09:37:29  2              Well, what is the function of the CASS

3    part of Experian?

09:37:40  4    A.   The consumer affairs special services?  We

5    address third-party complaints that derive from consumer

6    disputes.

09:37:49  7    Q.   All right.  Do you take disputes when they

8    initially come into Experian, or do you take them after

9    agents work on them and decide they need more help?

09:38:01  10   A.   It depends on the situation.

09:38:02  11   Q.   Well, what's typical?

09:38:04  12   A.   Typically the disputes come directly to our

13   department.

09:38:08  14   Q.   What disputes come directly to your department

15   as opposed to some other department?

09:38:16  16   A.   Those that are written by a third party.

09:38:18  17   Q.   When you say "third party," what do you mean?

09:38:20  18   A.   Maybe an attorney represented a consumer.

09:38:24  19   Q.   Okay.

09:38:25  20   A.   Potentially a government agency might be

21   representing the consumer.

09:38:35  22   Q.   You also handle inquiries from these so-called

23   credit repair organizations?

09:38:45  24   A.   The company does.

c  38:46   25   Q.   Yeah.  Your --

| | | |
|---|---|---|
| 09:38:46 | 1 | A.    Not necessarily my department. |
| 09:38:48 | 2 | Q.    Okay.  Do you also handle disputes that have |
| | 3 | been worked on by others within Experian who decide they |
| | 4 | need more help? |
| 09:39:00 | 5 | A.    Possibly. |
| 09:39:00 | 6 | Q.    Possibly?  Do you? |
| 09:39:03 | 7 | A.    We can.  It just depends on the situation. |
| 09:39:05 | 8 | Q.    Well, you do from time to time, right? |
| 09:39:08 | 9 | A.    Yes. |
| 09:39:09 | 10 | Q.    All right.  You say you've been in your present |
| | 11 | position for two years. |
| 09:39:13 | 12 |         What did you do before that? |
| 39:14 | 13 | A.    I managed a fraud department for a large |
| | 14 | telecommunications company. |
| 09:39:22 | 15 | Q.    So your first position with Experian is your |
| | 16 | current position? |
| 09:39:26 | 17 | A.    Correct. |
| 09:39:26 | 18 | Q.    And how long -- you say -- fraud department for |
| | 19 | what company? |
| 09:39:36 | 20 | A.    Vartec Telecom. |
| 09:39:39 | 21 | Q.    Okay.  And what was your position before that? |
| 09:39:46 | 22 | A.    I was -- oh, man.  I was a -- the supervisor, |
| | 23 | before that I was a lead, before that I worked in |
| | 24 | subscription services of the same company.  I also |
| | 25 | worked in our regulatory division of that same company. |

| | | |
|---|---|---|
| 09:40:11 | 1 | Q.   Okay.  So in your -- Experian is your first |
| | 2 | employer in the credit business, so to speak, right? |
| 09:40:18 | 3 | A.   I had credit experience at Vartec but in the -- |
| | 4 | in the credit bureau industry, yes, sir. |
| 09:40:43 | 5 | Q.   Now, in this particular -- well, strike that. |
| 09:40:47 | 6 | Did you review any documents in |
| | 7 | preparation for today's deposition? |
| 09:40:51 | 8 | A.   I did. |
| 09:40:52 | 9 | Q.   Well, what documents did you look at? |
| 09:40:55 | 10 | A.   The correspondence that I mailed to the |
| | 11 | consumer. |
| 09:41:03 | 12 | Q.   When you say "consumer," you mean Steven |
| | 13 | Yourke? |
| 09:41:08 | 14 | A.   Yes. |
| 09:41:11 | 15 | Q.   Okay.  Did you look at any other documents? |
| 09:41:11 | 16 | A.   I reviewed some of the logs. |
| 09:41:15 | 17 | Q.   Okay.  Let's look at those.  Experian has |
| | 18 | produced three documents which I'll hand you. |
| 09:41:24 | 19 | MR. ANDERSON:  Did we decide to mark these |
| | 20 | or not? |
| 09:41:28 | 21 | MR. NICOL:  No. |
| 09:41:29 | 22 | MR. ANDERSON:  No. |
| 09:41:29 | 23 | Q.   (By Mr. Anderson)  For identification, at the |
| | 24 | top left it says "disclosure log" and it's got Experian |
| | 25 | Bates stamp 395 through 39 -- no -- through 400. |

09:41:43  1          And then the next one I'll hand you is D/R

2    log report, Experian Bates stamp 401 through -- 401

3    through 417.  And then attached to it is also a dispute

4    resolution log, which is like a separate computer run

5    looks like for an earlier date, Experian 3941 page, and

6    then I'll paper clip that.  And then what I believe is

7    an administrative report Bates stamp 418 through 433.

09:42:35  8          Did you look at any of these documents in

9    preparation for today's deposition?

09:42:44  10    A.    Yes.

09:42:44  11    Q.    Okay.  First of all, tell me what's the

12   function of the disclosure report.

09:42:48  13    A.    The -- the -- the disclosure report shows any

14   time the consumer's report was accessed either by a

15   consumer's request through an investigation, potentially

16   through the Internet or self-service means of obtaining

17   his report.

09:43:13  18          MR. NICOL:  I'm sorry.  Do you think this

19   is going to get into stuff that we should seal?  Because

20   it looks like you're going to focus on this for a while.

09:43:21  21          MR. ANDERSON:  Right.  Yeah, I'm going to

22   talk about these reports for a while.

09:43:22  23          MR. NICOL:  Okay.  Let's start from here.

24          *(Confidential portion excerpted out and*

25          *appears in a separately-bound transcript.)*

STEVE GENTRY & ASSOCIATES, INC.    (214)  321-5333
2379 GUS THOMASSON ROAD, SUITE 100, MESQUITE, TX 75150

09:56:57   1          MR. NICOL:  Just to be clear, I think that

2     we can stop the sealing part right there, because it

3     looks like you're going to go on to the correspondence

4     now.

09:57:06   5          MR. ANDERSON:  Okay.

09:57:12   6     Q.   (By Mr. Anderson)  Now, do you have a memory of

7     ever personally speaking on the telephone to the

8     plaintiff in this case, Steven Yourke?

09:57:25   9     A.   I do not.

10          (Exhibits 3 through 34 marked)

09:57:33  11     Q.   I've had the court reporter mark a stack of

12    documents in chronological order starting with 3 through

13    34.  And let me put the whole stack in front of you just

14    for convenience and let's -- I want to find the first

15    point at which you became involved in this dispute

16    process.  Maybe I can point you to the place.  Let's see

17    here.

09:58:21  18          Now, you started with Experian on what

19    date?

09:58:26  20     A.   November 29th, 2004.

09:59:05  21     Q.   Why don't you look through there and go to your

22    letter, April 3rd, 2006, looks like about two-thirds of

23    the way down in terms of thickness of documents.

09:59:42  24     A.   (Witness reviews documents.)

0  59:43  25     Q.   You must have gone by it.

09:59:46 1    *A.*   Okay.

09:59:46 2    *Q.*   It's April 3rd, '06 date-wise, unless it didn't

3   get in there.  I tell you what, that stack didn't have

4   it, so let me get a copy.

10:00:31 5        *MR. ANDERSON:*  That's what fell down

6   behind.

10:00:47 7        Do you find one in yours?

10:00:51 8        *MR. NICOL:*  Not yet.

10:00:54 9        *MR. ANDERSON:*  I have one here which we

10   can use.

10:00:57 11        *MS. ANDREW:*  I can make a copy if we need

12   to.  Do you mind if we go off the record?

1 01:14 13        *MR. ANDERSON:*  Yes.

14        *(Recess taken from 10:01 to 10:05)*

15        *(Exhibit 35 marked)*

10:05:12 16    *Q.*   *(By Mr. Nicol)*  The court reporter has marked a

17   letter dated April 3, 2006, signed by the deponent to

18   Mr. Yourke, Exhibit 35.  If you will look at that.

10:05:49 19    *A.*   Okay.

10:05:49 20    *Q.*   Now, is this a letter you wrote to Steven

21   Yourke?

10:05:53 22    *A.*   I approved the letter.

10:05:56 23    *Q.*   Well, who drafted it?

10:05:58 24    *A.*   Ms. Higginbotham and myself, we did it

25   together.

| | |
|---|---|
| 10:06:03 | 1 |
| | 2 |
| | 3 |
| 10:06:13 | 4 |
| | 5 |
| 10:06:17 | 6 |
| 10:06:19 | 7 |
| | 8 |
| 10:06:26 | 9 |
| 10:06:32 | 10 |
| | 11 |
| | 12 |
| 1  06:44 | 13 |
| 10:06:44 | 14 |
| 10:06:45 | 15 |
| | 16 |
| 10:06:49 | 17 |
| 10:06:51 | 18 |
| | 19 |
| | 20 |
| | 21 |
| 10:19:17 | 22 |
| | 23 |
| 10:19:24 | 24 |
| 1  19:27 | 25 |

1     *Q.*   Okay.  Now, prior to this date, had you

2  personally had any involvement in any of the disputes

3  raised by Steven Yourke?

4     *A.*   Not in the disputes, in the review of his

5  claims.

6     *Q.*   Well, that's what I meant.

7          So at what point in time did you get

8  involved in the review of his claims, as you put it?

9     *A.*   Approximately sometime in February.

10    *Q.*   And so what was the first -- what was your

11  first involvement with this claim, as you put it, raised

12  by Mr. Yourke?

13          *MR. NICOL:*  I'm sorry.

14    *Q.*   *(By Mr. Anderson)*  What was the nature of it?

15          You said it was in February.  What was it

16  you did?

17          *MR. NICOL:*  Can we get a break real quick?

18          *MR. ANDERSON:*  Oh, sure.

19          *(Recess taken from 10:07 to 10:19)*

20          *(Exhibit 36 marked)*

21          *(Exhibit 36 marked)*

22    *Q.*   *(By Mr. Nicol)*  I'll hand you what's been

23  marked Plaintiff's 36.

24          Do you recognize that handwriting?

25    *A.*   Yes.

| | |
|---|---|
| 10:19:28 | 1 |
| 10:19:30 | 2 |
| 10:19:32 | 3 |
| 10:19:37 | 4 |
| 10:19:50 | 5 |
| | 6 |
| | 7 |
| 10:20:09 | 8 |
| | 9 |
| | 10 |
| 10:20:21 | 11 |
| 10:20:22 | 12 |
| | 13 |
| | 14 |
| 10:20:32 | 15 |
| 10:20:33 | 16 |
| | 17 |
| | 18 |
| | 19 |
| 10:20:45 | 20 |
| | 21 |
| 10:20:51 | 22 |
| 10:20:54 | 23 |
| 10:20:54 | 24 |
| | 25 |

1   Q.   Whose is it?

2   A.   That's Carrie Higginbotham's.

3   Q.   Let me look at it again.

4   A.   (Tenders document.)

5   Q.   Now, this bottom part of the handwriting says:

6   Phone verified docs -- D-O-C-S -- with Christie Norwood.

7   And it's got an area code (916) number.

8       Did you at the time discuss with

9   Ms. Higginbotham whether she should call the California

10  Franchise Tax Board concerning Mr. Yourke's claim?

11  A.   I don't recall.

12  Q.   Do you have a memory of talking with

13  Ms. Higginbotham about her conversation with anyone at

14  the Franchise Tax Board?

15  A.   I really don't.

16  Q.   Other than this note that you see here, do you

17  have any particular knowledge of what Ms. Higginbotham

18  may have learned from talking to the Franchise Tax

19  Board?

20  A.   Just that the liens were filed appropriately

21  based on their policies.

22  Q.   And that's what Ms. Higginbotham told you?

23  A.   Yes.

24  Q.   Do you know one way or another whether

25  Ms. Higginbotham ever called or tried to call anybody at

1    the Internal Revenue Service concerning Mr. Yourke's
2    claim?
10:21:06  3        A.    I do not know.
4                    (Exhibit 37 marked)
10:21:07  5        Q.    (By Mr. Anderson)  All right.  I'll hand you
6    what's been marked as Plaintiff's Exhibit 37.
10:21:13  7                    And is that from your own personal
8    notebook?
10:21:16  9        A.    It is.
10:21:17  10       Q.    And counsel has indicated that irrelevant
11   matters have been redacted.
10:21:26  12                   And I take it those notes pertain to
13   Mr. Yourke's claim?
10:21:40  14       A.    That's correct.
10:21:40  15       Q.    So you maintain a notebook on a day-to-day
16   basis?
10:21:40  17       A.    Yes.
10:21:58  18       Q.    Now, the first page has a date almost a year
19   ago, December 14th, '06.
10:22:06  20                   And the note on page 2, was that something
21   that would have been entered that date?
10:22:13  22                   MR. NICOL:  Point of clarification.  This
23   says February 14th, '06.  You said December.
10:22:20  24       Q.    (By Mr. Anderson)  Oh, I misspoke.  I meant
25   December 14th, '06.

10:22:28   1          A.    February 14th?

10:22:30   2          Q.    Did I say it again?  February 14th, '06.  Let's

           3    get it right.

10:22:32   4                So this note on page 2, is that something

           5    you would have entered on that date?

10:22:38   6          A.    Something I wrote in my notebook.

10:22:41   7          Q.    Right, that's what I meant.

10:22:43   8                And I'm having trouble reading some of

           9    this.  Can you read -- after tax lien, what does that

          10    say?

10:22:46  11          A.    Quote, at no time have I ever owed back taxes,

          12    end quote.

1  22:52  13          Q.    And it says what?

10:22:55  14          A.    Five tax liens, threatened lawsuit, sent

          15    documentation, liens were released.  There's a phone

          16    number and a report number.

10:23:13  17          Q.    Now, where did you get this information?

10:23:15  18          A.    Off my voice mail.

10:23:17  19          Q.    So this was a telephone call from Mr. Yourke

          20    that came into Experian and someone transferred it to

          21    your voice mail?

10:23:27  22          A.    That's correct.

10:23:27  23          Q.    Did Ms. Higginbotham transfer it?

10:23:30  24          A.    I don't know.

1  23:32  25          Q.    Do you remember taking any action in response

| | | |
|---|---|---|
| | 1 | to hearing this voice mail? |
| 10:23:36 | 2 | A.   According to the document, I gave it to Carrie. |
| 10:23:47 | 3 | Q.   Well, she's the one who transmitted Yourke's |
| | 4 | message to you, right? |
| 10:23:54 | 5 | A.   I don't know how he got into my voice mail. |
| 10:23:58 | 6 | Q.   Oh, it could have been any agent that |
| | 7 | transferred it? |
| 10:24:01 | 8 | A.   Yes, sir. |
| 10:24:01 | 9 | Q.   That's a yes? |
| 10:24:03 | 10 | A.   (Nods head affirmatively.) |
| 10:24:05 | 11 | Q.   Okay.  All right.  Let's go to the next page -- |
| | 12 | if can I read the date right -- February 24th, '06. |
| 1  24:15 | 13 | Okay.  So you reference the same report |
| | 14 | number as the previous page, right? |
| 10:24:22 | 15 | A.   Yes, sir. |
| 10:24:23 | 16 | Q.   All right.  And you say -- it says, Carrie |
| | 17 | contact franchise board. |
| 10:24:29 | 18 | Was that directions to her to call the |
| | 19 | Franchise Tax Board? |
| 10:24:34 | 20 | A.   I don't know if it was direction to her or what |
| | 21 | she told me she was doing. |
| 10:24:40 | 22 | Q.   Okay.  Then we have February 27th, '06, and a |
| | 23 | note Steven Yourke and then that number. |
| 10:24:53 | 24 | That's another report number, right? |
| 1  25:00 | 25 | A.   It appears to be another report number. |

10:25:05 1      Q.   Was this note made as -- in reaction to another

2      telephone call from Steven Yourke, you received the

3      voice mail?

10:25:19 4      A.   I would have made entry into my book if he had

5      left a voice mail.

10:25:25 6      Q.   So the answer is no?

10:25:26 7      A.   Well, the answer is yes, it would be a voice

8      mail.  That's usually when I enter things into my

9      notebook.

10:25:34 10      Q.   Okay.  I see.

10:25:38 11           And then March 14th, 2006, the next page

12      says Steven Yourke, and there's another number, Re:

13      dispute, working with Carrie, and then there's an area

14      code (415) number and then it says sent message to

15      Carrie at 4:15 p.m., need update status.

10:26:07 16           What does that mean?

10:26:08 17      A.   Need update on status.  Because I continued to

18      get voice mails, I wanted her to update me on what was

19      going on.

10:26:18 20      Q.   The next page looks like March 27th, '06; is

21      that right?

10:26:24 22      A.   It's March.

10:26:31 23      Q.   Then the entry on the next page says Carrie,

24      Steven Yourke and another number, No. 4 lien, 9,916,

25      duplicated, and (415) number.

10:26:47   1               Is that another voice mail you got from

2   Steven Yourke?

10:26:51   3      A.    Yes.

10:26:52   4      Q.    So whenever you wrote down Yourke's phone

5   number, that was a voice mail from him?

10:26:59   6      A.    That's correct.

10:26:59   7      Q.    Do you know if you took any action in response

8   to this voice mail?

10:27:02   9      A.    I would have given it to Carrie.

10:27:05   10      Q.    Now, all these voice mails, why didn't you call

11   Steven Yourke back yourself?

10:27:11   12      A.    I was under the impression that documents were

13   being verified with the California Franchise Tax Board

14   by Carrie and there wasn't anything else I could do

15   while we were waiting on a response.

10:27:26   16      Q.    Do you have a memory that there was some

17   problem getting information from the Franchise Tax

18   Board?

10:27:37   19      A.    I vaguely recall that messages were left for

20   Ms. Norwood that were not being returned because she was

21   not in the office and were waiting for her.

10:28:01   22      Q.    Now, throughout this period we're talking

23   about, February, March, April, '06, in that period, did

24   you personally review any documents pertaining to

25   Mr. Yourke's claim?

10:28:15  1        A.   I believe I looked at some documents Carrie

2   provided to me.

10:28:24  3        Q.   Did you look at any documents received from the

4   Franchise Tax Board?

10:28:29  5        A.   Yes.

10:28:29  6        Q.   Did you look at any documents received from --

7   either directly from Internal Revenue Service or

8   indirectly from Mr. Yourke?

10:28:38  9        A.   Yes.

10:28:57  10        Q.   If you would, look at Exhibit 16, please.

11   Exhibit 16 is a letter dated February 14th, '06 signed

12   by Carrie Higginbotham to Mr. Yourke.

1  29:20  13             Now, have you had a chance to read that?

10:29:26  14        A.   (Witness reviews document.)  Yes.

10:29:28  15        Q.   Have you seen it before today?

10:29:29  16        A.   Yes.

10:29:30  17        Q.   Did you participate in drafting this letter?

10:29:33  18        A.   No.

10:29:36  19        Q.   Ms. Higginbotham sent it out -- did she send

20   this letter out before you got involved in Mr. Yourke's

21   claim as far as you know?

10:29:45  22        A.   As far as I know.

10:29:55  23        Q.   Later on after you did become involved in

24   this -- Mr. Yourke's claim, did you ever -- did you read

25   this letter?

| | | |
|---|---|---|
| 10:30:07 | 1 | A.   Did I later read the letter? |
| 10:30:09 | 2 | Q.   Did you read it? |
| 10:30:10 | 3 | A.   Not until yesterday. |
| 10:30:11 | 4 | Q.   Okay.  That's what I was getting at. |
| 10:30:33 | 5 | If you would, please look at Exhibit 19, a |
| | 6 | letter from Steven Yourke to Ms. Higginbotham -- I'm not |
| | 7 | pronouncing that right -- February 28th, '06. |
| 10:31:03 | 8 | Not counting yesterday or any preparation |
| | 9 | for this deposition, have you ever seen this letter |
| | 10 | before? |
| 10:31:10 | 11 | A.   I don't recall.  I'm sure that I reviewed |
| | 12 | documents in the file prior to writing that letter |
| | 13 | April 3rd, but I don't recall which ones. |
| 10:31:28 | 14 | Q.   Take a look at Exhibit 20.  That's on the |
| | 15 | letterhead of the State of California Franchise Tax |
| | 16 | Board.  There's a date in the upper left, February 23rd, |
| | 17 | 2006. |
| 10:31:45 | 18 | A.   Okay. |
| 10:31:47 | 19 | Q.   Except for preparing for this deposition, have |
| | 20 | you ever seen this document before? |
| 10:31:53 | 21 | A.   I believe he included it in the correspondence |
| | 22 | he mailed to me, but it's not part of this packet. |
| 10:32:01 | 23 | Q.   All right.  Now, at the time you received this |
| | 24 | document, Exhibit 20, how did you interpret the |
| | 25 | situation with respect to what should be reported -- let |

1  me rephrase that.

10:32:23  2          Looking at this document, what was your

3  conclusion in terms of what Experian should report in

4  terms of this tax lien that's involved here?

10:32:33  5      A.    That Mr. Yourke's debt to the State of

6  California was $114 --

10:32:41  7      Q.    Was it your belief --

10:32:41  8      A.    -- on this document.   And then there's multiple

9  debts listed here.

10:32:50  10      Q.    Was it your belief that that $114 represented

11  taxes he owed?

10:32:57  12      A.    No.

⊥  32:57  13      Q.    What did you think it represented?

10:32:59  14      A.    It was the penalties and fees associated with

15  him not filing his taxes.

10:33:08  16      Q.    Did you consider it was just a -- whether it

17  was just a collection fee for having -- them having to

18  file a tax lien and then releasing it?

10:33:19  19      A.    I don't recall what I considered.

10:33:21  20      Q.    Do you recall Mr. Yourke was pointing out in

21  his correspondence throughout that this $114, these

22  small dollar items like that, were not taxes, not

23  interest, not penalties but simply a fee for Franchise

24  Tax Board having to file a tax lien and then releasing

25  it?

10:33:44   1          MR. NICOL:  Objection.  Which
        2   correspondence are you referring to?  And the question
        3   is somewhat ambiguous and long.  Would you mind
        4   rephrasing?
10:33:54   5          MR. ANDERSON:  No, it's a good question.
10:33:55   6      Q.   (By Mr. Anderson)  Go ahead and -- I think you
        7   should go ahead and answer.
10:33:57   8          MR. NICOL:  But which correspondence -- I
        9   mean, I don't even know which correspondence she --
10:34:00  10      A.   Well, you've got multiple documents here.  You
       11   want me to just look at this piece?
10:34:04  12      Q.   (By Mr. Anderson)  No.  See, I want you to
       13   listen to my question.
10:34:07  14          MR. ANDERSON:  In fact, you want to read
       15   it back to her?
10:34:07  16          THE REPORTER:  Question, "Do you recall
       17   Mr. Yourke was pointing out in his correspondence
       18   throughout that this $114, these small dollar items like
       19   that, were not taxes, not interest, not penalties but
       20   simply a fee for Franchise Tax Board having to file a
       21   tax lien and then releasing it?"
10:34:31  22      A.   I only recall that he had -- had not filed his
       23   taxes on time and there were penalties associated with
       24   not doing that.
1  34:40  25      Q.   (By Mr. Anderson)  So your assessment was he

| | |
|---|---|
| | 1 |
| 10:34:48 | 2 |
| 10:34:48 | 3 |
| | 4 |
| | 5 |
| | 6 |
| 10:35:53 | 7 |
| | 8 |
| 10:35:55 | 9 |
| | 10 |
| | 11 |
| 10:36:06 | 12 |
| | 13 |
| 10:36:10 | 14 |
| 10:36:21 | 15 |
| | 16 |
| 10:36:24 | 17 |
| | 18 |
| 10:36:29 | 19 |
| | 20 |
| 10:36:37 | 21 |
| 10:36:41 | 22 |
| | 23 |
| 10:47:03 | 24 |
| | 25 |

1   was being penalized for not filing his taxes on time?

2       A.    Correct.

3       Q.    Okay.  Why don't you look at Exhibit 23,

4   please.  This is a letter from Mr. Yourke addressed

5   to -- well, to Experian, attention Carolyn Helm.  It's a

6   three-page letter with attachments.

7       A.    Is this document right here supposed to be in

8   the packet?

9       Q.    You know, it may not.  I think you have a

10  point, that I think that should not be there.  I'm sure

11  it shouldn't.  Let's fix that.

12      A.    There's two of them in this packet -- actually

13  there's multiples in here.

14      Q.    I noticed that in the other version.

15              MR. ANDERSON:  Anybody got a staple

16  puller?

17              THE WITNESS:  Probably in one of those

18  drawers behind you.

19              MS. ANDREW:  I'm not sure if we've got

20  staple removers.  I can probably go find one.

21              MR. ANDERSON:  I'll get it.

22              MR. NICOL:  Let's go off the record.

23              (Recess taken from 10:36 to 10:47)

24              MR. ANDERSON:  I'm handing the witness

25  Plaintiff's Exhibit 23 as properly constituted.

STEVE GENTRY & ASSOCIATES, INC.     (214)  321-5333
2379 GUS THOMASSON ROAD, SUITE 100, MESQUITE, TX 75150

| | | |
|---|---|---|
| 10:47:34 | 1 | Q.   (By Mr. Anderson)   In this the Bates stamps go |
| | 2 | from 57 to 80? |
| 10:47:40 | 3 | A.   Uh-huh. |
| 10:47:45 | 4 | Q.   So you've had a chance to look through here -- |
| 10:47:50 | 5 | A.   Yes, I have. |
| 10:47:50 | 6 | Q.   -- the document? |
| 10:47:53 | 7 | Do you know if you read this letter from |
| | 8 | Mr. Yourke at the time it was sent to Experian? |
| 10:47:58 | 9 | A.   I did. |
| 10:47:58 | 10 | Q.   And what action did you take after reading the |
| | 11 | letter? |
| 10:48:09 | 12 | A.   I recall getting with Carrie to discuss the |
| | 13 | situation and having discussions with my legal |
| | 14 | department regarding the documents.  I began drafting |
| | 15 | the letter that you find from April 3rd as a result. |
| | 16 | But there's actually two different pieces of |
| | 17 | correspondence here.  There's a letter to me and there's |
| | 18 | a letter to Ms. Helm and they weren't sent at the same |
| | 19 | time. |
| 10:48:52 | 20 | Q.   Well, that means we're going to have to fix |
| | 21 | this again.  Let's fix that.  We'll get it right yet.  I |
| | 22 | see your point. |
| 10:49:07 | 23 | MR. ANDERSON:  So, Counsel, you agree that |
| | 24 | Exhibit 23 should be Bates stamped 57 through 76? |
| 1ˆ49:17 | 25 | MR. NICOL:  Let me just confirm.  Yeah, |

1    that's right.

10:49:26    2                MR. ANDERSON:  Okay.  And then why don't I

3    ask the court reporter to mark Bates stamped 78 through

4    80 as Exhibit 23A.

5                (Exhibit 23A marked)

10:50:05    6        Q.    (By Mr. Anderson)  Now, do you recall what

7    changes Experian made in Mr. Yourke's credit report

8    after your reading this letter and consulting with the

9    legal department and others within Experian?

10:50:22   10        A.    I recall that we determined that we would

11    adjust the amount on the liens to be that which the

12    consumer, Mr. Yourke, paid.

1   51:01   13        Q.    Now, in the dispute resolution log there is the

14    reference -- and we can look at it if you want -- it

15    says -- there is a reference to Marina Valardi.

10:51:17   16                Who is she?

10:51:18   17        A.    I need to see the log.

10:51:20   18        Q.    Oh, sure.  Did I take it back from you?

10:51:32   19        A.    Are they labeled?

10:51:32   20        Q.    No.  March 24th, '06.

10:51:39   21                MR. NICOL:  Could we find the exhibit for

22    that?  Do we have this labeled as an exhibit?

10:51:47   23                MR. ANDERSON:  You mean the dispute

24    resolution log?

1  51:50   25                MR. NICOL:  Yeah.

| | | |
|---|---|---|
| 10:51:50 | 1 | MR. ANDERSON:  We didn't make it one. |
| 10:51:55 | 2 | MR. NICOL:  Oh. |
| 10:51:57 | 3 | A.    I'm sorry.  Again, what date did you say? |
| 10:52:03 | 4 | Q.    (By Mr. Anderson)  March 24, '06. |
| 10:52:10 | 5 | A.    Marina Valarde is an employee in our legal |
| | 6 | department. |
| 10:52:16 | 7 | Q.    Is she a lawyer? |
| 10:52:17 | 8 | A.    No. |
| 10:52:18 | 9 | Q.    Paralegal? |
| 10:52:20 | 10 | A.    Yes. |
| 10:52:21 | 11 | Q.    Okay.  How about the other name, Abril Turner? |
| 10:52:27 | 12 | A.    Abril -- |
| 1  52:27 | 13 | THE REPORTER:  Abril? |
| 10:52:27 | 14 | MR. ANDERSON:  Unusual name.  A-B-R-I-L-L. |
| 10:52:31 | 15 | A.    It's actually spelled with one L. |
| 10:52:41 | 16 | Abril Turner is an employee in our legal |
| | 17 | department. |
| 10:52:41 | 18 | Q.    (By Mr. Anderson)  Is that person a lawyer? |
| 10:52:42 | 19 | A.    Yes. |
| 10:52:44 | 20 | Q.    Did you personally talk with that attorney? |
| 10:52:48 | 21 | A.    I did not personally speak with the attorney. |
| 10:52:51 | 22 | Q.    Do you know who did, about this matter? |
| 10:52:54 | 23 | A.    I don't know. |
| 10:53:02 | 24 | Q.    In the ordinary course of business, who would |
| | 25 | have talked to the legal department about this matter? |

10:53:08  1       A.   Carrie would have talked to the legal

2   department.   It was her case that she was working on.

10:53:15  3       Q.   Okay.   Now, after this date, if we look at

4   Mr. Yourke's updated consumer report, it still shows a

5   federal tax lien at 51,655.

10:53:42  6              MR. NICOL:   Objection.

10:53:43  7       Q.   (By Mr. Anderson)   Is that right?

10:53:43  8              MR. NICOL:   Which -- sorry.   Which credit

9   report are you referring to?

10:53:48 10       A.   I would need to see the report.

10:53:50 11              MR. ANDERSON:   I'll get that.

10:53:54 12       Q.   (By Mr. Anderson)   Let's go through here to the

13   report March 25th, '06.

10:54:08 14              What exhibit is that?

10:54:09 15       A.   26.

10:54:10 16       Q.   Okay.   If you look at page 2, the top one is

17   the federal tax lien that says claim amount 51,655.   But

18   the state tax lien amounts are the small amounts, 114,

19   120, 11 and zero.

10:54:36 20       A.   Correct.

10:54:36 21       Q.   Do you know why Experian didn't change the

22   federal tax lien amount to take off that very large

23   number, 51,000?

10:54:45 24       A.   As I recall, there was still a document being

25   reviewed by our legal department that would later change

          1    that.

10:54:57  2         Q.   Later on it was changed, correct?

10:54:59  3         A.   That's correct.

10:55:00  4         Q.   Okay.  Do you find that there is a consumer

          5    dispute verification dated March 23, '06?  I think that

          6    should be in this pile.  I'd ask you to look at that.

10:55:52  7         A.   Okay.

10:55:53  8         Q.   Yeah, that's Exhibit 24.

10:56:01  9              Now, this consumer dispute verification is

          10   filled out at the top.

10:56:06  11             Does it appear to have actually been sent

          12   anywhere?

:  56:17  13             MR. NICOL:  Objection.  What do you mean

          14   by sent?

10:56:19  15             MR. ANDERSON:  Well, let me rephrase that.

10:56:24  16        Q.   (By Mr. Anderson)  It says at the top:

          17   "Consumer states inaccurate information.  Please provide

          18   all documentation pertaining to these liens."

10:56:34  19             Does it appear that this was sent to one

          20   of Experian's vendors or --

10:56:38  21        A.   This would have been sent by -- to one of our

          22   vendors.

10:56:43  23        Q.   Does it appear that the vendor reported back on

          24   this?

1  56:46  25        A.   It does.

10:56:47  1     Q.   Okay.  Where is that shown?

10:56:49  2     A.   The handwritten -- the checkmarks, anything

3    written on here would have been done by the vendor in

4    response to the consumer dispute verification form.

10:57:04  5     Q.   Okay.  There's some handwritten initials

6    CASFRCI.

10:57:10  7          What's that mean, if you know?

10:57:12  8     A.   I don't know.

10:57:12  9     Q.   Well, is it correct that Experian's vendor

10   for -- in this -- looking at tax liens in San Francisco,

11   at least, is LexusNexis?

10:57:25  12    A.   I don't know that for certain.  It could be.

1  57:30  13    Q.   Did you look at any of the consumer dispute

14   verifications pertaining to Mr. Yourke's claim?

10:57:43  15    A.   I did not.

10:58:12  16    Q.   Let's go back to your letter.  And I just can't

17   quite remember what exhibit it is.

10:58:34  18    A.   35.

10:58:52  19    Q.   You earlier explained that this -- you signed

20   this letter but it was drafted by Ms. Higginbotham?

10:58:59  21    A.   It was a combination effort between the two of

22   us.  I approved the letter.

10:59:12  23    Q.   Now, in the third paragraph in the letter you

24   make reference to Internal Revenue Service.  You say:

25   "Please be aware the Franchise Tax Board and Internal

1  Revenue Service indicate that their records reflect

2  there were tax liens filed against you."

10:59:31  3  Do you have any knowledge whether anyone

4  at Experian had directly contacted the Internal Revenue

5  Service about Mr. Yourke's claim at that point in time?

10:59:43  6  A.  According to the -- the D/R log, there was a

7  dispute sent to the vendor to check the IRS records, so

8  it was through the CDV process.

10:59:56  9  Q.  Well, okay.  I've seen CDVs to the vendor that

10  went to San Francisco recorder to look to see what was

11  recorded there, but I'm asking was there --

11:00:13  12  A.  May I look at the documents?

1  00:16  13  Q.  Sure.

11:00:16  14  MS. ANDREW:  Can you repeat the question?

15  I'm sorry.

11:00:20  16  Q.  (By Mr. Anderson)  My question is whether

17  anyone at Experian contacted Internal Revenue Service

18  directly.

11:00:27  19  I'm not talking about the CDV process

20  where the vendor goes down to the recorder's office and

21  sees what's filed there.  I'm talking about directly

22  with phone or letter or any other way.

11:00:43  23  A.  I don't know.

11:00:43  24  Q.  I haven't seen any documents indicating there

25  was any contact with the IRS directly.

| | | |
|--|--|--|
| 11:00:50 | 1 | Have you? |
| 11:00:51 | 2 | A.   No. |
| 11:00:52 | 3 | You might want to ask the person who was |
| | 4 | working on the case. |
| 11:00:56 | 5 | Q.   I will. |
| 11:00:58 | 6 | A.   Thank you. |
| 11:01:02 | 7 | Q.   In your letter there's a reference to |
| | 8 | Section 605(a)(5) of the Fair Credit Reporting Act. |
| 11:01:11 | 9 | What's your understanding of what that |
| | 10 | section says? |
| 11:01:14 | 11 | A.   I don't have it memorized, but my understanding |
| | 12 | is that Experian as a credit reporting is able to report |
| | 13 | tax liens indefinitely.  There's no indication in the |
| | 14 | law that -- that states that we have to do it -- that |
| | 15 | Experian has to retain it for a certain amount of years. |
| 11:01:44 | 16 | Q.   All right.  Now, the last sentence in your |
| | 17 | letter states:  "Any further disputes regarding these |
| | 18 | tax liens should be addressed to the lienholders." |
| 11:02:05 | 19 | What did you mean by that? |
| 11:02:07 | 20 | A.   That he would need to contact both the State of |
| | 21 | California and/or the IRS. |
| 11:02:14 | 22 | Q.   Weren't you really saying to Mr. Yourke to quit |
| | 23 | calling Experian, quit bothering us about this? |
| 11:02:22 | 24 | A.   I think that we did all that we could.  There |
| | 25 | was nothing further that we could do for him. |

11:02:40  1        Q.   Now, after this letter was sent -- this is

2    Exhibit 35 I'm referring to, April 3rd, 2006 -- do you

3    recall any further dealings with Mr. Yourke's claim, you

4    personally?

11:02:58  5        A.   No, not me personally.

11:02:58  6        Q.   Do you see any indication in the D/R log that

7    you did anything with respect to Mr. Yourke's claim

8    after this date, April 3rd of '06?

11:03:09  9        A.   Me personally?

11:03:10 10        Q.   Yeah, you personally.

11:03:12 11        A.   No.

11:03:13 12        Q.   Okay.  Let me ask you a more general question.

13   Now, Experian has a manual or -- that pertains to

14   operating procedures, do you not, that applies to your

15   particular part of Experian?

11:04:19 16        A.   There's no manual specific to my department.

11:04:26 17        Q.   Well, but is there a manual that applies to

18   dispute resolution?

11:04:31 19        A.   It's an on-line manual.  It's not a physical

20   manual.

11:04:34 21        Q.   Okay.  What do you call it?

11:04:37 22        A.   On-line dispute manual.

11:04:41 23        Q.   All right.  Is there anything in that manual

24   that talks about disputes concerning tax liens?

1  04:49 25        A.   Yes.

11:04:52   1     *Q.*   And what's the gist of it?   What's it say?

11:05:01   2     *A.*   Consumer sends a dispute, review the consumer's

3   dispute, submit a dispute based on the review of the

4   documents, either updating internally or sending it out

5   through a CDV process, depending on what was received

6   from the consumer.

11:05:32   7     *Q.*   Does anything in the manual discuss the matter

8   of whether Experian agents should call tax authorities

9   directly --

11:05:42   10     *A.*   No.

11:05:42   11     *Q.*   -- under a tax lien?

11:05:49   12        Nothing?

1  05:49   13     *A.*   Nothing.

11:05:50   14     *Q.*   In other just -- have you ever handled or

15   worked on disputes for other consumers involving tax

16   liens?

11:06:00   17     *A.*   I don't recall.

11:06:10   18     *Q.*   Is there any policy or procedure restricting

19   the ability of Experian agents to call tax authorities

20   directly to ask about taxpayers' tax liens?

11:06:25   21     *MR. NICOL:*   Objection.   This is getting

22   into the sort of information we're going to be

23   discussing tomorrow that you noticed for the 30(b)(6)

24   depos.

1  06:34   25     *MR. ANDERSON:*   Well, that's not a proper

1  objection in my book.

11:06:38  2      Q.   (By Mr. Anderson)  But if you know, you can

3  answer.

11:06:41  4      A.   There is nothing that would restrict an agent

5  besides, you know, just the policies that's listed in

6  the book, and that's not part of the policy.

11:06:53  7      Q.   All right.

11:06:54  8      A.   But the policy does not say that you can't do

9  that.

11:07:05  10     Q.   I'd hate to have to call IRS myself, but -- try

11  and get through to somebody.

11:07:21  12          One of the documents produced in this case

13  is -- I'll just show you -- is a glossary of codes.  I'm

14  not going to go into great detail here.  It says

15  prescreen, slash, quest, glossary of codes.

11:07:39  16          What's that mean, quest, trademark?

11:07:42  17     A.   I don't know.

11:07:44  18     Q.   Do you have a name for the computer system you

19  use day to day?

11:07:49  20     A.   CAPS.

11:07:51  21     Q.   CAPS, C-A-P-S?

11:07:53  22     A.   Yes, sir.

11:07:53  23     Q.   And how long has that particular system been in

24  place?

1  07:58  25     A.   I don't know.

| | | |
|---|---|---|
| 11:07:59 | 1 | Q.   As long as you've been at Experian? |
| 11:08:02 | 2 | A.   Yes, sir. |
| 11:08:02 | 3 | Q.   And under these codes there's -- it says |
| | 4 | version seven code, version six. |
| 11:08:11 | 5 | Do you know what the difference would be |
| | 6 | or what that refers to? |
| 11:08:16 | 7 | A.   No, sir. |
| 11:08:50 | 8 | Q.   Now, one of the letters Mr. Yourke wrote to |
| | 9 | Experian -- in fact, it's Exhibit 23A -- is date -- |
| | 10 | is -- that's a letter addressed to you. |
| 11:09:20 | 11 | Do you recall reading this at or about the |
| | 12 | time it was received? |
| 1  09:30 | 13 | A.   I'm sure I reviewed it, but I don't recall. |
| 11:09:39 | 14 | Q.   Was this something you would have referred to |
| | 15 | Ms. Higginbotham? |
| 11:09:44 | 16 | A.   That's correct. |
| 11:09:55 | 17 | Q.   And then somewhere in that stack is there a |
| | 18 | letter dated March 23rd, '06 to Mr. Yourke from you |
| | 19 | [sic]. |
| 11:10:58 | 20 | A.   Not if these are in chronological order. |
| 11:11:12 | 21 | Q.   Well, I'll just have this marked next in order |
| | 22 | if you can't find it. |
| 11:11:27 | 23 | A.   I don't believe so.  It's not here. |
| 11:11:34 | 24 | Q.   Well, I've got this three-page document Bates |
| | 25 | stamped 44, 45, and then I've got number 56 on there and |

1  I'm not certain that should be.

11:11:47  2          MR. ANDERSON:  Does that match yours,

3  Jonathon?

11:11:52  4          MR. NICOL:  Let's see that.

11:11:53  5          MR. ANDERSON:  Before we mark them let's

6  get it straight.

11:11:58  7          MR. NICOL:  Yeah, this should be something

8  else.  Yeah, it should go up to 56.  Should be 44 to 56.

11:12:14  9          MR. ANDERSON:  Well, once again, I've --

11:12:18  10          MR. NICOL:  It's all the attachments.

11:12:22  11          MR. ANDERSON:   -- messed it up.  Can I

12  bother you to copy those the right way again?  I'm

13  sorry.

11:12:34  14          MS. ANDREW:  Sure.  Can we go off the

15  record?

11:12:40  16          MR. ANDERSON:  Yeah.

17          (Recess taken from 11:12  to 11:14)

11:14:48  18          MR. ANDERSON:  Okay.  Back on the record.

11:14:49  19          What number are we up to?

11:14:54  20          THE WITNESS:  38.

21          (Exhibit 38 marked)

11:14:54  22    Q.  (By Mr. Anderson)  Okay.  The court reporter

23  has marked a letter dated March 23rd, '06, addressed to

24  you, Exhibit 38, Bates stamps 44 through 56.

1  15:08  25          Does this appear to be a letter that

1   Mr. Yourke sent to Experian addressed to you on or about

2   March 23rd?

11:15:16   3       A.    That's correct.

11:15:16   4       Q.    And there is a stamp in the upper right that

5   says Consumer Affairs Special Services.  It's got a date

6   March 27th, '06.

11:15:24   7             That indicates, does it not, that's the

8   date it was received in your department?

11:15:30   9       A.    That's correct.

11:15:30   10      Q.    Did you read this letter at the time it came

11  in?

11:15:35   12      A.    I did read the letter.  I don't know if it was

13  on March 27th.

11:15:41   14      Q.    Well, fair enough.

11:15:43   15             Whenever -- on or about the date it came

16  in you read it?

11:15:47   17      A.    Yes, I did.

11:15:52   18      Q.    So you considered that letter and its

19  attachments before writing your letter back to

20  Mr. Yourke on April 3rd, correct?

11:16:04   21      A.    Correct.

11:16:25   22      Q.    Let me ask you sort of a general question

23  involving Mr. Yourke's claim.

11:16:31   24             Who within Experian was sort of the final

25  decision-maker on how to report on these tax liens that

1    Mr. Yourke had incurred?

11:16:42    2        A.    Well, Ms. Higginbotham used the documents that

3    she received to make that decision with the assistance

4    of our legal department.

11:16:51    5        Q.    Well, that's what I'm getting at.

11:16:54    6              Was it really the legal department that

7    ultimately said this is the way it should be reported?

11:17:06    8        A.    I think it was a joint decision with their

9    direction.

11:17:18    10        Q.    I want to check and make sure I asked you about

11    each letter that you received or -- let me ask you this.

11:17:28    12              Are there any letters from Mr. Yourke that

13    you received we haven't talked about?

11:17:34    14        A.    To my knowledge, he only mailed me two letters

15    personally and one to my boss, and those were the ones

16    that I intercepted.

11:17:47    17        Q.    Okay.  And to your boss, Carolyn Helm?

11:17:48    18        A.    That's correct.

11:17:50    19        Q.    And I've asked you about both letters to you,

20    correct?

11:17:54    21        A.    You did.

11:17:54    22        Q.    And also the one to Carolyn Helm?

11:17:57    23        A.    You did.

11:17:58    24        Q.    Okay.  And then you wrote one letter back

25    April 3rd, '06, and that was basically the end of your

1    involvement with this Yourke matter at least until this

2    lawsuit popped up, right?

11:18:12  3        A.    Correct.

11:18:14  4             MR. ANDERSON:  I don't need anything

5    further.

11:18:15  6             MR. NICOL:  Okay.

11:18:22  7             THE WITNESS:  Thanks, Mark.

8             (Proceedings concluded at 11:18 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    **CHANGES AND SIGNATURE**

2    WITNESS NAME:  CRISTEN RANSOM

3    DATE OF DEPOSITION:  FEBRUARY 13, 2007

4    <u>PAGE</u>          <u>LINE</u>        <u>CHANGE</u>              <u>REASON</u>

5    _____

6    _____

7    _____

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   _____

24   _____

25   _____

STEVE GENTRY & ASSOCIATES, INC.   (214)  321-5333
2379 GUS THOMASSON ROAD, SUITE 100, MESQUITE, TX 75150

1     I, CRISTEN RANSOM, have read the foregoing

2 deposition and hereby affix my signature that same is

3 true and correct, except as noted above.

4

5                                    _____

6                                    CRISTEN RANSOM

7

8 THE STATE OF _____)

9 COUNTY OF _____)

10

11     Before me, _____, on

12 this day personally appeared CRISTEN RANSOM, known to me

13 or proved to me on the oath of _____ or

14 through _____ (description of

15 identity card or other document) to be the person whose

16 name is subscribed to the foregoing instrument and

17 acknowledged to me that he/she executed the same for the

18 purpose and consideration therein expressed.

19     Given under my hand and seal of office on this

20 _____ day of _____, 20_____.

21

22                                    _____

23                                    NOTARY PUBLIC IN AND FOR

24                                    THE STATE OF _____

25 My Commission Expires: _____

1    STATE OF TEXAS      )

2    COUNTY OF DALLAS    )

3

4           I, Susie Miller, Certified Court Reporter, duly

5    qualified in and for the State of Texas, do hereby

6    certify that, pursuant to the stipulations hereinbefore

7    set forth, there came before me, CRISTEN RANSOM, who was

8    by me duly sworn to testify the truth, the whole truth

9    and nothing but the truth of their knowledge concerning

10   the matters in controversy in this case; and that they

11   were thereupon carefully examined upon their oath and

12   their examination reduced to typewriting by me or under

13   my supervision; that the deposition is a true record of

14   the testimony given by the witness, same to be sworn to

15   and subscribed by said witness before any Notary Public,

16   pursuant to the stipulations of the parties.

17

18          I further certify that I am neither attorney

19   nor counsel for, nor related to or employed by any of

20   the parties to the action in which this deposition is

21   taken, and further that I am not a relative or employee

22   or any attorney or counsel employed by the parties

23   hereto or financially interested in the action.

24

25          In witness whereof, I have hereunto set my hand

1  and affixed my seal this ____2nd_____ day of

2

3  ___March_____, 20 07.

4

5

6  _____

7  Susie Miller, Texas CSR No. 5033
   Expiration date:  12/31/07

8  Firm Registration No. 195
   Steve Gentry & Associates, Inc.

9  2379 Gus Thomasson Road, Suite 100
   Mesquite, Texas  75150

10  Telephone Number:  (214) 321-5333

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25